# Exhibit I

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration
Between

MICHAEL GIRO

Claimant,

v.

DST SYSTEMS, INC., ET AL.,

AAA No. 01-19-0001-9428
**Oral Argument Requested**

## CLAIMANT'S APPLICATION FOR ATTORNEY'S FEES AND COSTS

Claimant MICHAEL GIRO, through his undersigned counsel, respectfully asks the Arbitrator to award $126,515.36 in attorney's fees and $16,987.10 in costs. The affidavits supporting this request are attached as Exhibits 1-4. Exhibit 5 is a summary of the fees and costs contained in the affidavits. Exhibit 6 is an affidavit from lead counsel Kenneth McClain attesting to the reasonableness of the hourly rates being claimed and number of hours spent on this case. Exhibit 7 is a similar affidavit from co-counsel Ted Kapke. Finally, Exhibit 8 is an expert affidavit from the Honorable Ronald R. Holliger in support of the reasonableness of the requested fee. In further support, Claimant states the following. Claimant also requests a hearing on the matter.

## I.   INTRODUCTION

Now that Claimant has prevailed, his counsel is choosing not to collect any fee from his portion of the award. Instead, Claimant's counsel is asking the Arbitrator to award reasonable attorney fees. And Claimant's counsel has also agreed to never collect more than 100% of the time spent on these cases. For instance, Claimant's counsel has spent a total of 10,667.16 hours on

matters specifically advancing his case, as well as all other claims, for a total of $7,670,460.00. Once this amount is awarded and paid in full, Claimant's counsel will not collect any more fees for this time.

Claimant's counsel is agreeing to not collect fees out of the client's award and not to collect more than 100% of the time spent because it is a fair way to approach this unique situation. Claimant's counsel filed a class action in 2017 on behalf of all plan participants. DST refused to allow it to proceed, choosing to enforce the individual arbitration agreements. These claims should be settled by this point—DST is losing 85% of them—but DST refuses to engage in settlement talks and seeks to force Claimant's counsel to try every single claim. DST also refuses to entertain discussions about a reasonable way to approach attorney fees. Absent input from DST, Claimant's counsel has decided to apply for attorney fees for the reasonable hours spent specifically on Mr. Giro's claim (20.35), and a reasonable number of the Group Time hours (106.67). All with the condition that they will never collect more than 100% of any time incurred, even if awarded. This is a fair way to ensure Claimant's counsel is compensated as ERISA intends, while avoiding any double recovery.

ERISA allows the prevailing plaintiff to recover attorney fees because doing so fulfills its purpose of protecting the retirement savings of Americans. This fee shifting provision is especially important in situations like this one where the plan's fiduciary implemented an individual arbitration agreement and then enforced it to dismiss the class action Claimant's counsel brought in 2017. Given the risks and costs involved, it is unworkable to pursue most cases individually on a contingency fee basis. Without ERISA's fee shifting provision allowing counsel to forgo their contingency fee from the client in favor of being compensated for the actual time spent pursuing a successful claim, the arbitration agreement would prevent the vast majority of plan participants

from pursuing claims to recover their losses. Claimant's counsel prevailed on Mr. Giro's behalf and now decides to allow him to keep the entire amount of his award and to ask the Arbitrator to award reasonable attorney fees under ERISA.

And the amount being sought is reasonable, when one steps back and looks at the big picture. First, the number of hours spent on Mr. Giro's claim is reasonable. This was a complex ERISA case requiring years of discovery to prepare for a hearing. DST produced over one hundred thousand documents. Together, the two sides hired five expert witnesses. Given all this, it is more than reasonable for Claimant's counsel to have spent only 127.02 hours—less than one month's worth of time for a single attorney—on Mr. Giro's claim. This number of hours comes from adding together two different categories of time: Time spent on matters specific to bringing Mr. Giro's claim to a hearing (20.35); and 1% of the Group Time (106.67), which benefited all arbitrations equally. These amounts are reasonable, and Claimant's counsel should be compensated for this time spent on this case.

Claimant's counsel's hourly rates are also reasonable. Courts within the Eighth Circuit have approved rates ranging from $998 per hour to $460 per hour for Missouri ERISA attorneys. The attorneys from Paul Weiss working on this case have hourly rates beginning at over $700 per hour and ending above $1,200 per hour. And the Shook Hardy attorneys' hourly rates range from approximately $450 per hour to approximately $900 per hour. Claimant's counsel's hourly rates of $400 per hour to $950 per hour are reasonable.

Combining these reasonable number of hours with these reasonable hourly rates, Claimant's counsel has generated the following fees pursuing this claim:

| | |
|---|---|
| Total Specific Time: | $11,990.00 |
| 1% percent of total Group Time: | $76,704.60 |
| Total lodestar amount: | $88,694.60 |

This is a reasonable amount of fees to generate in preparing and presenting this case from beginning to end. Claimant's counsel also incurred $37,820.76 in reasonable out of pocket expenses of the kind generally passed along to the client and recoverable as attorney fees. DST has not been disputing these expenses, nor have they been disputing Claimant counsel's statutory costs, which for this claim are $16,987.10.

And yet, DST is going to ask the Arbitrator to refuse to award any attorney fees, in violation of ERISA. Relying on non-ERISA cases, DST will ask the Arbitrator to punish Claimant's counsel for succeeding in this claim because, DST will argue, the hours and fees necessary to do so rendered this claim unworthy of being pursued. According to DST, Claimant's counsel should have given up pursuing all but the largest of these claims once DST enforced the arbitration agreement to have the earlier class action dismissed. And should the Arbitrator follow ERISA and awards attorney fees, DST will seek to enforce the contingency fee agreement it is not a party to, despite the clear law that Claimant's counsel is not limited to this agreement. The fee agreement protects our client, Mr. Giro, from ever paying more than 40% of his recovery in fees. As the agreement allows, Claimant's counsel is choosing not to collect any fee from any damages the Arbitrator awarded. DST is not a third-party beneficiary to this contract; it cannot force Claimant's counsel to accept a contingency fee well below the value of the time spent successfully pursuing this claim.

4

Claimant's counsel's fee request is fair given the rates courts approve for skilled ERISA attorneys and the number of hours required by DST's energetic defense. Rather than racking up unnecessary hours, Claimant's counsel simply put in the work required by DST's scorched-earth tactics. And these long hours are paying off for our clients—85% of the awards are being entered in their favor. And yet, DST continues to appeal every award and continues to refuse to discuss a settlement. It still hopes to wear Claimant's counsel down by sticking them with fee awards so low that these cases become unworkable, even with such a high success rate. Heads DST wins, tails Claimant's counsel loses. This is not fair to Claimant's counsel and it is not fair to claimants. It also violates ERISA which provides for fee-shifting because the retirement savings of American workers is too important to allow the stronger party to deny recovery by wearing down the weaker party. Claimant has prevailed, and his request for a reasonable amount of attorney fees should be granted.

## II.    LEGAL AUTHORITY AND ARGUMENT

### A.  The Arbitrator is an expert on attorney fees and familiar with the issues and counsel in this case; he has a wide discretion to award any amount his deems appropriate

The Eighth Circuit affords courts wide discretion to determine whatever amount of attorney's fees is appropriate. Unless it is clear the court abused this discretion, any amount of attorney's fees may be awarded. "The amount of an award of attorneys' fees rests within the sound discretion of the court and we will not disturb it absent clear abuse of that discretion." *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009) (citing *Walton Gen. Contractors, Inc./Malco Steel, Inc. v. Chicago Forming, Inc.,* 111 F.3d 1376, 1385 (8th Cir.1997)). The court presiding over the case is afforded this broad discretion because it "knows all the case's issues" and "is an expert on the question of attorney fees." *In re Alcolac, Inc. Litigation,* 945 S.W.2d 459, 461 (Mo. App. W.D. 1997) (citing *Roberts v. M c Nary,* 636 S.W.2d 332, 338 (Mo.

banc 1982) (overturned on other grounds)). *See also Berry v. Volkswagen Group of America, Inc.* 397 S.W.3d 425, 430 (Mo. App. W.D. 2013) ("The trial court is deemed an expert at fashioning an award of attorney's fees and may do so at its discretion."). The Arbitrator knows the case, he is familiar with the attorneys and the work performed, and may award any amount of attorney's fees in his discretion.

### B. Anytime a plaintiff in an ERISA claim shows just some degree of success on the merits, attorney's fees are warranted.

ERISA allows courts in their discretion to "allow a reasonable attorney's fees and costs of action to either party." 29 U.S.C.A. § 1132. The Supreme Court explains this does not require the Claimant to prevail, only that he shows "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245, 130 S. Ct. 2149, 2152, 176 L. Ed. 2d 998 (2010) (quoting *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)). In order to meet this requirement, a litigant must only show something beyond a "trivial" success or "procedural victory." *Id.* Now that he has prevailed in entirety, Mr. Giro is entitled to attorney fees.

### C. The Eighth Circuit holds a prevailing claimant in an ERISA claim should be denied attorney's fees in only the rarest of circumstances.

"[A]lthough there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees." *Starr v. Metro Sys. Inc*., 461 F.3d 1036, 1041 (8th Cir. 2006). The reason a prevailing plaintiff almost always receives fees is that ERISA is liberally construed to protect employees' retirement savings by securing their ability to litigate their claims:

> ERISA is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans. A district court considering a motion for attorney's fees under ERISA should therefore apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts.

*Id.,* (quoting *Welsh v. Burlington N., Inc., Employee Benefits Plan,* 54 F.3d 1331, 1342 (8th Cir.1995)).

There are five factors a court should consider when determining if the case before it is the rare ERISA case that does not warrant an award of fees:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984). Not all of these factors need to weigh in favor of the prevailing plaintiff to require an award of attorney's fees. For instance, in *Starr*, the Eighth Circuit held it was an abuse of discretion to deny attorney's fees even though the first and fourth factors were not met. *Starr*, 461 F.3d at 1041.

Here, all five factors are met. First, DST acted in bad faith. In his deposition, Mr. Lavin repeatedly insisted he was never a fiduciary. In fact, the Advisory Committee had to be told by the CEO to do something about the Valeant position, and even then it ignored his July order requiring a plan and a timeline to rebalance out of Valeant, gave Mr. Goldfarb unlimited discretion, and failed to monitor whether or not he was selling any shares of Valeant in response to their August letter to him. This reckless disregard for its ERISA fiduciary duty allowed 45% of the Plan to remain invested in Valeant for far too long, and well after the Advisory Committee recognized the risks of being over-concentrated in Valeant outweigh any benefits. DST also acted in bad faith in this litigation, first enforcing the arbitration agreement in federal court three years ago and now trying to wipe out each and every arbitration result by supporting a mandatory class action in New York. In fact, DST is refusing to settle these claims and instead is appealing everyone because it

7

is trying to drag these out as long as possible with the hopes of undoing all the progress made in arbitration by forcing the arbitration claimants into a mandatory class-wide settlement for far less than they are being awarded in arbitration. DST's hands are not clean.

Second, DST has the ability to pay, there is no doubt of this. Third, an award of attorney's fees will also deter DST from failing to monitor their employees' (including Mr. Giro's) retirement accounts in the future. Fourth, counsel seeking attorney's fees seeks to benefit not just the 500 plan participants they represent, but all plan participants. The 85% success rate they are having in these cases should help all plan participants who seek full compensation for their losses, whether via collateral estoppel, issue preclusion, or by other means. And fifth and finally, the merits are overwhelmingly on claimant's side (as evidenced by Mr. Giro prevailing via summary judgment). Mr. Giro's is not the rare case where the prevailing plaintiff can be denied attorney's fees.

### D. The Eighth Circuit approves using the "lodestar" method to determine the amount of attorney's fees in ERISA actions; this method begins by multiplying a reasonable rate with a reasonable number of hours.

The Eighth Circuit approves using the "lodestar" method to determine reasonable attorney fees in ERISA cases. *See Brown v. Aventis Pharm., Inc.,* 341 F.3d 822, 829 (8th Cir. 2003), *see also Local 513, Int'l Union Operating Engineers v. Larry Ortmann Contracting, Inc*., No. 4:08-CV-1177 CAS, 2009 WL 151698, at *2 (E.D. Mo. Jan. 22, 2009) ("The Eighth Circuit has affirmed this Court's use of the lodestar approach to determining an attorney's fee award in an ERISA withdrawal liability case.") The lodestar is determined by the number of hours reasonably expended multiplied by a reasonable hourly rate. *Fish v. St. Cloud State Univ*., 295 F.3d 849, 851 (8th Cir. 2002).

### i. The twelve factors to consider when determining a reasonable loadstar.

There are twelve "legitimate factors" which courts in the Eighth Circuit should consider "in some if not most cases" when determining whether a proposed lodestar amount is reasonable. *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 931 (8th Cir. 1984) (citing *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1117 (9th Cir. 1979)). These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Seymour*, 605 F.2d at 1117.

Here, an analysis of these factors confirms the requested fee is reasonable.

### 1. The time and labor required.

The time and labor this case required was tremendous. It required four law firms to represent Mr. Giro. Each law firm dedicated at least two lawyers to these matters, many of whom have been working almost exclusively on these cases. Attached as Exhibits 1-4, 6, and 7, are affidavits from lead counsel for each one of the four law firms. As the affidavits show, many thousands of hours were required to prepare these arbitrations for adjudication on the merits. Claimant's counsel had to build the case from scratch, starting with the more than one hundred thousand documents DST produced. These documents did not come with a road map[1]. Counsel had to master the contents of these documents before they could begin taking depositions or having

---

[1]Quite the opposite, DST's counsel forced Claimant's counsel to navigate these documents twice. Upon prevailing in their motion to dismiss the class action, DST demanded Claimant's counsel return all documents. DST then shuffled these documents and affixed different Bates Numbers before re-producing them in these arbitrations. All this did was create more work for Claimant's counsel, work that is rightfully reflected in the Group Time.

9

intelligent conversations with expert witnesses. Once they spent the thousands of hours necessary to understand these documents, counsel could begin the long process of preparing their case for adjudication on the merits by consulting with experts, deposing the fact witnesses, producing their expert witnesses, and deposing DST's expert witnesses. Only when they had completed all this discovery, could they prepare Mr. Giro's motion for summary judgment.

All of the hours spent on these tasks were necessary to prepare not just Mr. Giro's claim, but the claims of all other claimants, for adjudication on the merits. On top of this, Claimant's Counsel spent time on matters specific to each claimants' case. In Mr. Giro's case, this included work such as communicating directly with him, conference calls with the Arbitrator, preparing the scheduling order, preparing the briefs, etc. In total, claimant's counsel spent 10,905.61 hours on work that benefited Mr. Giro's claim. Of this time, 10,667.16 hours were spent on work necessary to bring his case, and all other cases, to hearing ("Group Hours"). On top of the Group Hours, 31.25 hours were dedicated specifically and solely to advancing Mr. Giro's case (phone calls with him, conference calls with the Arbitrator, preparing the scheduling order, preparing the briefs, etc.).

### 2. The novelty and difficulty of the questions presented.

"ERISA is a complex field that involves difficult and novel legal theories and often leads to lengthy litigation." *Krueger v. Ameriprise Fin., Inc*., No. 11-CV-02781 SRN/JSM, 2015 WL 4246879, at *1 (D. Minn. July 13, 2015). One of the complexities specific to this case is that DST attempted to invoke ERISA's "safe harbor" defense. DST claimed it delegated its fiduciary duties to Ruane, and therefore could not be held liable for the losses in Mr. Giro's account.

Of course, it is not true that this section of ERISA relieves DST from liability in this case. DST was always a fiduciary and therefore always had a continuing duty to monitor. But

nonetheless, because of DST's "safe harbor" defense, Mr. Giro could not be confident that he could simply rely on the joint and several liability found in 29 U.S.C. § 1105(a). And so, he endeavored to also prove his case on the grounds that "[t]he duty to monitor also includes a duty to take action upon discovery that appointed fiduciaries are not performing properly." *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010) (quotation omitted).

By pouring through the tens of thousands of documents produced, taking depositions, and retaining experts, Claimant's counsel was able to mount a compelling case against DST for failing to act despite knowing Ruane was not performing properly. The evidence Claimant's counsel compiled and presented was overwhelming, and Mr. Giro prevailed via summary judgment. But still, DST's "safe harbor" defense made an already complex area of law even more complex.

### 3. The skill requisite to perform the legal services properly.

As mentioned above, ERISA is a complex field involving difficult issues and lengthy litigation. *Krueger*, at *1, *see also In re AOL Time Warner ERISA Litig.*, No. 02 CIV. 8853 SWK, 2006 WL 2789862, at *8 (S.D.N.Y. Sept. 27, 2006) ("The substantive risks faced in this litigation are compounded by the fact that ERISA claims are rarely decided on their merits at trial, thus ERISA litigation boasts few successful precedents"). Add to all of this complexity the need to manage hundreds of arbitrations while DST took varying and inconsistent positions to prevent them from ever seeing a hearing and it becomes clear the skill claimant's counsel needed to overcome these hurdles and present this case was exceptionally high.

In the beginning, DST enforced the arbitration agreements and compelled their employees to resolve these claims via individual arbitrations. When Claimant's counsel filed a class action in January 2017, DST moved to compel arbitrations, arguing that "because all of Mr. Giro's claims are subject to arbitration, and pursuant to Federal Rule of Civil Procedure 12(b)(6) this Court

should dismiss the Amended Complaint with prejudice." *See DuCharme v. DST Systems Inc.,* Case No. 17-cv-00022-BCW, ECF No. 27. DST argued its class action waiver was binding and enforceable and "Mr. DuCharme or any other party to the Arbitration Agreement" was free to "arbitrat[e] a breach of fiduciary duty claim in connection with purported losses to their individual accounts." *DuCharme,* ECF No. 47. The court agreed and held the class action waiver prevented Mr. DuCharme from acting in a representative capacity on behalf of a class or collective action. *DuCharme,* ECF No. 57. As for his individual claims, the Court held "to the extent DuCharme alleges a § 502(a)(2) [claim] as an individual," his claims are arbitrable. *Id.*

And so, Claimant's counsel began filing individual arbitrations—hundreds of them. Hence, not only did Claimant's counsel need to prepare Mr. Giro's case for hearing by seeking written discovery, reviewing documents, taking deposition, and hiring expert witnesses, but they needed to do all of this while also scheduling and pursuing hundreds of other arbitrations. There can be no doubt successfully navigating so many arbitrations demands extremely skilled counsel.

And the demands on Claimant's counsel grew when, just as the arbitrations were set to be heard, DST contradicted its prior position and sought to escape the arbitration agreements. It argued in the Southern District of New York that a mandatory class action was the only way to resolve these disputes. DST also moved to stay these arbitrations, first in court and when that failed in each arbitration individually as the hearing date approached. Claimant's counsel were forced to prepare for hundreds of arbitrations, oppose a mandatory class action, and oppose motions to stay. On top of all of this, DST began lobbing personal attacks on counsel's integrity, all in an effort to have them disqualified and put a halt to the arbitrations. In fact, it was not until recently that the court in New York finally denied DST's motion to disqualify Claimant's counsel in these arbitrations. The time spent defending DST's motion to disqualify and opposing the mandatory

class action are included in Group Time because it was time spent necessary to advance these arbitrations. If Claimant's counsel lost either one, these arbitrations would not proceed.

Recently, Arbitrator Vering entered an award of attorney's fees and held the skill Claimant's Counsel displayed was some of the best lawyering he has seen in over 40 years of practice in the Kansas City area:

> The Arbitrator finds that Claimant's counsel displayed a very high level of skill in handling the claims of Mr. Payne while pursuing over 490 other arbitrations and fending off other litigation designed to prevent Mr. Payne and other plan participants from recovering anything in arbitration proceedings. The legal skill, dedication and hard work displayed by Claimant's counsel in this arbitration is some of the best lawyering this Arbitrator has seen in over 40 years of practice in the Kansas City area.

Exhibit 9, p. 15.

It was this very high level of skill that allowed Claimant's counsel to overcome everything DST's lawyers threw at them and secure a timely victory by proving DST's fiduciary breaches caused Mr. Giro's loss. Given all of this, the skill required to achieve a victory for Mr. Giro cannot be overstated.

**4. The preclusion of employment by the attorney due to acceptance of the case.**

Several of Mr. Giro's attorneys have worked on little else but these DST arbitrations over the past few years. For example, the Klamann Law Firm consists of one employee and two attorneys, John M. Klamann and Andrew Schermerhorn. Combined, these two attorneys have spent over 3,300 hours on matters that either benefited the arbitration group as a whole, or specifically Mr. Giro. They have been working non-stop on these cases, to the exclusion of all other matters, for the past year and a half. Likewise, Kapke and Willerth has only four attorneys yet has spent over 2,000 hours on these arbitrations. His firm has had to pass on other matters so it could dedicate the time needed to these claims. William Carr has spent almost 1,000 hours and

has had to assign multiple tasks in other cases to other attorneys in his office. Since the beginning of this litigation, his firm (which has only six attorneys) has needed to carefully plan its caseload to ensure it could dedicate sufficient time and resources to these arbitrations. Finally, Ms. Pierce has spent almost 2,500 hours that have either directly or indirectly benefited Mr. Giro's claim. She, too, has had little time to spend on any other matter. Claimant's Counsel has passed-up employment opportunities in order to pursue Mr. Giro's and his co-workers' claims for the past four years. They should be compensated for the time they've spent at the expense of pursuing other matters.

But, of course, it's not just an attorney's time that determines whether or not she can take on a case. Cases cost money to litigate. Especially cases needing expert witnesses like this one. In order to make a submissible case, Claimant's counsel needed to hire three expert witnesses, Ms. Wagner, Mr. Marin, and Dr. May. Marcia Wagner was Claimant's ERISA expert. She has thirty years' experience advising clients on ERISA matters, including advisory committees much like the one in this case. Her testimony was an invaluable piece of Claimant's evidence. So too was the testimony from Mr. Marin. As someone with extensive investment experience, he was able to explain from a practical point of view why the committee needed to act to first cap the amount of Valeant stock the Plan held and then to completely divest in the fall of 2015. It was just too risky a stock to be in an ERISA account. Finally, Claimant could not succeed without someone to calculate his damages. Dr. May's testimony and reports were therefore the final crucial piece to his claim. Without any of these experts, Claimant would not have prevailed. Understandably, given their credentials and experience, these experts are not cheap. Altogether, these experts have charged approximately One Million Dollars for work done in these arbitrations. That number continues to rise as these claims continue to advance, each one requiring its own expert report from

each expert. The costs of pursuing Mr. Giro's and others' arbitrations also prevented Claimant's counsel from taking on other matters.

There is a risk that Claimant's counsel will not receive complete reimbursement for the funds spent on our experts. Claimant's counsel will never get back the time spent on this case. Claimant's counsel ought to be compensated for their fees and costs.

### 5. The customary fee.

The requested fee is much smaller than fees customarily granted by Eighth Circuit courts in ERISA cases. *See Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781 SRN/JSM, 2015 WL 4246879, at *4 (D. Minn. July 13, 2015) (approving $9,166,666 in fees and $782,209.69 in costs in an ERISA case); *Tussey v. ABB, Inc.*, No. 06-CV-04305-NKL, 2019 WL 3859763, at *6 (W.D. Mo. Aug. 16, 2019) (Approving $18,331,500 in fees and $2,256,805 in costs in an ERISA case); and *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1004 (D. Minn. 2005) (awarding $20,000,000.00 in fees and $481,422.94 in expenses in an ERISA case).

The requested hourly rates also compare favorably with the customary fees of other attorneys in ERISA matters, not just the Eighth Circuit but in Missouri as well. In 2016, the Southern District of Illinois held hourly rates for St. Louis attorneys in an ERISA case ranging from $998 - $460/hr. were reasonable:

> [T]his Court finds that the reasonable hourly rate for Class Counsel's services at this time are as follows: for attorneys with at least 25 years of experience, $998 per hour; for attorneys with 15–24 years of experience, $850 per hour; for attorneys with 5–14 years of experience, $612 per hour; for attorneys with 2–4 years of experience, $460 per hour; for Paralegals and Law Clerks, $309 per hour; for Legal Assistants, $190 per hour.

*Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016). Similar hourly rates were recognized in 2009 as reasonable by the Circuit Court for the 22nd Circuit of Missouri. "[F]or attorneys with 25 years or more experience, $800 per hour; for attorneys

with 15–24 years of experience, $625 per hour; 5–15 years of experience, $450 per hour; 2–4 years of experience, $325 per hour; and for professional support staff, $125 per hour." *Tussey v. ABB, Inc.,* No. 06-04305-CV-C-NKL, 2012 WL 5386033, at \*3 (W.D. Mo. Nov. 2, 2012), vacated and remanded, 746 F.3d 327 (8th Cir. 2014) (citing *Eshelman v. Client Services, Inc., et al*., No: 0822–cv–00763 (22d Cir.Mo. Dec. 7, 2009)).

In *Tussey,* the United States Federal Court for the Western District of Missouri held attorney's fees of $800 an hour were reasonable. *Tussey* 2012 WL 5386033, at \*3. The Eighth Circuit reversed on other grounds, but held the court did not err when it held such a rate is reasonable: "Although the hourly rate the district court applied for attorney work is generous and the resulting fee award substantial, we are unable to say the district court abused its discretion in determining the rate to use in calculating the award." *Tussey v. ABB, Inc*., 746 F.3d 327, 340–41 (8th Cir. 2014).

Another way to compare Claimant's counsel's hourly rates to the customary fee is to look at what defense counsel is charging. "Additionally, comparison of Plaintiffs' requested fees to the fees Defendants paid their attorneys may also be relevant to determining reasonableness. *Tussey*, 2012 WL 5386033 at \*4 (citing *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1220 (8th Cir.1981)). Claimant's counsel's fees pale in comparison to what DST's attorneys charge. DST is presented by lawyers from the law firm Paul, Weiss, Rifkind, Wharton & Garrison, LLP. These lawyers charge from over $700/hr. to over $1,400/hr. DST is also represented by Shook Hardy & Bacon, whose hourly rates range from approximately $450 per hour to approximately $900 per hour. When compared to fees customarily charged in other (and this) ERISA cases, Claimant's counsel's hourly rates are reasonable.

**6. Whether the fee is fixed or contingent.**

Claimant's counsel has a contingency agreement with their client, but it also allows counsel to forgo this fee and seek their attorney fees from the Arbitrator. The agreement does not require counsel to seek only the contingency fee from the Arbitrator. Claimant's counsel seeks a reasonable fee, based on the lodestar method. This method is the superior way to determining what is reasonable in cases where damages prove to be much smaller than the cost of pursuing the case, like this one. To hold otherwise would undermine ERISA's purpose of empowering employees to protect their retirement income from losses caused by fiduciaries.

Both the Eighth Circuit and the Supreme Court hold Claimant's counsel is not limited to the 40% contingency fee. In 1989 the Supreme Court held it is up to the district judge to "in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case. The trial judge should not be limited by the contractual fee agreement between plaintiff and counsel." *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S. Ct. 939, 946, 103 L. Ed. 2d 67 (1989). In 2010 the Eighth Circuit relied on *Blanchard* and confirmed "[t]he attorney's fees provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable." *Quigley v. Winter*, 598 F.3d 938, 956 (8th Cir. 2010).

**7. Time limitations imposed by the client or the circumstances.**

As explained above, the circumstances of DST first forcing Mr. Giro and hundreds of other claimants into individual arbitrations before changing its mind and trying to force them back into a mandatory class imposed severe time limitations on Claimant's counsel. Beyond DST's shenanigans, another circumstance limiting time is that under both AAA rules and the arbitration agreements themselves, the arbitration process is to be fast and efficient. Hence, in order to protect Mr. Giro's right to a timely resolution of his claim, Claimant's counsel was tasked with quickly

17

preparing for a hearing on a matter as complex and difficult as ERISA law. Despite these limitations, claimant's counsel secured a timely victory by proving DST caused loss to Mr. Giro's retirement account.

### 8. The amount involved and the results obtained.

The Supreme Court holds that when determining the proper amount of attorney's fees, along with the reasonable rate and reasonable hours spent the "extent of a plaintiff's success is a crucial factor." *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S. Ct. 1933, 1943, 76 L. Ed. 2d 40 (1983). Mr. Giro has completely prevailed by recovering the losses to his retirement account caused by DST, and his counsel should also be completely compensated.

As for the amount involved, courts in the Eighth Circuit and Missouri award attorney's fees in ERISA cases in amounts many times greater than what the plaintiff recovers. In 2004, the Eight Circuit upheld an award of nearly $80,000.00 in attorney's fees in an ERISA case with a $687.00 verdict. *Parke v. First Reliance Standard Life Ins. Co*., 368 F. 3d 999 (8th Cir. 2004). The Eight Circuit held it was within the discretion of the trial court to award such a fee because the trial court was in the best position to determine the reasons why such fees needed to be generated in the case: "The parties blame each other for the amount of time and resources expended in the lawsuit, and the district court was in the best position to evaluate the relative roles of the parties in extending the litigation." *Parke*, 368 F 3d at 1013. Likewise, in 2013 the Western District upheld the trial court's decision to award Attorney's fees in an amount equal to 49 times the damages awarded to the entire class. *Berry v. Volkswagen Group of America, Inc.,* 397 S.W.3d 425 (Mo. App. W.D. 2013). *See also Schultz v. Sw. Credit Sys., LP*, No. 16-CV-2033-LRR, 2018 WL 3398139, at *2 (N.D. Iowa July 12, 2018) ("In this case, Schultz was awarded attorney fees in an amount 66.8 times greater than the damages he was awarded.").

18

Courts are free to award attorney fees in amounts hundreds of times higher than the client's recovery because the Eighth Circuit rejects "a per se rule applied by some courts that the attorney's fees award should be limited" to the amount of damages recovered. *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.,* 623 F.2d 1255, 1274–75 (8th Cir. 1980). There, the Eighth Circuit explained the ratio between the fees requested and amount recovered should be examined so the court can be satisfied the prevailing party did not unnecessarily run up their legal bill on a relatively small case with the intent of sticking the other side with their fees: "A party is not entitled needlessly to accumulate exorbitant legal fees with the expectation that the losing party will be called upon to pick up the entire tab. This court will exercise vigilance and pare down needless and unconscionably high legal fees. An award of attorney's fees is compensatory, not punitive" *Id.* 1275 (citing *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 871 (8th Cir. 1977).

Here, Claimant's counsel is not guilty of accumulating unnecessary fees in pursuing Mr. Giro's claim. Quite the opposite, DST never offered to settle this case, and DST will almost certainly appeal. Rather than needlessly accumulating attorney's fees, Claimant's counsel has simply spent the time DST's litigation strategy of refusing to give an inch has demanded. DST bears the cost of this strategy, not Claimant.

### 9. The experience, reputation, and ability of the attorneys.

Humphrey, Farrington & McClain, P.C. is nationally recognized for its success in trying cases and since 1984 has over $1 Billion in verdicts across the country. Mr. McClain was the lead trial attorney on these cases. He is licensed both in the United States and Canada. In 2005, Missouri Lawyers Weekly honored him as the Attorney of the Year. It has since recognized him multiple times for having the Top Plaintiff's Verdict of the year. He has pioneered several areas of litigation

including against asbestos suppliers, the tobacco industry, and artificial butter flavoring manufacturers and suppliers in the microwave popcorn industry. He recently won a $60 million verdict in New York for a husband and wife business ownership team in a breach of contract case against HMS Holdings Corp., where he served as lead trial attorney on a team of attorneys, many of which are Claimant's Counsel in this matter. In his Final Award Regarding Application for Attorney's Fees and Costs, Arbitrator Vering noted that he "is familiar with the reputation of Mr. McClain who is regarded as one of the best plaintiff's attorneys in this region" and indeed has a national reputation. Ex. 9, p. 23.

The Klamann Law Firm is a boutique firm which takes on a variety of complex cases. It has been instrumental in the recovery of more than one-half billion dollars for Plaintiffs in a wide variety of complex litigation settings, including most recently a group of unprecedented recoveries for NFL players suffering from CTE. Mr. Klamann and Mr. Schermerhorn were both members of the team of attorneys that won the $60,000,000 verdict in New York, mentioned above. In his 42 years of practice, Mr. Klamann has been the responsible attorney for liability prosecution in an action which was settled for $83 million for approximately 500,000 victims in a "vanishing premium" insurance class action; he has been lead counsel in a joinder of 147 plaintiffs in 23 states in a federal action involving securities fraud; and he has been lead counsel for a bankruptcy committee representing more than 23,000 asbestos victims; he has authored three (3) Am Jur Trial articles on how to prepare and try complex civil cases. Mr. Klamann was the "Attorney of the Year" in U.S. News in 2014 in the field of employment litigation.

Kapke & Willerth LLC maintains a broad practice including the representation of multiple municipalities, corporations, large homeowner's associations and individuals. George E. ("Ted) Kapke Jr. is the past President of the Eastern Jackson County Bar Association. He has served as

lead trial counsel on seven jury trials that have been tried to verdict. These cases have ranged from employment discrimination matters to inverse condemnation claims including cases tried in the United States District Court of Kansas, Clay County and Jackson County, Missouri. He has tried dozens of bench trials and served as second chair counsel on numerous jury trials. In addition to his trial experience, he has served as first chair for three arbitrations tried to final decision and argued before the Missouri Court of Appeal for the Western District of Missouri on several occasions.

The law firm of White, Graham, Buckley & Carr has been in existence for over three decades and has successfully obtained tens of millions of dollars of verdicts for their clients, including several successful results in multi-plaintiff and Class Action representation. Recently the firms and its attorneys were selected in eighteen categories for Best Lawyers by US News and World Reports and five categories for Best Law Firms. Mr. Carr, a managing partner, has been a trial attorney for nearly thirty (30) years and has been the lead trial counsel in over fifty (50) jury trials in multiple states, including Missouri, Kansas, Nebraska and New York. He has obtained several verdicts well in excess of a million dollars, including being part of the team (made up of many of the same attorneys in this group) that secured a $60 million jury verdict in a commercial case in the Commercial Division of the Manhattan County Court in New York. He has also served as co-counsel in a number of multi-Plaintiff or Class Action claims, including several settled and approved by the Court recently in the Western District of Missouri.

**10. The "undesirability" of the case.**

DST certainly thought pursuing individual arbitrations would be undesirable. It first attempted to avoid responsibility by enforcing the arbitration agreements and compelling individual arbitrations, thinking that would put an end to matters. And given Mr. Giro suffered

approximately $31,000.00 in damages, one can see why DST would think individual arbitration would be undesirable, considering the amount of time and costs necessary to pursue his claim. But as undesirable as it may be, it is still an important claim. This is his retirement money—not DST's.

Beyond the amount at stake, ERISA cases are difficult, time-consuming cases that can end in failure. Claimant's Counsel should not be punished for taking an undesirable case by receiving less than a reasonable hourly rate or less than the hours they reasonably spent on the case. *See West v. Aetna Life Ins. Co.*, 188 F. Supp. 2d 1096, 1100 (N.D. Iowa 2002) ("The court will not create a 'disincentive' to counsel to take on a challenging case or to obtain the specialized knowledge of an unfamiliar area of the law that may be required in a particular case, such as this one under ERISA, by reducing the attorneys' fees, after the fact, on the ground that counsel spent too much time becoming adequately prepared to prosecute the case.")

Another idea of the "undesirability" of this case comes from a comparison of the risks with the costs. Mr. Giro needed to hire counsel able to navigate the complex and difficult world of ERISA law. He also needed counsel capable (and willing) of investing significant resources into the case. His claim also required testimony from three experts. Without such counsel or experts, Mr. Giro could not prevail. The costs are high and so were the risks. Fortunately, ERISA allows attorney's fees so that it can protect the retirement savings of all Americans, not just the wealthy.

**11. The nature and length of the professional relationship with the client.**

Claimant's counsel has represented Mr. Giro for over two years. We regularly update him, along with all our clients, on the status of his claim. He appreciates these updates and all the work we do on his behalf. When DST filed its motion to disqualify us as a litigation tactic, he signed a conflict waiver affirming he is happy with our representation of him and wants us to continue to

do so. His faith in us has been well-placed; we have secured a timely hearing wherein we presented the evidence of the losses that DST caused to his retirement account.

## 12. Awards in similar cases.

Again, in 2004, the Eight Circuit upheld an award of nearly $80,000.00 in attorney's fees in an ERISA case with a $687.00 verdict. *Parke v. First Reliance Standard Life Ins. Co*., 368 F. 3d 999 (8th Cir. 2004). As explained above, the amount requested and the hourly rates are well within the range of awards in ERISA cases in the Eighth Circuit. As far back as 2009, a Missouri state court held ERISA attorney's hourly rates of $800 - $325/hr. are reasonable. Last year, a federal court held reasonable rates for Missouri attorneys in an ERISA case ranged from $998 - $460/hr. These rates are still far below the rates DST's counsel charges. Claimant's counsel's requested rates of $400 - $950/hr. compare favorably and are well below what defense counsel charges. They are reasonable.

The total amount requested also compares favorably with ERISA cases throughout Missouri and the Eighth Circuit. The three cases cited above all awarded more than $10,000,000.00 in fees and costs. The requested amount is reasonable.

## E. Claimant's counsel are not limited to the 40% contingency fee contained in their contract with Mr. Giro to compensate them for all the work done on his behalf.

DST is not a party to the contingency fee contract. Nor is it a third-party beneficiary. The contract protects the client from ever paying more than a 40% contingency fee. And where, as is the case here, counsel chooses to recover no fees from the client under the contract and instead seek a reasonable fee from the Arbitrator, both the Eighth Circuit and the Supreme Court hold Claimant's counsel is not limited to the 40% contingency fee.

In 1992, the Supreme Court confirmed an earlier holding that no such limitation exists: "For example, in *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), we

23

held that the lodestar governed, even though it produced a fee that substantially exceeded the amount provided in the contingent-fee agreement between plaintiff and his counsel (which was self-evidently an amount adequate to attract the needed legal services)." *City of Burlington v. Dague*, 505 U.S. 557, at 566 (1992). *Blanchard* involved attorney's fees under a § 1988 claim which, again like ERISA, provides for "reasonable" attorney's fees. *Blanchard,* 49 U.S. at 91. The Supreme Court prohibited limiting such awards to the contingency fee agreement. "It is central to the awarding of attorney's fees under § 1988 that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case. The trial judge should not be limited by the contractual fee agreement between plaintiff and counsel." *Blanchard*, at 96. Finally, in *Quigley* the Eighth Circuit held in a Fair Housing Act case (also providing for "reasonable" attorney's fees) that counsel's contingency fee agreement does not cap their recovery: "The attorney's fees provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable." *Quigley v. Winter*, 598 F.3d 938, 956 (8th Cir. 2010) (quoting *Blanchard*, at 96).

In the past, DST attempted to distinguish the above cases by suggesting "reasonable attorney's fees" means something different when used in ERISA than it does when used in § 1988, the Fair Housing Act, the Solid Waste Recovery Act, and the Clean Water Act. Of course, there are no cases adopting this unique argument of statutory construction. Nonetheless, DST used to cite to *Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966 (8th Cir. 2002). *Martin* is off point because it does not address how to determine a reasonable amount of fees. Instead, it holds that unlike § 1988 claims there is no presumption in favor of attorney's fees under ERISA. But the Eighth Circuit makes clear once a determination is reached to award attorney's fees they are to be calculated the same under ERISA as other fee-shifting statutes. For instance, the fact that the

judgment does not result in a pool of money from which fees can be paid should be "considered when determining the *amount* of the judgment, once the district court has already decided a fee should be awarded." *Martin* 299 F.3d at 972. Nothing in *Martin* suggests the holdings in *Dague*, *Blanchard*, and *Quigley* do not apply here.

Claimant's counsel is not capped by a contingency fee and it is within the Arbitrator's discretion to award attorney fees in any amount, including an amount based on what they determine is a reasonable number of hours and reasonable hourly rates. The test is what is a reasonable amount, and a 40% contingency fee is clearly not reasonable in this case.

i. **The Chair of the Fee Arbitration Program for the State Bar of Arizona recently rejected DST's request to limit the fees to 40%, explaining a lodestar award is more appropriate in the lower value cases.**

Arbitrator Steven M. Guttell has served as the Chair of the Fee Arbitration Program for the State Bar of Arizona for the past seven years. Steven M. Guttell C.V., Ex. 12. He is an expert on the reasonableness of attorney fees, having given presentations on both fee arbitrations and reasonable fee awards. *Id.* He rejected DST's argument that Claimant's counsel should not be seeking a lodestar amount in most cases, while asking for a contingency amount in the few highest value cases. Final Award in *Barbara O'Mara v. DST Systems, Inc.*, AAA No. 01-19-0004-4510, Ex. 13. As he explained, this is a situation like none other. Hence, there is no caselaw providing guidance. However, based on his own extensive expertise in issues surrounding requests for attorney fees, there Claimant's counsel's approach is a reasonable one:

> In awarding attorneys' fees, the Arbitrator is cognizant that this matter as one of many. It may well be that whether fees are reasonable cannot be determined until all matters are concluded and the total claim for fees is considered in relation to the total moneys recovered. Counsel are not aware, and neither is the Arbitrator, of any case law that provides direction in assessing fees where there is one act that results in multiple individual high and low value claims each subject to a mandatory arbitration and class-action waiver agreement.

25

Respondent argues that fees should be limited to 40% of Claimant's recovery. In the Eighth Circuit it "is within the discretion of the [arbitrator] to choose …" whether to apply a percentage of recovery or lodestar method." *Johnston v. Comerica Mortg. Corp*., 83 F. 3rd 241, 246 (8th Cir. 1996). The Arbitrator finds that in this case a contingent fee approach would not result in a reasonable fee and that the lodestar method is appropriate and will be applied. The Arbitrator is aware that Counsel has sought a contingent fee recovery in some, presumably high value, arbitrations.

*Id.,* at 3.

Claimant's counsel's approach is reasonable because it is the best way to ensure that arbitration agreements serve their intended purpose—fair and efficient dispute resolution, instead of being used to quash hundreds of legitimate, but low-value, claims. In order to prevent this outcome, a reasonable attorney fee based on the lodestar method must be awarded in the majority of cases. If not, "[s]imply stated many attorneys will not undertake these cases due to the high-risk factor." *Id.* at 4 (citing *Lamps Plus, Inc., v. Varela*, 587 US ___, _ (2019) (Ginsburg, J., dissenting) ("[w]hat rational lawyer" … would accept representation for a relatively small value claim. (citation omitted)). Claimant's counsel should not be punished for brining successful smaller value claims by receiving an inadequately low contingency fee.

### F. Claimant's counsel's requested rates and hours are reasonable.

The twelve factors above should guide the Arbitrator on the ultimate issues, not distract from them. Those ultimate issues are: What are reasonable hourly rates, and what was a reasonable number of hours to spend on this case? First, the requested rates are reasonable. Ranging from a low of $400/hr. to a high of $950/hr. they fall below what the Southern District of Illinois held to be reasonable rates for Missouri attorneys in a 2016 ERISA case. *Spano*, 2016 WL 3791123, at *3. They are also well below what DST's counsel charges. These are reasonable rates.

On November 5, 2020, Arbitrator Eugene Hollander entered an order awarding Claimant's counsel attorney's fees and finding our hourly rates are reasonable. Exhibit 10. Arbitrator

Hollander recognized they were in line with other rates and cases involving lawyers skilled enough to navigate complex ERIS matters:

> It is well established that complex ERISA litigation involves a national standard and special expertise. See, e.g., <u>Torgeson v. Unum Life Ins. Co. of Am.</u>, 2007 WL 433540 at *6 (N.D.Iowa Feb.5, 2007); <u>Dobson v. Hartford Fin. Services Group, Inc.</u>, 2002 WL 31094894 at *3 (D. Conn. Aug.2, 2002); <u>Mogck v. Unum Life Ins. Co. of Am.</u>, 289 F.Supp.2d 1181, 1191 (S.D.Cal.2003). Claimants' attorneys are clearly experts in ERISA litigation. The litigation is complex in size and subject matter, and involved novel questions of law, and spanned two years. The Arbitrator thus finds that a reasonable rate in this case would be best assessed against national rates for complex specialized litigation.
> In <u>Tussey</u>, the Eighth Circuit approved the district court's top attorney rate of $800 per hour (decided in 2012). As this matter is eight years later, the Arbitrator does not find that the hourly rates sought by Claimant's counsel are out of line with the necessary skill and expertise of national counsel to prosecute the claim.

Ex. 10, p. 8.

The number of hours requested are reasonable too. Preparing this case for a hearing required all the hours of work being claimed. ERISA is a complex area of law to begin with, but Mr. Giro's counsel first had to wade through over a hundred thousand documents to understand what happened here. Only then could they have intelligent conversations with the three expert witnesses necessary to make a submissible case. Claimant's counsel also deposed DST's fact and expert witnesses. Preparation for the depositions was necessarily extensive given the wealth of documents and information needing to be addressed with only the handful of witnesses DST was willing to produce. Finally, once counsel processed the hundreds of thousands of documents, produced heir expert witnesses, deposed the fact witnesses, and deposed DST's experts, they could begin preparing to present the case. This was yet another extensive and time-consuming process. Two years' worth of discovery and hundreds of thousands of pages of information needed to be reduced to a clear and concise argument in a brief. Claimant's counsel proved up to the task, but

it would have been impossible without the thousands upon thousands of hours they spent working on the case for over four years.

On top of all of this, Claimant's counsel was forced to constantly fight off DST's collateral attacks on the arbitration process. DST sought to stay the arbitrations, sought to disqualify Claimant's counsel in these arbitrations, and sought to force Mr. Giro into a mandatory class settlement. In fact, even now after Mr. Giro has received summary judgment, DST seeks to enjoin this proceeding before any award in his favor can become final and collectable. This litigation "strategy" by DST demanded a tremendous amount of time from Mr. Giro's attorneys.

i. **Any time spent on matters "intimately tied to the resolution of the judicial action" is recoverable.**

All of this Group Time is recoverable in this arbitration because all of it directly benefited Mr. Giro's claim. The Eighth Circuit holds that in ERISA cases an award of attorney's fees should include time spent on every matter "intimately tied to the resolution of the judicial action." *Parke v. First Reliance Standard Life Ins. Co.,* 368 F.3d 999, 1010 (8th Cir. 2004). The entire Group Time meets this definition. The overwhelming majority of it is time dedicated specifically to preparing these arbitrations, including Mr. Giro's, for adjudication on the merits. The remainder was spent as a direct result of DSTs litigation strategy to stop the arbitrations at any cost.

Hence, Mr. Giro's counsel spent a total of 10,667.16 hours on matters specifically advancing his case, as well as all other claims. *See* Affidavits of counsel, Exhibits 1-4, 6, and 7, and summary of fees and expenses, Exhibit 5. At the reasonable rates listed in the affidavits, this amounts to a lodestar of $7,670,460.00. *Id.* Claimant's counsel should not fail to receive compensation for this time merely because it also benefited other arbitrations. In fact, this is even more of a reason to compensate them for this time, not less of a reason. It can be awarded in one part, all in this case, or it can be awarded in many parts in multiple cases (and again, Claimant's

28

counsel is keeping a tally as Group Time is collected to avoid any double recovery). But either way, ERISA provides that DST is required to compensate Claimant's counsel for this time.

Recognizing this reality, Claimant's counsel called DST's counsel to suggest they come to an agreement on a way to allocate the common time so claimants would be compensated for their losses and Claimant's counsel would be properly compensated for their time. DST's counsel refused to engage in any such discussion and simply told Claimant's counsel to apply for the entire Group Time in every case. In light of DST's refusal to agree on an allocation, we are suggesting 1% of the Group Time lodestar be allocated to Mr. Giro's case. This is equal to 106.67 hours, which is a lodestar of $76,704.60.

Claimant's counsel also spent time on matters specific solely to Mr. Giro's claim. This includes phone calls with him, conference calls with the Arbitrator, preparing the scheduling order, responding to discovery, producing the expert reports specific to him, and preparing the letters and briefs filed in his case. In total, Claimant's counsel spent 20.35 hours specific solely to Mr. Giro's claim. (Exhibits 1-5). At their reasonable rates, this time amounts to a lodestar of $11,990.00 for the Claimant-specific time. *Id*

Because the rates requested are reasonable and consistent with those commonly awarded in ERISA cases, and because 127.02 hours is a reasonable number of total hours to spend litigating this complex ERISA case from start through a five-day trial (after all, that is under one month's worth of time from a single attorney dedicated to such a complicated matter), the requested lodestar of $88,694.60 is reasonable.

### G. The Eighth Circuit does not prohibit billing in quarterly hour increments.

DST has argued in other cases that Claimant's counsel should be punished for keeping their time in quarterly hour increments by reducing their attorney's fee between 10 and 20%. There is

no authority for an automatic reduction; courts in the Eighth Circuit often accept quarterly hour billing increments. For example, just this summer the United States District Court for the District Court of Minnesota refused to reduce a fee award on these grounds: "In addition to the absence of binding precedent or a clear trend toward finding quarter-hour billing increments unreasonable, Green Nature offers no non-arbitrary method to determine which billing entries should be reduced, and by how much, to address this issue." *Nesse as Trustees of Minnesota Laborers Health & Welfare Fund v. Green Nature-Cycle, LLC*, No. 18-CV-636 (ECT/HB), 2020 WL 2848193, at *3 (D. Minn. June 2, 2020) *See also Planned Parenthood of the Heartland v. Heineman,* No. 4:10CV3122, 2011 WL 772861, at *3 (D. Neb. Feb. 28, 2011) ("The Court is satisfied that Plaintiffs' quarter-hour entries are not inherently unreliable merely because they are not stated in tenth-hour increments.").

Even more recently, Arbitrator Vering rejected this argument from DST and refused the reduce Claimant's counsel's fee award based on some of their records being kept at quarter hour increments. As Arbitrator Vering explained:

> While there is some authority that an attorney's fee should be reduced for failing to bill in one-tenths of an hour, there is a split of authority on this issue. *See e.g., Nesse as Trustees of Minnesota Laborers Health & Welfare Fund v. Green Nature-C*, 2020 WL 2848193 at *3 (U.S. D. Minn.). The Arbitrator declines to reduce Claimant's counsel's hours because of quarter hour billings by some of Claimant's counsel.

Ex. 9, p. 30.

Claimant's counsel should not be punished for billing in quarterly hour increments.

## H. The time records are mostly contemporaneous and have all been verified for accuracy.

In the Eighth Circuit, both reconstructed and contemporaneous records are treated as equally valid ways to submit time records in support of a motion for attorneys' fees. "This circuit

has already rejected, furthermore, the imposition of a per se rule that the submission of reconstructed time records rather than contemporaneous time accounts requires the denial of all attorneys' fees, so we see little reason to require a reduction of attorneys' fees in the same circumstances." *Kline v. City of Kansas City, Mo., Fire Dept.*, 245 F.3d 707, at 708-09 (8th Cir. 2001) (citing *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, at 1061 (8th Cir. 1988)). "The question of whether reconstructed records accurately document the time attorneys have spent is best left to the discretion of the court most familiar with the litigation." *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054, at 1061 (8th Cir. 1988).

Here, a majority of the time records are contemporaneous records, with the exception of some records from White, Graham, Buckley, and Carr, and some records from The Klamann Group, which have been reconstructed. The records produced for Humphrey, Farrington & McClain's ("HFM") attorneys are contemporaneous records. HFM requires its attorneys keep contemporaneous time records in order to receive their paycheck. Claimant's counsel verified these records for completeness and accuracy by comparing them to both the AAA docket and internal work product, including emails and the attorney notes of Chelsea Pierce. Ms. Pierce kept notes from the hundreds of calls in this case, including who was on the call, the topics discussed, and her mental impressions. HFM's records are verified, contemporaneous records.

So are the records submitted in support of the hours spent by the attorneys from Kapke Willerth. Like HFM, Kapke Willerth kept contemporaneous time records of all their time in these arbitrations. These records were also checked for accuracy and completeness against the AAA docket, internal emails, and work product including Ms. Pierce's extensive notes.

The records produced from White, Graham, Buckley, & Carr are a hybrid of contemporaneous records and reconstructed records. All contemporaneous records were checked

against the AAA docket and Ms. Pierce's notes. The records that were not kept contemporaneously were reconstructed in reliance on Ms. Pierce's notes, the AAA docket, internal emails, and work product.

The time records from The Klamann Group are also a mix of reconstructed and contemporaneous. To do this, we relied on the AAA docket, Ms. Pierce's notes, internal emails, and the extensive work-product of the two attorneys, Andy Schermerhorn and John Klamann. Neither attorney has worked on anything other than these cases for at least a year. Mr. Schermerhorn, as he has done for almost all other arbitration claimants, wrote all the briefs in Mr. Giro's case and did all the supporting legal research. Mr. Klamann reviewed the over 100,000 documents DST produced and composed detailed factual memos with reference to the documents. He also drafted lengthy outlines, again with references to the record, concerning documents, witnesses, and entire topics. His work product fills boxes upon boxes.

Finally, Claimant's counsel once again ensured reliability of the time records before signing their affidavits – both for the contemporaneous and reconstructed records—by having J'Nan Kimak, an attorney at HFM, audit and standardize every billing record. In doing so she spoke to the attorneys and confirmed the time spent and the tasks performed. The records we produced, whether contemporaneous or reconstructed, are accurate and reliable.

**I. Reasonable out of pocket expenses.**

An award of attorney's fees under ERISA also includes all reasonable out of pocket expenses. "Such a fee, of course, must include 'reasonable out-of-pocket expenses of the kind normally charged to clients by attorneys.'" *Emmenegger v. Bull Moose Tube Co*., 33 F. Supp. 2d 1127, 1133 (E.D. Mo. 1998) (citing *Pinkham v. Camex, Inc*., 84 F.3d 292, 294-95 (8th Cir. 1996)). In *Emmenegger,* the court recognized the Supreme Court requires any attorney's fee awarded in

an ERISA case "must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit." *Emmenegger*, at 1133 (citing *Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

For instance, because they are "legitimate out-of-pocket expenses," a prevailing plaintiff in an ERISA case can recover as a part of their attorney's fees "all photocopies made during the work on the case." *Emmenegger*, at 1134. Copying is not limited to what can be done on a Xerox machine and instead includes the "costs of OCR scanning, TIFF conversions, the imaging of computer storage drives, the transfer of files from one drive or disc to another, the production of load files, and the extraction or imaging of metadata where required to provide a complete copy of a file if such metadata is requested by the opposing party." *Jo Ann Howard & Assocs. P.C. v. Cassity,* 146 F. Supp. 3d 1071, 1084 (E.D. Mo. 2015).

Computer legal research (CLR) is another one of these common out-of-pocket expenses that can be recovered in an award of legal fees. The Eighth Circuit specifically holds so:

> CLR is now a common litigation expense, and it may be reimbursable. *See In re UnitedHealth Group Inc. S'holder Derivative Litig*., 631 F.3d 913, 918–19 (8th Cir. 2011) (noting "[t]he prevailing view among other circuits is to permit awards to reimburse counsel for the reasonable costs of online legal research"); *see also Sturgill v. United Parcel Serv., Inc*., 512 F.3d 1024, 1036 (8th Cir. 2008) (concluding district court had discretion to award attorney travel and private process server costs to prevailing party in Title VII case where such costs were incurred by attorney and normally would be charged to a fee-paying client). When billing such fees separately becomes "the increasingly widespread custom" in the relevant marketplace, district courts have the discretion to award them to the prevailing party under a fee-shifting statute. *Jenkins,* 491 U.S. at 286, 109 S.Ct. 2463 (internal quotation marks and quotation omitted). More particularly, if the prevailing party demonstrates that separately billing for CLR is the "prevailing practice in a given community" and that such fees are reasonable, the district court may award those costs. *Id*. at 287, 109 S.Ct. 2463. Because the district court in this case was of the view it lacked discretion to award costs for CLR at all, we remand

for a determination of whether the expenses Hernandez incurred for CLR should be shifted to BATO.

*Hernandez v. Bridgestone Americas Tire Operations, LLC*, 831 F.3d 940, 950 (8th Cir. 2016).

Here, Claimant's Counsel out-of-pocket expenses that can be reward as a part of their attorney's fees include $6,510.75 in electronic storage; $997.67 in Federal Express; $577.95 in Zoom hosting fees; $24.81 for media expenses; $17,682.33 in Westlaw and Pacer research; and $12,027.25 in electronic conversion costs. In total, Claimant's counsel requests $37,820.76 in additional legal fees in reasonable out-of-pocket expenses.[2]

### J.  The following costs are also recoverable under § 1821 and § 1920.

In an ERISA case, the prevailing party is entitled to all costs provided for in 28 U.S.C. §§ 1821 and 1920. *Johnson Tr. of Operating Engineers Local #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc*., 950 F.3d 510, 527 (8th Cir. 2020). These costs include "discovery-related copying" and depositions "when necessarily obtained for use in a case, even if not introduced at trial." *Id.* Copying is not limited to what can be done on a Xerox machine and instead includes the "costs of OCR scanning, TIFF conversions, the imaging of computer storage drives, the transfer of files from one drive or disc to another, the production of load files, and the extraction or imaging of metadata where required to provide a complete copy of a file if such metadata is requested by the opposing party." *Jo Ann Howard & Assocs. P.C. v. Cassity,* 146 F. Supp. 3d 1071, 1084 (E.D. Mo. 2015). Filing fees may also be recovered as costs. *See UNI-Sys. Inc. v. Delta Air Lines, Inc*., No. CIV. 4-96-973(JRT/RL), 2002 WL 505914, at *1 (D. Minn. Mar. 28, 2002) ("Filing fees paid to the clerk of the court are a taxable cost.") (Citing 28 U.S.C. §1920(1)). *Johnson Tr. of*

---

[2] Once again, Claimant's counsel has submitted other Fee Applications seeking some of these reasonable out-of-pocket expenses as they were incurred on behalf of all claimants. In the event these costs are awarded on more than one Fee Application, once paid by DST a deduction will be applied to offset so Claimant's counsel does not receive a double recovery.

*Operating Engineers Local #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 527 (8th Cir. 2020).

Based on this, Mr. Giro requests the Arbitrator award as costs $1,515.70 for the transcript of the deposition of Donald May, Ph.D., $2,612.00 for Volume I of the deposition transcript for DST's corporate representative, Chris Brenner, $3,351.40 for Volume II of the deposition transcript of DST's corporate representative, Chris Benner, $2,238.10 for the deposition transcript of Dr. Lehn, $1,696.50 for Volume I of the deposition transcript of Jerry Lavin, $1,837.50 for Volume II of the deposition transcript of Jerry Lavin, $2,872.00 for the deposition transcript of Phil McKnight, and $863.90 for the deposition transcript of Thomas McCullough. This totals $16,987.10.

## III.   CONCLUSION

DST is to blame for the thousands of hours spent pursuing these arbitrations. DST took every chance to make things less efficient. As an arbitration panel recently observed when denying collateral estoppel, DST's preference for inefficiency is backfiring on it: "[C]ollateral estoppel/issue preclusion limits the ability of the stronger party to wear down the weaker one. However, given the likelihood of the award of attorney's fees and costs if the Claimant prevails, the stronger party in this case may be wearing itself down." Exhibit 11, at 27. One is again reminded of the parable of the boy who murders his parents and then cries for mercy as an orphan. Claimant's counsel did not waste time or unnecessarily accumulate hours. DST chose to drag out this litigation, Claimant's counsel did not. This is exactly the type of situation ERISA's fee-shifting provisions are meant to address by providing Mr. Giro's counsel to be compensated in full for their time and expense, once they prevail on his behalf. ERISA protects the retirement savings of all Americans, not just the wealthy ones.

WHEREFORE, Claimant's Counsel respectfully asks the Arbitrator award them $126,515.36 in attorney's fees and $16,987.10 in costs. Claimant requests a hearing on the matter.

Dated: May 10, 2021

Respectfully Submitted,

HUMPHREY, FARRINGTON & McCLAIN,

/s/ Jonathan M. Soper
Kenneth B. McClain
Jonathan M. Soper
221 West Lexington, Suite 400,
P.O. Box 900
Independence, MO 64051
Telephone: (816) 836-5050
kbm@hfmlegal.com
jms@hfmlegal.com

THE KLAMANN LAW FIRM
John M. Klamann
Andrew Schermerhorn
4435 Main Street, Suite 150
Kansas City, MO 64111
(816) 421-2626
jklamann@klamannlaw.com
ajs@klamannlaw.com

KAPKE & WILLERTH
Ted Kapke
Mike Fleming
3304 N.E. Ralph Powell Road
Lee's Summit, MO 64064
(816) 461-3800
ted@kapkewillerth.com
mike@kapkewillerth.com

36

WHITE, GRAHAM, BUCKLEY & CARR
William Carr
Bryan T. White
19049 East Valley View Parkway
Independence, MO 64055
(816) 373-9080
wcarr@wagblaw.com
bwhite@wagblaw.com
Attorneys for Claimant

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was served upon counsel for all parties via electronic mail on May 10, 2021.

/s/Jonathan M. Soper

# EXHIBIT 1

In the Matter of the Arbitration Between

MICHAEL GIRO,

      Claimant,

            v.

DST Systems, Inc.,

      Respondents.

01-19-0001-9428

## AFFIDAVIT OF KENNETH B. MCCLAIN

I, Kenneth B. McClain, declare as follows:

1.     I make this Declaration of my own personal knowledge, and if called as a witness, I would and could testify competently to the matters stated herein.

2.     I am a shareholder of my law firm Humphrey, Farrington & McClain and have been the lead attorney for my firm in this and all litigation representing the arbitration claimants, including Mr. Giro.

3.     I submit this declaration in support of Claimant's Application for Attorney's Fees and Costs.

4.     I have been practicing law for 38 years. I am licensed to practice in the State of Missouri, numerous Federal Courts, and Canada. I have been the lead trial counsel in federal and state courts across the nation. As lead trial counsel, I have won numerous multi-million dollar verdicts several of which have made the National Law Journal's annual Top 100 Verdicts list. This includes verdicts totaling more than $100 million for several workers at microwave popcorn factories who were exposed to diacetyl, a chemical used to make the butter flavoring, and suffered debilitating lung diseases. Altogether, the amount of verdict I have achieved and settlements I have negotiated exceed $1 billion. Along the way, I have pioneered several areas of litigation including against asbestos suppliers, the tobacco industry, and artificial butter flavoring manufacturers and suppliers in the microwave popcorn industry. Most recently, I won a $60 million verdict in New York for a husband and wife business ownership team in a breach of contract case against HMS Holdings Corp. In that case, I worked with a team of attorneys, many of which are Claimant's Counsel in this matter.

5.     Jonathan Soper is a shareholder at my firm who worked on this case with me. He has twelve years of experience, all at my firm. I am familiar with his work and it is excellent. Based on his experience, my familiarity with his work, his role in this case,

and my review of case law, $600/hr. is a reasonable hourly rate for his work in this case.

6.  J'Nan Kimak is a shareholder at my firm who worked on this case with me. She has 16 years of experience, all at my firm. I am familiar with her work and it is excellent. Based on her experience, my familiarity with her work, her role in this case, and my review of case law, $500/hr. is a reasonable hourly rate for her work in this case.

7.  Chelsea McClain is an associate at my firm who worked on this case with me. She has 11 years of experience, 2 at my firm. I am familiar with her work and it is excellent. Based on her experience, my familiarity with her work, her role in this case, and my review of case law, $400/hr. is a reasonable hourly rate for her work in this case.

8.  David Olson is the IT professional at my firm who worked on this case with me. He has 17 years of experience, 6.5 years at my firm. I am familiar with his work and it is excellent. Based on his experience, my familiarity with his work, his role in this case, and my review of case law, $250/hr. is a reasonable hourly rate for his work in this case.

9.  Melanie Mitchell is the lead trial paralegal at my firm who worked on this case with me. She has 32 years of experience, 14 at my firm. I am familiar with her work and it is excellent. Based on her experience, my familiarity with her work, her role in this case, and my review of case law, $200/hr. is a reasonable hourly rate for her work in this case.

10. I and co-counsel White, Graham, Buckley and Carr, Kapke and Willerth, and Klamann & Schermerhorn, ("Claimant's Counsel") have been actively involved in all stages of this and the other arbitrations. This includes investigating and preparing the Complaint, successfully defending against motions to stay, seeking discovery, reviewing documents, hiring experts, drafting and researching dispositive motions, preparing for and participating in arbitration hearings.

11. As lead attorney for my firm, I personally managed, delegated, and supervised the allocation of personnel and expenses by my firm in this case. We have aggressively and vigorously prosecuted this case and represented the best interests of Mr. Giro and the other arbitration claimants. Over the course of this arbitration, we incurred the following reasonable out of pocket expenses:

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| **Deposition Testimony Transcript** | **U.S. Legal Support, Inc. – Invoice #130149269 Certified Copy of Transcript of Donald May\*** | **$1,515.70** |
| **Deposition Testimony Transcript** | **Veritext, LLC Invoice #4380367 Certified Copy of Transcript of Chris Benner\*** | **$2,612.00** |

2

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Deposition Testimony Transcript | Veritext, LLC Invoice #4383190 Certified Copy of Transcript of Chris Benner* | $3,351.40 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4394979 Certified Copy of Deposition Transcript of Kenneth Matthew Lehn | $2,238.10 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4410385 Certified Copy of Deposition Transcript of Jerry Lavin* | $1,696.50 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4168600 Certified Copy of Deposition Transcript of Jerry Lavin, Vol. II* | $1,837.50 |
| Deposition Testimony Transcript | Alaris Invoice #126084 Certified Copy of Deposition Transcript of Phil McKnight* | $2,872.00 |
| Deposition Testimony Transcript | U.S. Legal Support Invoice #130154490 Certified copy of Deposition Transcript of Thomas McCullough* | $863.90 |
| TOTAL | | $16,987.10 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Legal Research | Westlaw Research Invoice #842630637* | $555.30 |
| Legal Research | Westlaw Research Invoice 842796027* | $4,592.94 |
| Legal Research | Westlaw Research Invoice #842796027* | $64.19 |
| Legal Research | Westlaw Research Invoice #842796027* | $3,781.91 |
| Legal Research | Westlaw Research Invoice #8423142560* | $1,455.23 |
| Legal Research | Westlaw Research* Invoice #843142560 | $805.33 |
| Legal Research | Westlaw Research Invoice #843489623* | $3,883.58 |
| Legal Research | Westlaw Research Invoice #843652276* | $536.94 |
| Legal Research | Westlaw Research Invoice #843821978* | $520.49 |
| Legal Research | Westlaw Research Invoice #843821978* | $221.12 |
| Legal Research | PACER* | $28.20 |
| Legal Research | PACER* | $115.50 |
| Legal Research | PACER* | $52.40 |
| Legal Research | Westlaw Research Invoice #844146929* | $1,069.20 |
| TOTAL | | $17,682.33 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #54931)* | $1,348.13 |
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #54967)* | $647.10 |
| Electronic Conversion | Wondershare UniConverter-converting MP4 Video Depositions to MPEG for Arbitration* | $39.95 |
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #55058)* | $2,173.18 |
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #55090)* | $539.25 |
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #55116)* | $657.89 |
| Electronic Conversion | Video Services (Invoice #MW4405575) Syncing video deposition of DST Corporate Rep, Chris Benner for Arbitration* | $619.97 |
| Electronic Conversion | TBC Video-Editing and Cutting Arbitration Hearing Video (Invoice #55212)* | $161.78 |
| Electronic Conversion | Video Services, Veritext, LLC Invoice #4384129 video deposition of Chris Benner* | $1,647.50 |
| Electronic Conversion | Video Services (Invoice #MW4415135) Video Deposition of Jerry Lavin* | $1,175.00 |
| Electronic Conversion | Veritext, LLC Invoice #4401232 Video Deposition of Kenneth Matthew Lehn* | $1,552.50 |
| Electronic Conversion | Video Services (Invoice #MW4405576) Video Deposition of Mary Elizabeth Sweetman* | $1,465.00 |
| TOTAL | | $12,027.25 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Postage, FEDEX, Courier | Federal Express* | $29.13 |
| TOTAL | | $29.13 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Media | Media Expense* | $24.81 |
| TOTAL | | $24.81 |

12.     These expenses are reasonable out of pocket expenses of the kind normally charged by an attorney to the client.

13. The firm's time and other records, including work product, indicate and support the following hours worked that were specific to Mr. Giro's arbitration:

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Kenneth McClain | Attorney w/ 25+ years of experience | $950.00 | .25 | $237.50 |
| Jonathan Soper | Attorney w/ 10-14 years of experience | $600.00 | 1.50 | $900.00 |
| J'Nan Kimak | Attorney w/ 15-24 years of experience | $500.00 | 2.90 | $1,450.00 |
| Chelsea M. Pierce | Attorney w/ 10-14 years of experience | $400.00 | 5.35 | $2,140.00 |
| **TOTAL** | | | **10.00** | **$4,727.50** |

14. The firm's time and other records, including work product, indicate and support the following hours worked on matters that were beneficial to all arbitrations, including Mr. Giro's:

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Kenneth McClain | Attorney w/ 25+ years of experience | $950.00 | 814.40 | $773,680.00 |
| Jonathan Soper | Attorney w/ 10-14 years of experience | $600.00 | 478.70 | $287,220.00 |
| J'Nan Kimak | Attorney w/ 15-24 years of experience | $500.00 | 287.00 | $143,500.00 |
| Chelsea M. Pierce | Attorney w/ 10-14 years of experience | $400.00 | 2,464.50 | $985,800.00 |
| **TOTAL** | | | **4,044.60** | **$2,190,200.00** |

15. Claimant's Counsel only spent the time necessary to effectively prosecute these arbitrations, and attempted to avoid duplication of efforts.

16. Details and material supporting the time referenced in this declaration is available upon the request of the Court.

5

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Further affiant says not.

Kenneth B. McClain

STATE OF MISSOURI )
                    ) §
COUNTY OF Jackson )

Subscribed to and sworn before me this 10th day of May, 2021.

Notary

My Commission Expires:

6/7/22

PATRICIA A. PARKS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires June 7, 2022
Commission # 14897255

6

# EXHIBIT 2

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

In the Matter of the Arbitration Between

MICHAEL GIRO,

     Claimant,

          v.

DST Systems, Inc.,

     Respondents.

01-19-0001-9428

## AFFIDAVIT OF JOHN M. KLAMANN

I, John M. Klamann, declare as follows:

1. I make this Declaration of my own personal knowledge, and if called as a witness, I would and could testify competently to the matters stated herein.

2. I am the sole shareholder of The Klamann Law Firm and have been the lead attorney for my firm in this and all litigation representing the arbitration claimants, including Mr. Giro.

3. I submit this declaration in support of Claimant's Application for Attorney's Fees and Costs.

4. I am Licensed to practice in the States of Kansas and Missouri as well in the Federal Courts of both states. I have been in practice since September, 1978, or for nearly 42 years. During that entire time, I have been engaged in the practice of civil litigation.

5. Andy Schermerhorn is a non-equity partner at my firm who worked on this case with me. He has ten (10) years of experience as a civil litigation attorney, all of which have been spent at my firm. I am familiar with his work and it is excellent. Based on his experience, my familiarity with his work, his role in this case, and my review of case law, $750/hr. is a reasonable hourly rate for his work in this case.

6. I and co-counsel from Humphrey, Farrington and McClain, White, Graham, Buckley and Carr, and Kapke and Willerth ("Claimant's Counsel") have been actively involved in all stages of this and the other arbitrations. This includes, without limitation, investigating and preparing the Complaint, successfully defending against motions to stay, seeking discovery, reviewing documents, hiring experts, drafting and researching dispositive motions, and preparing materials for and attending arbitration hearings.

1

7.   As lead attorney for my firm, I personally managed, delegated, and supervised the allocation of personnel and expenses employed by my firm in this case. We have aggressively and vigorously prosecuted this case and represented the best interests of Mr. Giro and the other arbitration claimants.

8.   The firm's time and other records, including work product, indicate and support the following hours worked that were specific to Mr. Giro's arbitration:

| Name | Position | Hourly Rate | Hours | Lodestar |
|------|----------|-------------|-------|----------|
| John Klamann | Attorney w/ 25+ years of experience | $950 | .25 | $237.50 |
| Andy Schermerhorn | Attorney w/ 10-14 years of experience | $750 | 4.35 | $3,262.50 |
| **TOTAL** | | | 4.60 | $3,500.00 |

9.   The firm's time and other records, including work product, indicate and support the following hours worked on matters that were beneficial to all arbitrations, including Mr. Giro's:

| Name | Position | Hourly Rate | Hours | Lodestar |
|------|----------|-------------|-------|----------|
| John Klamann | Attorney w/ 25+ years of experience | $950.00 | 1,603.00 | $1,522,850.00 |
| Andy Schermerhorn | Attorney w/ 10-14 years of experience | $750.00 | 1,772.16 | $1,329,120.00 |
| **TOTAL** | | | 3,375.16 | $2,851,970.00 |

10.  Claimant's Counsel only spent the time necessary to effectively prosecute these arbitrations, and attempted to avoid duplication of efforts.

11.  Details and material supporting the time and expenses referenced in this declaration are available upon the request of the Arbitrator.

2

I declare under penalty of perjury, that the foregoing is true and correct to the best of my

knowledge, information and belief.

Further affiant says not.

_____
John M. Klamann

STATE OF MISSOURI )
                   ) §
COUNTY OF Jackson )

Subscribed to and sworn before me this  10  day of May, 2021.

_____
Notary

My Commission Expires:

_____August  22, 2022_____

ROCHELLE SEIWERT
My Commission Expires
August 22, 2022
Jackson County
Commission #18600941

3

# EXHIBIT 3

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| MICHAEL GIRO, | |
| Claimant, | 01-19-0001-9428 |
| v. | |
| DST Systems, Inc., | |
| Respondents. | |

## AFFIDAVIT OF WILLIAM L. CARR

I, William L. Carr, declare as follows:

1. I make this Declaration of my own personal knowledge, and if called as a witness, I would and could testify competently to the matters stated herein.

2. I am a managing partner of the law firm White, Graham, Buckley & Carr and have been the lead attorney for my firm in this and all litigation representing the arbitration claimants, including Mr. Giro.

3. I submit this declaration in support of Claimant's Application for Attorney's Fees and Costs.

4. I have been a trial attorney for nearly thirty (30) years and have been the lead trial counsel in over fifty (50) jury trials in multiple states, including Missouri, Kansas, Nebraska and New York. I have successfully obtained multiple verdicts well in excess of a million dollars, including being part of the team (made up of many of the same attorneys in this group) that secured a $60 million jury verdict in a commercial case in the Commercial Division of the Manhattan County Court in New York. I have also served as co-counsel in a number of multi-Plaintiff or Class Action claims, including several settled and approved by the Court recently in the Western District of Missouri. My firm has invested substantial time and resources into these arbitrations. In the early stages of this litigation, our firm was precluded from taking on a number of cases due to the projected expenses and time that would be required to prosecute these claims. Planning was important to ensure that we had not taken on too many new matters in order to give the time/expense needed as the litigation progressed. This planning proved to be important as I have had little time to spend on any other matters other than the "DST litigation" as the arbitration hearings approached, requiring me to assign multiple other tasks to other attorneys in the office. This has precluded me from even considering new potential cases or work for several months.

1

5.      Taylor Arri is an associate at my firm who has worked on this case with me.  She has handled complex litigation cases and served as lead or co-lead counsel on hundreds of employment related cases.  She routinely serves as counsel for employees bringing claims for discrimination in Federal and State Courts in Missouri and Kansas.  She routinely conducts discovery in those cases, including written discovery and conducting depositions in those cases.  She originally worked for Shook Hardy & Bacon, after serving as a law clerk for the Missouri Supreme Court.  She has been listed as a Super Lawyer for several years and has completed the Ross T. Roberts Inn of Court and the KCMBA Leadership Academy, sponsored by the Kansas City Metropolitan Bar Association.  Based on her experience, my familiarity with her work, her role in this case, and my review of case law, $300.00/hr. is a reasonable hourly rate for her work in this case.

6.      Bryan White is a partner at my firm who worked on this case with me. He has over 12 years of experience, including 10 at my firm. I am familiar with his work and it is excellent. Mr. White has been trial counsel in over ten jury trials and arbitration hearings and has argued before the Supreme Court of Missouri.  Mr. White has also been co-lead counsel in several significant commercial litigation, multi-district litigation and class action matters.  In June of this year, Mr. White was appointed to be Co-lead Counsel and a member of the Executive Committed in the *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Sales, Marketing and Products Liability Litigation* MDL pending in the United States District Court for the Western District of Missouri. That appointment follows Mr. White's work as co-lead counsel in related litigation in 2018 and 2019, securing over $20 million in settlements for purchasers of tractor hydraulic fluid across the United States. Based on his experience, my familiarity with his work, his role in this case, and my review of case law, $750.00/hr. is a reasonable hourly rate for his work in this case.

7.      I, and co-counsel from Humphrey, Farrington & McClain, Kapke and Willerth, and Klamann & Schermerhorn ("Claimant's Counsel") have been actively involved in all stages of this and the other arbitrations. This includes investigating and preparing the Complaint, successfully defending against motions to stay, seeking discovery, reviewing documents, hiring experts, and drafting and researching dispositive motions, preparing materials for and attending arbitration hearings.

8.      As lead attorney for my firm, I personally managed, delegated, and supervised  the allocation of personnel and expenses employed by my firm in this case. We have aggressively and vigorously prosecuted this case and represented the best interests of Mr. Giro and the other arbitration claimants.

9.      The firm's time and other records, including work product, indicate and support the following hours worked that were specific to Mr. Giro's arbitration:

2

| Name | Position | Hourly Rate | Hours | Lodestar |
|------|----------|-------------|-------|----------|
| Bill Carr | Attorney w/ 25+ years of experience | $950.00 | .25 | $237.50 |
| Taylor Arri | Attorney w/ less than 5 years of experience | $300.00 | 1.00 | $300.00 |
| TOTAL | | | 1.25 | $537.50 |

10. The firm's time and other records, including work product, indicate and support the following hours worked that were beneficial to all arbitrations, including Mr. Giro's:

| Name | Position | Hourly Rate | Hours | Lodestar |
|------|----------|-------------|-------|----------|
| Bill Carr | Attorney w/ 25+ years of experience | $950.00 | 963.70 | $915,515.00 |
| Bryan White | Attorney w/ 10-14 years of experience | $750.00 | 308.90 | $231,675.00 |
| TOTAL | | | 1,272.60 | $1,147,190.00 |

11. Claimant's Counsel only spent the time necessary to effectively prosecute these arbitrations, and attempted to avoid duplication of efforts.

12. Details and material supporting the time referenced in this declaration are available upon the request of the Arbitrator.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Further affiant says not.

William L. Carr

STATE OF MISSOURI )
) §
COUNTY OF Jackson )

Subscribed to and sworn before me this 10th day of May , 2021.

Notary

**PATRICIA A. PARKS**
**Notary Public - Notary Seal**
**STATE OF MISSOURI**
**Jackson County**
**My Commission Expires June 7, 2022**
**Commission # 14897255**

4

# EXHIBIT 4

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| MICHAEL GIRO, | |
| Claimant, | 01-19-0001-9428 |
| v. | |
| DST Systems, Inc., | |
| Respondents. | |

## AFFIDAVIT OF GEORGE E. KAPKE JR.

I, George E. ("Ted) Kapke Jr., after being duly sworn, upon my oath, state the following:

1.      I am currently licensed to practice law in the States of Missouri and Kansas. I have been practicing law since September of 2002.

2.      I practice as a partner in the firm of Kapke & Willerth, LLC in Lee's Summit, Missouri. I began practicing law at the firm Husch & Eppenberger, LLC (now Husch Blackwell). My entire practice has been devoted to litigation including employment litigation. I left Husch Eppenberger, LLC to join the employment defense firm Seyferth Knittig, LLC (now Seyferth Blumenthal and Harris). At Seyferth Knittig my practice was limited to representing defendants in employment matters. In 2005, I joined Kapke & Willerth, LLC since joining the firm, I have handled all forms of litigation matters from all matters of employment disputes, personal injury, contract and property disputes and complex trust and fiduciary litigation. I maintain responsibility for supervising all litigation at Kapke & Willerth, LLC.

3.      Kapke & Willerth LLC maintains a broad practice including the representation of multiple municipalities, corporations, large homeowner's associations and individuals. Kapke &

Willerth, LLC is made up of 4 partners, 3 paralegals and one bookkeeper. While representing Claimant, at least two lawyers and one paralegal have been fully committed to the prosecution of this case.

4.      I have served as lead trial counsel on seven jury trials that have been tried to verdict. These cases have ranged from employment discrimination matters to inverse condemnation claims including cases tried in the United States District Court of Kansas, Clay County and Jackson County, Missouri. I have tried dozens of bench trials and served as second chair counsel on numerous jury trials. In addition to experience in trial, I have served as first chair for three arbitrations tried to final decision and argued before the Missouri Court of Appeal for the Western District of Missouri on several occasions.

5.      I am the past President of the Eastern Jackson County Bar Association. I am a member of the Kansas City Metropolitan Bar Association. I am a frequent lecturer at CLEs on employment litigation and all matters related to the collection and production of electronically stored data. In 2017, I was invited to speak at the Missouri Bar Annual Meeting on electronic discovery in employment matters. I am also a former adjunct professor of trial advocacy at the UMKC School of Law.

6.      In 2002, I graduated with distinction from the UMKC School of Law. I was a member of the National Moot Court and Trial Teams, a member of the Order of Barristers and recipient of the Thomas E. Deacey Memorial Trial Practice Award.

7.      In addition to my service, Michael Fleming, a partner with Kapke & Willerth, LLC, committed substantial time to the prosecution of this matter.

8.      Mr. Fleming is a member of the Kansas Bar Association Board of Governors serving as a representative of Johnson County, Kansas. Mr. Fleming also serves as the Treasurer

of the Kansas Trial Lawyers Association and is a member of the Board of Directors for the Johnson County Bar Association.

9.      Mr. Fleming has also been appointed by Governor Laura Kelly to serve on the Kansas Appellate nominating committee.

10.      Mr. Fleming's practice is devoted exclusively to litigation and primarily the representation of individuals in personal injury, employment disputes and commercial disputes. Mr. Fleming is experienced in multidistrict litigation including the representation of Montgomery County and Bourbon County, Kansas in lawsuits filed against Opioid manufacturers. Additionally, Mr. Fleming has represented small businesses in Missouri and Nebraska against Blue Cross and Blue Shield in an action related to agreements not to compete for customers.

11.      Mr. Fleming is a graduate of Creighton University undergraduate and Washburn University Law School.

12.      Finally, George E. Kapke, has assisted with this case. The senior Mr. Kapke is a preeminent member of the Missouri bar having practiced law in Missouri for over 50 years. Mr. Kapke is a 1966 graduate of William Jewell College and a 1969 graduate of the University of Missouri at Kansas City School of Law. Mr. Kapke has been a trial lawyer his entire career and has tried more than 100 jury trials to verdict. Mr. Kapke served in the ABA young lawyer section and later served as the Kansas City Metropolitan Bar Association delegate to the ABA. Thereafter, Mr. Kapke was elected to the Missouri Bar Board of Governors and served as a panel member to the region 13 disciplinary panel in the State of Missouri. Mr. Kapke currently serves as City Attorney for Liberty, Missouri. Mr. Kapke maintains an active litigation practice focused on employment, real estate and complex estate and trust litigation.

13.     I, George E. Kapke Jr., am familiar with the time spent and the work performed in representing Claimant.  The time is reasonable, the requested rates are in line with the prevailing rates for Missouri, and in recognition of the complexity and risk associated with this representation.

14.     I have practiced employment law for 18 years and I am familiar with the rates charged and awarded to Missouri lawyers in connection with complex ERISA representation.

15.     Mr. Fleming has practiced law for 19 years.

16.     George E. Kapke has practiced law for 51 years.

17.     An instructive case on the award of attorney's fees in complex ERISA cases is Tussey v. ABB, Inc., et al Case No. 01-CV-04305 NKL.  In connection with the fee application of a successful ERISA claimant, a review of the various hourly rates approved in ERISA cases included a rate of $1,060.00 per hour for attorneys with 25 years' experience, $900.00 per hour for attorneys with 15-24 years' experience, $650.00 per hour for attorneys with 5-14 years' experience, $490 per hour for attorneys with 2-4 years' experience and $330.00 per hour for Paralegal and Law Clerk.

18.     The attorneys with Kapke & Willerth, LLC are seeking approval of a fee rate of $750.00 per hour for all attorneys who worked on this case.  Each of the attorneys working on this matter have more than 15 years' experience and have significant experience in the prosecution of complex employment and fiduciary litigation.  Kapke & Willerth's requested rate of $750.00 per hour in imminently reasonable on this matter.

19.     As lead attorney for Kapke & Willerth, LLC, I personally managed, delegated, and supervised  the allocation of personnel and expenses employed by my firm in this case. We have aggressively and vigorously prosecuted this case and represented the best interests of Mr. Giro and

the other arbitration claimants. Over the course of this arbitration, we incurred the following reasonable out of pocket expenses. These expenses are reasonable out of pocket expenses of the kind normally charged by an attorney to the client. Details and material supporting the time records and expenses referenced in this declaration are available upon the request of the Court.

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Electronic Storage | Logikcull; Invoice #110868* | $752.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-008* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-009* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0010* | $753.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0011* | $751.25 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0012* | $751.25 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0013* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0014* | $752.75 |
| Electronic Storage | Logikcull | $500.50 |
| TOTAL | | $6,510.75 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Postage, FEDEX, Courier | Federal Express* | $65.22 |
| Postage, FEDEX, Courier | Federal Express* | $41.79 |
| Postage, FEDEX, Courier | Federal Express* | $41.79 |
| Postage, FEDEX, Courier | Federal Express* | $41.89 |
| Postage, FEDEX, Courier | Federal Express* | $98.66 |
| Postage, FEDEX, Courier | Federal Express* | $69.23 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| Postage, FEDEX, Courier | Federal Express* | $80.46 |
| Postage, FEDEX, Courier | Federal Express* | $80.46 |
| Postage, FEDEX, Courier | Federal Express* | $80.65 |
| Postage, FEDEX, Courier | Federal Express* | $70.05 |
| Postage, FEDEX, Courier | Federal Express* | $80.65 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Postage, FEDEX, Courier | Federal Express* | $80.08 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| TOTAL | | $968.54 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Technology Support | Zoom software for hosting* | $447.12 |
| Technology Support | Zoom software for hosting* | $130.83 |
| TOTAL | | $577.95 |

20.     This was a difficult case – there were numerous witnesses, thousands of documents and a vigorous defense at every juncture of the case.  Missouri Rule of Professional Conduct 4-1.1 provides: "[a] lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, *thoroughness and preparation reasonably necessary for the representation.*"  Respondent challenged, and as the expected response to this application is likely to reveal, will continue to challenge literally every position taken in this case.

21.     As lead attorney for Kapke & Willerth, LLC, I personally managed, delegated, and supervised  the allocation of personnel and expenses employed by my firm in this case. We have aggressively and vigorously prosecuted this case and represented the best interests of Mr. Giro and the other arbitration claimants. The firm's time and records, including work product, indicate and support the following hours worked that were specific to Mr. Giro's arbitration:

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Ted Kapke | Attorney w/ 15-24 years of experience | $750.00 | 1.75 | $1,312.50 |
| Mike Fleming | Attorney w/ 15-24 years of experience | $750.00 | 2.50 | $1,875.00 |
| Shelli Hager | Paralegal | $150.00 | .25 | $37.50 |
| | | TOTAL | 4.50 | $3,225.00 |

6

22.     The firm's time and other records, including work product, indicate and support the following hours worked on matters that were beneficial to all arbitrations, including Mr. Giro's:

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| George Kapke, Sr. | Attorney w/ 25+ years of experience | $750.00 | 3.25 | $2,437.50 |
| Ted Kapke | Attorney w/ 15-24 years of experience | $750.00 | 1,609.50 | $1,207,125.00 |
| Mike Fleming | Attorney w/ 15-24 years of experience | $750.00 | 362.05 | $271,537.50 |
| | | **TOTAL** | **1,974.80** | **$1,481,100.00** |

23.     As demonstrated by the successes the Claimant's counsel have achieved these rates are reasonable. Details and material supporting the time and expenses referenced in this declaration are available upon the request of the Arbitrator.

24.     This is an ERISA breach of fiduciary duty case.  This case could not have been pursued by Claimant absent provisions of ERISA that provide for an award of fees and even in light of these provisions, it is likely no lawyer would have taken Claimant's case absent a significant number of similar cases.  Counsel for Claimant retained three nationally acclaimed experts to assist in establishing liability and calculating damages in Claimant's case.  Counsel for Claimant has incurred significant risk in advancing millions of dollars to experts to establish liability in these cases.

25.     In addition to this Claimant, Kapke & Willerth, LLC has undertaken representation of over 500 other plan participants.  Respondent DST, like many companies, elected to adopt an arbitration agreement that contained a class action and representative action waiver.  Initially, Respondent enforced the arbitration agreement and compelled Claimant and others to file individual arbitrations.  However, after litigating these matters for two years, Respondent is now

attempting to saddle Claimant and others with a mandatory class action wherein Respondent alone would be permitted to dictate the recovery.

26. This case involved a significant risk in that Kapke & Willerth, LLC devoted thousands of hours and hundreds of thousands of dollars in costs have been invested in this case. The attorneys of Kapke & Willerth, LLC have been unable to consider taking additional cases because of the significant work associated with this matter. Moreover, because of having 500 individual arbitrations Kapke & Willerth, LLC has been required to expend significant time maintaining databases of the various cases and the associated deadlines. Finally, Kapke & Willerth, LLC is a small firm it has devoted significant resources to this case because the cause was one in which counsel believed in each lawyer at the firm has taken great personal risk in pursuing these actions in an effort to seek maximum recovery for Mr. Giro. We ask that this risk be properly considered in connection with the fee application submitted herewith.

I declare under penalty of perjury, that the foregoing is  true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NOT.

George E. Kapke Jr.

Subscribed and sworn to me this 10th day of _May_ , 2021

Notary Public

My Commission Expires:

6/7/22

PATRICIA A. PARKS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires June 7, 2022
Commission # 14897255

# EXHIBIT 5

# MICHAEL GIRO

| | |
|---|---|
| **TOTAL GIRO SPECIFIC TIME** | **$11,990.00** |
| **1% OF TOTAL GROUP TIME ($7,670,460.00)** | **$76,704.60** |
| **TOTAL REASONABLE OUT-OF-POCKET EXPENSES** | **$37,820.76** |
| **EQUALS** | **$126,515.36** |
| | |
| **TOTAL COSTS RECOVERABLE UNDER 28 U.S.C. §§ 1821 and 1920** | **$16,987.10** |

# TOTAL MICHAEL GIRO SPECIFIC TIME

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Kenneth McClain | Attorney w/ 25+ years of experience | $950 | .25 | $237.50 |
| John Klamann | Attorney w/ 25+ years of experience | $950 | .25 | $237.50 |
| Bill Carr | Attorney w/ 25+ years of experience | $950 | .25 | $237.50 |
| Ted Kapke | Attorney w/ 15-24 years of experience | $750 | 1.75 | $1,312.50 |
| Andy Schermerhorn | Attorney w/ 10-14 years of experience | $750 | 4.35 | $3,262.50 |
| Mike Fleming | Attorney w/ 15-24 years of experience | $750 | 2.50 | $1,875.00 |
| Jonathan Soper | Attorney w/ 10-14 years of experience | $600 | 1.50 | $900.00 |
| J'Nan Kimak | Attorney w/ 15-24 years of experience | $500 | 2.90 | $1,450.00 |
| Chelsea Pierce | Attorney w/ 10-14 years of experience | $400 | 5.35 | $2,140.00 |
| Taylor Arri | Attorney w/ <1 year of experience | $300 | 1.00 | $300.00 |
| Shelli Hager | Paralegal | $150 | .25 | $37.50 |
| **Total** | | | 20.35 | $11,990.00 |

# TOTAL GROUP TIME

| Name | Position | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|
| Kenneth McClain | Attorney w/ 25+ years of experience | $950 | 814.40 | $773,680.00 |
| John Klamann | Attorney w/ 25+ years of experience | $950 | 1,603.00 | $1,522,850.00 |
| Bill Carr | Attorney w/ 25+ years of experience | $950 | 963.70 | $915,515.00 |
| George Kapke | Attorney w/ 25+ years of experience | $750 | 3.25 | $2,437.50 |
| Ted Kapke | Attorney w/ 15-24 years of experience | $750 | 1,609.50 | $1,207,125.00 |
| Andy Schermerhorn | Attorney w/ 10-14 years of experience | $750 | 1,772.16 | $1,329,120.00 |
| Mike Fleming | Attorney w/ 15-24 years of experience | $750 | 362.05 | $271,537.50 |
| Bryan White | Attorney w/ 10-14 years of experience | $750 | 308.90 | $231,675.00 |
| Jonathan Soper | Attorney w/ 10-14 years of experience | $600 | 478.70 | $287,220.00 |
| J'Nan Kimak | Attorney w/ 15-24 years of experience | $500 | 287.00 | $143,500.00 |
| Chelsea Pierce | Attorney w/ 10-14 years of experience | $400 | 2,464.50 | $985,800.00 |
| **Total** | | | **10,667.16** | **$7,670,460.00** |

# MICHAEL GIRO[1]

| | |
|---|---|
| **TOTAL COSTS RECOVERABLE UNDER 28 U.S.C. §§ 1821 and 1920** | **$16,987.10** |

| | |
|---|---|
| **REASONABLE OUT-OF-POCKET EXPENSES KAPKE WILLERTH** | **$8,057.24** |
| **REASONABLE OUT-OF-POCKET EXPENSES HFM** | **$29,763.52** |
| **TOTAL REASONABLE OUT-OF-POCKET EXPENSES** | **$37,820.76** |

---

[1] Plaintiff's counsel has other Fee Applications currently pending. All expenses with an asterisk are common expenses incurred on behalf of all Plaintiffs have been included and/or are now being included on Fee Applications at varying times as submitted. In the event any of these expenses are awarded on more than one Fee Application, a deduction will be applied to offset.

# MICHAEL GIRO

# KAPKE WILLERTH, LLC.

# REASONABLE OUT-OF-POCKET EXPENSES

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Electronic Storage | Logikcull; Invoice #110868* | $752.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-008* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-009* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0010* | $753.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0011* | $751.25 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0012* | $751.25 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0013* | $750.00 |
| Electronic Storage | Logikcull; Invoice #06F59C6-0014* | $752.75 |
| Electronic Storage | Logikcull | $500.50 |
| TOTAL | | $6,510.75 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Postage, FEDEX, Courier | Federal Express* | $65.22 |
| Postage, FEDEX, Courier | Federal Express* | $41.79 |
| Postage, FEDEX, Courier | Federal Express* | $41.79 |
| Postage, FEDEX, Courier | Federal Express* | $41.89 |
| Postage, FEDEX, Courier | Federal Express* | $98.66 |
| Postage, FEDEX, Courier | Federal Express* | $69.23 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| Postage, FEDEX, Courier | Federal Express* | $80.46 |
| Postage, FEDEX, Courier | Federal Express* | $80.46 |
| Postage, FEDEX, Courier | Federal Express* | $80.65 |
| Postage, FEDEX, Courier | Federal Express* | $70.05 |
| Postage, FEDEX, Courier | Federal Express* | $80.65 |
| Postage, FEDEX, Courier | Federal Express* | $80.08 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| Postage, FEDEX, Courier | Federal Express* | $45.87 |
| TOTAL | | $968.54 |

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 70 of 195

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|:---:|:---:|:---:|
| Technology Support | Zoom software for hosting* | $447.12 |
| Technology Support | Zoom software for hosting* | $130.83 |
| **TOTAL** | | $577.95 |

# MICHAEL GIRO

# HUMPHREY FARRINGTON & MCCLAIN, P.C.
## COSTS RECOVERABLE UNDER
## 28 U.S.C. §§ 1821 and 1920

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Deposition Testimony Transcript | U.S. Legal Support, Inc. – Invoice #130149269 Certified Copy of Transcript of Donald May* | $1,515.70 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4380367 Certified Copy of Transcript of Chris Benner* | $2,612.00 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4383190 Certified Copy of Transcript of Chris Benner* | $3,351.40 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4394979 Certified Copy of Deposition Transcript of Kenneth Matthew Lehn | $2,238.10 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4410385 Certified Copy of Deposition Transcript of Jerry Lavin* | $1,696.50 |
| Deposition Testimony Transcript | Veritext, LLC Invoice #4168600 Certified Copy of Deposition Transcript of Jerry Lavin, Vol. II* | $1,837.50 |
| Deposition Testimony Transcript | Alaris Invoice #126084 Certified Copy of Deposition Transcript of Phil McKnight* | $2,872.00 |
| Deposition Testimony Transcript | U.S. Legal Support Invoice #130154490 Certified copy of Deposition Transcript of Thomas McCullough* | $863.90 |
| TOTAL | | $16,987.10 |

# MICHAEL GIRO

# HUMPHREY FARRINGTON & MCCLAIN, P.C.
# REASONABLE OUT-OF-POCKET EXPENSES

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Legal Research | Westlaw Research Invoice #842630637* | $555.30 |
| Legal Research | Westlaw Research Invoice 842796027* | $4,592.94 |
| Legal Research | Westlaw Research Invoice #842796027* | $64.19 |
| Legal Research | Westlaw Research Invoice #842796027* | $3,781.91 |
| Legal Research | Westlaw Research Invoice #8423142560* | $1,455.23 |
| Legal Research | Westlaw Research* Invoice #843142560 | $805.33 |
| Legal Research | Westlaw Research Invoice #843489623* | $3,883.58 |
| Legal Research | Westlaw Research Invoice #843652276* | $536.94 |
| Legal Research | Westlaw Research Invoice #843821978* | $520.49 |
| Legal Research | Westlaw Research Invoice #843821978* | $221.12 |
| Legal Research | PACER* | $28.20 |
| Legal Research | PACER* | $115.50 |
| Legal Research | PACER* | $52.40 |
| Legal Research | Westlaw Research Invoice #844146929* | $1,069.20 |
| TOTAL | | $17,682.33 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #54931)* | $1,348.13 |
| Electronic Conversion | TBC Video- Editing and Cutting Deposition Designation Video (Invoice #54967)* | $647.10 |
| Electronic Conversion | Wondershare UniConverter-converting MP4 Video Depositions to MPEG for Arbitration* | $39.95 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Electronic Conversion | TBC Video– Editing and Cutting Deposition Designation Video (Invoice #55058)* | $2,173.18 |
| Electronic Conversion | TBC Video– Editing and Cutting Deposition Designation Video (Invoice #55090)* | $539.25 |
| Electronic Conversion | TBC Video– Editing and Cutting Deposition Designation Video (Invoice #55116)* | $657.89 |
| Electronic Conversion | Video Services (Invoice #MW4405575) Syncing video deposition of DST Corporate Rep, Chris Benner for Arbitration* | $619.97 |
| Electronic Conversion | TBC Video-Editing and Cutting Arbitration Hearing Video (Invoice #55212)* | $161.78 |
| Electronic Conversion | Video Services, Veritext, LLC Invoice #4384129 video deposition of Chris Benner* | $1,647.50 |
| Electronic Conversion | Video Services (Invoice #MW4415135) Video Deposition of Jerry Lavin* | $1,175.00 |
| Electronic Conversion | Veritext, LLC Invoice #4401232 Video Deposition of Kenneth Matthew Lehn* | $1,552.50 |
| Electronic Conversion | Video Services (Invoice #MW4405576) Video Deposition of Mary Elizabeth Sweetman* | $1,465.00 |
| TOTAL | | $12,027.25 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Postage, FEDEX, Courier | Federal Express* | $29.13 |
| TOTAL | | $29.13 |

| EXPENSE CATEGORY | DESCRIPTION | AMOUNT |
|---|---|---|
| Media | Media Expense* | $24.81 |
| TOTAL | | $24.81 |

# EXHIBIT 6

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

| In the Matter of the Arbitration Between | |
|---|---|
| MICHAEL GIRO, | |
| Claimant, | 01-19-0001-9428 |
| v. | |
| DST Systems, Inc., | |
| Respondents. | |

## AFFIDAVIT OF KENNETH B. MCCLAIN

I, Kenneth B. McClain, declare as follows:

1.   I make this Declaration of my own personal knowledge, and if called as a witness, I would and could testify competently to the matters stated herein.

2.   I am a shareholder of my law firm Humphrey, Farrington & McClain and have been the lead attorney for my firm in this and all litigation representing the arbitration claimants, including Mr. Giro.

3.   I submit this declaration in further support of Claimant's Application for Attorney's Fees and Costs and incorporate my other submitted affidavit in support of Claimant's Application for Attorney's Fees as if stated herein.

4.   To be clear, attorney fees will not be taken out of any damages awarded to Mr. Giro in an Interim Award and instead Claimant's Counsel is seeking their attorney fees from the Arbitrator. What this means is that no matter what amount you decide to include as attorney fees in your Final Award, Mr. Giro's recovery under the Final Award will remain unaffected.

5.   As additional certification of my co-counsel's rates in this case, I am personally acquainted with my co-counsel at White, Graham, Buckley, and Carr; Kapke and Willerth; and Klamann and Schermerhorn, and state the following:

6.   I am familiar with plaintiff's attorneys' hourly rates in civil litigation matters.  The prevailing market rates for attorneys practicing ERISA employment litigation ranges from a low end of $250.00 per hour (for attorneys with little or no experience) up to $950.00 per hour (for the most experienced trial lawyers).  A liberal interpretation of ERISA necessitates that skilled counsel be adequately compensated for their work, it is imperative that plaintiff's attorneys be encouraged to accept such cases on a contingent fee basis through an adequate and truly compensable award of statutory

1

attorney's fees.  The risk to a plaintiff's lawyer in taking these types of cases on a contingent fee and advancing millions of dollars in expenses is extremely high.

7.     With respect to John Klamann, I have known Mr. Klamann my entire career. Mr. Klamann is the owner of the Klamann Law Firm, a boutique firm which takes on a variety of complex cases that has been instrumental in the recovery of more than one-half billion dollars for Plaintiffs in a wide variety of complex litigation settings, including most recently a group of unprecedented recoveries for NFL players suffering from CTE. Mr. Klamann and Mr. Schermerhorn were both members of a team of attorneys I led that won a $60,000,000 verdict in New York. In his 42 years of practice, Mr. Klamann has been the responsible attorney for liability prosecution in an action which was settled for $83 million for approximately 500,000 victims in a "vanishing premium" insurance class action; he has been lead counsel in a joinder of 147 plaintiffs in 23 states in a federal action involving securities fraud; and he has been lead counsel for a bankruptcy committee representing more than 23,000 asbestos victims; he has authored three (3) Am Jur Trial articles on how to prepare and try complex civil cases. Mr. Klamann was the "Attorney of the Year" in U.S. News in 2014 in the field of employment litigation.

The unparalleled dedication Mr. Klamann has given to Mr. Giro and the other claimant's cases cannot be overstated.  Mr. Klamann reviewed over 100,000 documents produced by DST (twice, each time with different bates stamps) and composed detailed factual memos with reference to the documents. Mr. Klamann also drafted lengthy outlines, again with references to the record, concerning documents, witnesses, and entire topics. This work was performed throughout the entirety of his group time entries.

A brief summary of the actual work and process undertaken by Mr. Klamann is necessary to understand the depth of his time he has dedicated to this litigation. Of the 100,000+ documents DST produced, Mr. Klamann reviewed these records on three separate occasions. Initially, he culled a set of hot documents from a population that had been flagged by co-counsel. Once these hot documents were designated, he then went back through them a second time to highlight necessary passages. The third step of his review included, re-reviewing the records and their highlighting and then typing an outline of each document's important sections. This project was an evolving project with new documents being regularly produced, altering the contents of his work. This outline, entitled "General Hot Documents" is 219 pages and 67,618 words and can be produced for your *in camera* review if you would like.

Mr. Klamman also worked tirelessly to prepare a narrative of the contents from these produced documents. Given the possibility that several litigation teams would have to be assembled to separately try these cases, Mr. Klamman was tasked with the job of preparing a comprehensive outline of the documents and the story of the case for the litigation teams to digest in preparation for arbitration.  This story of the case outline, entitled "Outlining the Story of the Case" is 342 pages and 112,462 words and also can be provided for your *in camera* review.

2

In addition, Mr. Klamann reviewed seven (7) four-inch binders containing Ruane's Due Diligence reports. Again, he followed the same three step review process to ultimately prepare another outline, this time 60 pages and 28,503 words, entitled "Hot Docs-Ruane Due Diligence Reports re: Valeant," also available for *in camera* review.

Mr. Klamann followed this same process for various other reviews, including a review of documents produced by different RFP responders and another review of publications regarding Valeant which ultimately resulted in a 102-page, 41,714-word outline, entitled "The Story of Valeant".

Mr. Klamann's trial preparation didn't stop there. After all of these document reviews he then broke out topical Hot Document outlines to summarize the General Hot Document Outline. The number of outlines and versions of these documents is extensive and his production of these outlines continues even today.

Mr. Klamann's hourly rate for this matter is $950.00/hour. This rate is reasonable based upon his experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required, the undesirability of this case, and the skill of his work.

8.  I have known Bill Carr since approximately 2017. Mr. Carr was another member of the team of attorneys I led that won the above-mentioned $60,000,000 verdict in New York. Mr. Carr's firm, White, Graham, Buckley, and Carr has been in existence for over three decades and has successfully obtained tens of millions of dollars of verdicts for their clients, including several successful results in multi-plaintiff and Class Action representation. Recently the firms and its attorneys were selected in eighteen categories for Best Lawyers by US News and World Reports and five categories for Best Law Firms. Mr. Carr, a managing partner, has been a trial attorney for nearly thirty (30) years and has been the lead trial counsel in over fifty (50) jury trials in multiple states, including Missouri, Kansas, Nebraska and New York. He has obtained several verdicts well in excess of a million dollars, including being part of the team (made up of many of the same attorneys in this group) that secured a $60 million jury verdict in a commercial case in the Commercial Division of the Manhattan County Court in New York. He has also served as co-counsel in a number of multi-Plaintiff or Class Action claims, including several settled and approved by the Court recently in the Western District of Missouri.

Mr. Carr has been working on this matter since 2016. Mr. Carr has served as a second chair in these cases, attending and participating in almost all of the 200+ arbitrations tried, to date. In addition to Mr. Carr's extensive trial preparation, he has worked tirelessly with Claimants' experts to prepare an ever-changing Master Damages Spreadsheet. The work surrounding this has been extensive and extremely time consuming. As an example, a quick review of Mr. Carr's emails reveal 1200+ pages of emails surrounding Mr. Carr's work on Master Damages spreadsheets. There were many iterations of the analysis (versions went up to at least version 17) and all data

3

points were entered manually. Mr. Carr's role in this project was assembling the data points, conducting numerous conversations with experts, and once entered, countless reviews to ensure no errors. These master damages spreadsheets have been used extensively for cross-checking damages, arbitrator selections (interested to know what damages someone may have as we select arbitrators), and in trials as we see how the arbitrators are reacting to the evidence. Just this project alone resulted in over 100+ emails by searching the term "master damages." These emails can be made available for your *in camera* review. Should you require the damages spreadsheets themselves, they too can be provided. This work also includes many hours of discussion regarding how to prepare the master damages chart and what information was needed for input.

In addition to his trial and expert witness work, Mr. Carr has been actively involved in all stages of this and the other arbitrations. This includes investigating and preparing the Complaint, successfully defending against motions to stay, seeking discovery, reviewing documents, hiring experts, drafting and researching dispositive motions, and preparing materials for and attending arbitration hearings. Mr. Carr also took the lead in handling the damages experts at the hearings. He prepared and conducted the direct examination of Claimant's expert, Donald May, Ph.D. He also prepared his cross-examination of Respondent's damages expert, Kenneth M. Lehn, Ph.D. Each week he actively participates in the hearings, including introducing the testimony of Dr. May (he explains how Dr. May's videotaped testimony from Week 2 relates to each claimants' specific damages), and objecting and responding to the arbitrators' questions of Dr. May and Dr. Lehn, as appropriate.

Mr. Carr's hourly rate for this matter is $950.00/hour. The rate of Bryan White in Mr. Carr's office is $750.00/hour. Mr. White, like Mr. Schermerhorn, has assisted in legal research and writing throughout this litigation. Taylor Arri's rate is $300.00/hour. Ms. Arri, a new associate in Mr. Carr's office, has assisted with case specific deadlines and filings and producing clients for deposition. I am familiar with the work of all of them and it is outstanding. These rates are reasonable based upon their experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required, the undesirability of this case, and the skill of their work.

9.     I have known Andy Schermerhorn for approximately 10 years and his work is outstanding. As stated above, Mr. Schermerhorn was a member of the team of attorneys I led that won the above-mentioned $60,000,000 verdict in New York. In addition, I have worked on other complex litigation with Mr. Schermerhorn over the years, including the NFL concussion cases. Throughout this litigation, Mr. Schermerhorn has been responsible for writing almost all of the briefs and supporting legal research on behalf of Mr. Giro and all of the claimants both in these arbitrations and in the actions in New York. I have personally observed Mr. Schermerhorn's work on this matter and

4

it has far exceeded that submitted by Respondent. His legal writing and analysis is some of the best I have seen in my entire career.

Mr. Schermerhorn's rate for this case is $750/hour. This rate is reasonable based upon his experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this case has required, the undesirability of this case, and the skill of his work.

10. I have known George E. ("Ted") Kapke Jr. for over 20 years. He is a partner in the firm of Kapke & Willerth, LLC in Lee's Summit, Missouri. Kapke & Willerth LLC maintains a broad practice including the representation of multiple municipalities, corporations, large homeowner's associations and individuals. Mr. Kapke's practice is primarily restricted to litigation with an emphasis on employment law. He is the past President of the Eastern Jackson County Bar Association. He has served as lead trial counsel on seven jury trials that have been tried to verdict. These cases have ranged from employment discrimination matters to inverse condemnation claims including cases tried in the United States District Court of Kansas, Clay County Circuit Court of Missouri, and Jackson County Circuit Court of Missouri. He has tried dozens of bench trials and served as second chair on numerous more. In addition to his trial experience, he has served as first chair for three arbitrations tried to final decision and argued before the Missouri Court of Appeal for the Western District of Missouri on several occasions. He has also served as an adjunct professor of trial advocacy at the University of Missouri at Kansas City School of Law. He is a frequent CLE presenter on topics ranging from employment law to electronic production protocols.

Mr. Kapke has been working on this case since its inception. His experience in employment law has been instrumental. He has led the charge in managing all client communications, producing claimants for depositions, preparing discovery responses, and coordinating with experts. This is no small task given the hundreds of clients we have. I am amazed that each time I discuss a client with Mr. Kapke, he appears to know each one personally and can tell me details about his or her case and situation. Judging by how quickly and warmly clients respond to his emails, it is clear each one feels they know him personally as well. His work and relationship with each client are invaluable pieces to these arbitrations. In addition to his client and expert witness work, Mr. Kapke has been actively involved in all stages of this and the other arbitrations. This includes investigating and preparing the Complaint, successfully defending against motions to stay, seeking discovery, reviewing documents, hiring experts, drafting and researching dispositive motions, and preparing materials for and attending arbitration hearings.

Mr. Kapke's rate for this case is $750/hour. Mike Fleming, another partner at Kapke Willerth has also committed substantial time to the prosecution of this matter. His rate is also $750/hours. His involvement in the case has included client communications, producing clients for deposition, preparing discovery responses, and being actively involved in all stages of this litigation. These rates are reasonable based upon their experience, the time and effort required to prosecute this case, the novel legal issues

5

presented, the incredible investment of time this has required, the undesirability of this case, and the skill of their work.

11. I have personally been working on this case since 2016 when we first became involved. I have participated in and/or overseen every aspect of the work performed by my co-counsel's firms. Each and every hour dedicated to this case was reasonable, necessary and required to achieve the results that have been achieved.

12. I have reviewed the billing statements and the requested fee of $88,694.60. I believe the hours expended, 10,687.51 are reasonable and in line with the scorched earth defense.

13. It is my opinion that this "lodestar" amount of attorneys' fees requested in this case is fair, reasonable, and necessary to compensate Claimant's counsel for the legal work they performed, particularly in light of the excellent results obtained.

14. In addition to the lodestar amount, Eighth Circuit law permits Claimant's counsel to recover as attorney fees reasonable out of pocket litigation expenses that would ordinarily be borne by a client. Plaintiff's request for these expenses in the amount of $37,820.76 is reasonable and in line with a case of this magnitude.

15. Finally, Claimant's Counsel is entitled to statutory costs of $16,987.10. These costs are justified, and Respondents have not been challenging them.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Further affiant says not.

Kenneth B. McClain

STATE OF MISSOURI )
                  ) §
COUNTY OF Jackson )

Subscribed to and sworn before me this 10th day of May, 2021.

Notary

My Commission Expires:

6/7/22

PATRICIA A. PARKS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires June 7, 2022
Commission # 14897255

7

# EXHIBIT 7

# BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between<br><br>MICHAEL GIRO,<br><br>     Claimant,<br>              v.<br><br>DST Systems, Inc.,<br><br>     Respondents. | 01-19-0001-9428 |

## AFFIDAVIT OF GEORGE E. KAPKE JR. IN SUPPORT OF CLAIMANT'S MOTION FOR ATTORNEY'S FEES ANDEXPENSES

STATE OF MISSOURI     )
COUNTY OF JACKSON    )

I, George E. Kapke Jr., after being duly sworn, upon my oath, state the following:

1.     I am currently licensed to practice law in the States of Missouri and Kansas. I have been practicing law since September of 2002.

2.     I practice as a partner in the firm of Kapke & Willerth, LLC in Lee's Summit, Missouri.

3.     I am a former president of the Eastern Jackson County Bar Association, a member of the Missouri Bar, and the Kansas City Bar Association. I have also served as an adjunct professor of trial advocacy at the University of Missouri at Kansas City School of Law. I am a frequent CLE presenter on topics ranging from employment law to electronic production protocols.

4.     My practice is primarily restricted to litigation with an emphasis on employment law. I have tried cases to verdict in State and Federal Court before the honorable Judge Vratil, Judge Harman, Judge Manners, Judge Grate, Judge Roldan, and Judge Otto.

5.     I am familiar with plaintiff's attorneys' hourly rates in civil litigation matters. The

prevailing market rates for attorneys practicing ERISA employment litigation ranges from a low end of $250.00 per hour (for attorneys with little or no experience) up to $950.00 per hour (for the most experienced trial lawyers).  A liberal interpretation of ERISA necessitates that skilled counsel be adequately compensated for their work, it is imperative that plaintiff's attorneys be encouraged to accept such cases on a contingent fee basis through an adequate and truly compensable award of statutory attorney's fees.  The risk to a plaintiff's lawyer in taking these types of cases on a contingent fee and advancing hundreds of thousands of dollars in expenses is extremely high.

      6.     I am personally acquainted with Ken McClain, Chelsea Pierce, Jonathan Soper, J'Nan Kimak, Melanie Mitchell and David Olsen, the attorneys and staff at Humphrey Farrington and McClain who have served as counsel for Claimant.  Ken McClain is one of the foremost trial attorneys in the Country litigating complex issues ranging from environmental contamination cases, diacetyl exposure, cigarette litigation and complex fiduciary litigation.  Mr. McClain's trial experience is unrivaled by any attorney in this Country.  Mr. McClain has worked on this case since 2016.  Since the Summer of 2020, when cases were first set, Mr. McClain has been working round the clock preparing these cases for trial.  Mr. McClain never ceases in his pursuit of improving the presentation of these cases – often calling at all hours to discuss strategies and thoughts on improving the evidence presented.  In taking this case, Mr. McClain has been forced to forego other case and other matters.  Moreover, Respondent DST and in particular the attorneys at Paul Weis have taken a scorched earth approach to this litigation.  As of this date, Mr. McClain has personally tried this case more than 200 times.  Mr. McClain, because of DST's tactics is forced to focus almost exclusively on litigating this case, to the exclusion of other business.  This constitutes an incredible financial sacrifice for a firm that is, undoubtedly, reliant on Mr. McClain as a primary source of firm income.  After trying this case over 200 times, DST is now appealing

virtually every single decision rendered by an arbitrator in favor of a claimant. This case will be appealed. The goal is simple, DST wants to prevent any arbitration claimant from recovering what he or she is awarded, and further DST is attempting to prevent counsel for the arbitration claimant from recovering any fees associated with the services rendered. This is a war of attrition and that must be considered when evaluating the time, effort and expense that has been devoted by Claimant's counsel, who not only face the risk of losing, but also face a multi-billion dollar company that is committed to taking every step possible to ensure its employees and their counsel *never* recover these losses or earn a fee associated with recovering these losses. Mr. McClain's hourly rate for this matter is $950/hour this rate is reasonable based upon his experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case. Moreover, this rate is reasonable considering that Mr. McClain has a nationwide practice and there are virtually no lawyers, who bill by the hour, who have even a fraction of the trial experience of Mr. McClain. In this particular case, DST's counsel Robert Adams is billing at a rate of $890/hour. While Mr. Adams is an accomplished, veteran trial attorney, Mr. McClain has nevertheless, bested Mr. Adams on more than one occasion.

7.     I have known Chelsea Pierce for more than twenty years and I have personally observed her work in this matter. Ms. Pierce has had primary responsibility for ensuring that every task that is necessary to try over five hundred arbitrations is tracked, assigned, and timely completed. This is an incredible task. Ms. Pierce is often emailing assignments to counsel at all hours of the night and regularly working 12-16 hour days that include attending hearings, conferences, and ensuring that a team of lawyers and paralegals are able to accomplish all tasks needed to try these cases. While this effort has been ongoing for years, for each specific case,

3

months before the case is heard, Ms. Pierce attends the case management conference and coordinates the monitoring and compliance with all deadlines as well as specific requests of arbitrators. Before the hearings, Ms. Pierce supervises the creation and dissemination of all witness lists, exhibits and trial notebooks. These are often sent all over the country to accommodate the requests of arbitrators. Finally, Ms. Pierce monitors hearings while maintaining detailed information regarding information that is requested and needed for each matter. Because the Claimants' counsel are not law firms made up of any army of lawyers and paralegals, the Claimant's counsel have often had to perform the work of two or three lawyers. Ms. Pierce is unmatched in the effort she has personally devoted to the Claimants. Chelsea Pierce's hourly rate for this matter is $400/hour this rate is reasonable based upon her experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case.

8.     I have known Jonathan Soper since he was in my trial advocacy class at the University of Missouri Kansas City School of Law. Mr. Soper combines unparalleled research and writing skills with the common sense and creativity necessary for trial work. I have personally observed Mr. Soper's work on this matter and it has far exceeded that of the work product submitted by Respondent. Mr. Soper, like all of Claimant's counsel, has been working on this matter since 2016. Thus, what the arbitrators see for one week is, in fact, the culmination of years of effort on the part of this litigation team. There have been numerous roadblocks and efforts to derail this litigation since 2016 and these roadblocks will continue. DST has appealed almost every ruling against it including fee awards. Mr. Soper has been on the front line of each of these battles with DST assisting with the briefing and work necessary to prepare these cases for trial. Beginning in the summer of 2020, Mr. Soper turned his attention to assisting to prepare this matter

for trial. Mr. Soper, along with other attorneys on the team, assisted in preparing initial exams of virtually every witness. Mr. Soper has also taken the lead in preparing and briefing fee submissions and applications. Mr. Soper, like Ms. Pierce, has done the work of two or three lawyers. He has worked tirelessly advancing the Claimant's cause while constantly being bombarded with personal, mean-spirited accusations from the Paul Weiss counsel; including, allegations of overbilling, overworking a file and having too many lawyers work on a case. While this may simply be excused as part of the litigation process, the spiteful and harsh rhetoric aimed at counsel for the Claimant's does take its toll. Every lawyer representing the arbitration Claimant's wakes up in the morning prepared to dedicate his or her entire day, no matter how many hours that may be, to the singular focus of restoring losses to the retirement accounts of hardworking DST employees. This is a grueling process, made infinitely more difficult by counsel more interested in personally attacking the claimants and their lawyers and delaying the recovery of any funds due to the DST employees than defending against these allegations. Mr. Soper's rate for this case is $600 per hour this rate is reasonable based upon his experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case. Moreover, Mr. Soper practices alongside Mr. McClain and, thus, has a nationwide practice.

9.     I have personally observed the work of J'Nan Kimak. Ms. Kimak is incredibly organized and has maintained responsibility for auditing all billing statements submitted for submission by Plaintiff's counsel. Ms. Kimak has spent hundreds of hours on this matter, reviewing fee submissions and verifying the accuracy of the time submitted serving to ensure that every minute submitted is fair, reasonable, and accurate. I have personally received emails from Ms. Kimak at all hours of the day and night. She has vigilantly ensured the accuracy of the billing

information that has been submitted. Moreover, Ms. Kimak has overseen and monitored the payment of hundreds of thousands of dollars of expenses that Claimants' counsel has advanced in furtherance of the prosecution of this case without any guarantee or assurance that such amounts will ever be paid, even if they are awarded. Ms. Kimak has tracked and monitored these payments to allow Claimant's counsel to submit concise and documented evidence of costs and expenses. Ms. Kimak's hourly rate for this case is $500, this rate is reasonable based upon her experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case.

10.     I have personally observed the work of Melanie Mitchell, a paralegal with Humphrey, Farrington and McClain, who has worked diligently on this case. Ms. Mitchell has participated in all facets of this case from attending hearings and responding to requests for documents and information during trial. Moreover, Ms. Mitchell has been preparing and organizing all exhibits for submission to arbitrators in advance of hearing and coordinating the production of transcripts week after week. Ms. Mitchell has assisted in allowing counsel to present this case week after week after week in a seamless manner, rarely, missing a deadline and rising to every logistical challenge created in trying these cases. Ms. Mitchell's hourly rate for this case is $200 hour this rate is reasonable based upon her experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case.

11.     I am familiar with and have directly supervised the work of David Olsen. Mr. Olsen is a technical genius who week after week runs these hearings. It has been suggested that watching this trial week after week be included as a recognized form of torture in the Geneva Convention. Mr. Olsen's persistence in providing the technical presentation on this case is an incredible feat.

He is often asked to locate and display document on short notice, resolve the IT problems of attorney and arbitrators on the Zoom calls and monitor the hearings to ensure proper presentation of evidence and video clips. Mr. Olsen's hourly rate for this case is $250 hour this rate is reasonable based upon his experience, the time and effort required to prosecute this case, the novel legal issues presented, the incredible investment of time this has required and the undesirability of this case

12.     I have personally been working on this case since 2016 when we first became involved. I have participated in and/or overseen every aspect of the work performed by the Humphrey Farrington and McClain firm. Each and every hour dedicated to this case was reasonable, necessary and required to achieve the results that have been achieved.

13.     I have reviewed the billing statements and the requested fee of $88,694.60. I believe the hours expended, 10,687.51 are reasonable and in line with the scorched earth defense.

14.     It is my opinion that this "lodestar" amount of attorneys' fees requested in this case is fair, reasonable, and necessary to compensate Claimant's counsel for the legal work they performed, particularly in light of the excellent results obtained.

15.     In addition to the lodestar amount, Eighth Circuit law permits Claimant's counsel to recover as attorney fees reasonable out of pocket litigation expenses that would ordinarily be borne by a client. Plaintiff's request for these expenses in the amount of $37,820.76 is reasonable and in line with a case of this magnitude.

16.     Finally, Claimant's Counsel is entitled to statutory costs of $16,987.10. These costs are justified, and Respondents have not been challenging them.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NOT.

George E. Kapke Jr.

Subscribed and sworn to me this 10ᵗʰ day of May, 2021

Notary Public

My Commission Expires:

6/7/22

PATRICIA A. PARKS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires June 7, 2022
Commission # 14897255

8

# EXHIBIT 8

**<u>AFFIDAVIT OF HONORABLE RONALD R. HOLLIGER (RET.) IN SUPPORT OF
CLAIMANT'S MOTION FOR ATTORNEY'S FEES AND EXPENSES</u>**

STATE OF MISSOURI      )
COUNTY OF JACKSON    )

I, Ronald R. Holliger, after being duly sworn, upon my oath, state the following:

1.      I am currently licensed to practice law in the State of Missouri and I have been actively practicing law since 1973. For 22 years I was in private practice engaged in litigation including medical malpractice, products liability and employment litigation until 1995 when I was appointed as a Circuit Judge for the Sixteenth Judicial Circuit in Kansas County, Missouri. In 2000, I was appointed to the Missouri Court of Appeals for the Western District of Missouri. Following my retirement from the Court of Appeals, I became General Counsel to the Missouri Attorney General in 2009 and in 2014 I was appointed Special Counsel for the Missouri Attorney General.

2.      Currently, I operate the Holliger Law Group and my practice is focused on appellate litigation, serving as a testifying expert witness, and alternative dispute resolution.

3.      During my service as a trial judge, I presided over hundreds of jury and non-jury trials and was responsible for awarding attorney fees in various matters whether such fees were provided for by statute or contract. As an Appellate Judge, I presided over hundreds of appeals relating to all facets of Missouri law. In that role, I was called upon to evaluate and determine litigants' rights to recover attorney fees and address cases wherein the legal standard to award a fee was met and whether an awarded fee was reasonable.

4.      A copy of my Resume is attached hereto.

5.      In preparing to offer an opinion in this matter, I have been provided and reviewed the following materials: 1) Claimant's Application for Fees and Expenses and exhibits; 2)

1

Claimant's Specific Time; 3) Group Time; 4) Backup for Claimant's Reasonable Out of Pocket Expenses and Statutory Costs; 5) the Attorney Client Agreement; 6) DST's Opposition to Claimant's Application for Fees and Expenses in another related arbitration, *Lovell*; and 7) Arbitrator Vering's Interim Award in the *Payne* matter.

6.  All opinions expressed in this affidavit I hold to a reasonable degree of legal certainty based upon my 48 years in the legal profession as a practicing attorney, judge and government counsel.

7.  The claims pursued in this matter are asserted under the Employee Retirement Income Security Act ("ERISA"). ERISA allows courts in their discretion to "allow a reasonable attorney's fees and costs of action to either party." 29 U.S.C.A. § 1132. The Supreme Court explains this does not require the Claimant to prevail, only that he show "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 245, 130 S. Ct. 2149, 2152, 176 L. Ed. 2d 998 (2010) (quoting *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)). To meet this requirement, a litigant must only show something beyond a "trivial" success or "procedural victory." *Id.*

8.  Because ERISA is a remedial statute, under Eighth Circuit law, a fee award should be denied in only the rarest of circumstances. *See Starr v. Metro Sys. Inc.*, 461 F.3d 1036, 1041 (8th Cir. 2006).

9.  Both the Eighth Circuit and Missouri courts approve the use of the lodestar methodology in determining whether a fee award is reasonable. *See Brown v. Aventis Pharm., Inc.,* 341 F.3d 822, 829 (8th Cir. 2003), *see also Local 513, Int'l Union Operating Engineers v. Larry Ortmann Contracting, Inc*., No. 4:08-CV-1177 CAS, 2009 WL 151698, at *2 (E.D. Mo. Jan. 22, 2009) ("The Eighth Circuit has affirmed this Court's use of the lodestar approach to

determining an attorney's fee award in an ERISA withdrawal liability case."); *See also Berry v. Volkswagen Group of America, Inc.* 397 S.W.3d 425, 430 (Mo. App. W.D. 2013)

10.     The lodestar methodology consists of 12 factors to be considered in determining the reasonableness of an award of attorney's fees.  The factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

## The time and labor required

11.     I have reviewed the time entries provided by Counsel associated with this matter including both specific and common time.  It should be noted that under the lodestar methodology, the question to be answered is the time and labor required to "properly" represent the client.  While I understand that Claimant's counsel represents hundreds of plan participants, the amount of work necessary to "properly" represent each of those individuals necessarily includes the common time, that is, work that benefits all of the clients.  For instance, the parties reviewed hundreds of thousands of documents, conducted common discovery and generally prepared a common liability case against the Respondent DST.  This work would have been necessary regardless of whether there were one or five hundred cases and therefore it is consistent with the lodestar methodology.  Claimant's counsel has proposed a one percent allocation of this Group Time  to this case  with the caveat that they will not collect more than 100% of the Group Time,  thus ensuring that counsel is  not compensated twice.

3

12.     In reviewing the entries, I find the time spent on this matter to be reasonable.  As a Judge, if I wanted to test the reasonableness of the time spent on a matter, I would regularly ask a Defendant for all time spent on the matter.  I understand in this situation, that Respondent does not separately bill for each matter, but criticizes Claimant's inclusion of common time for reimbursement.  I would be shocked if the time spent by Respondent is not an order of magnitude greater than that spent on this matter by Claimant.  Certainly, there would be no harm in seeing the combined hours collectively spent by all Defense firms in litigating this and related cases.  Even without the Respondent's time, it is my opinion that the time spent on this matter, as reflected in both the common and specific time, was reasonable and necessary to properly represent Claimant.

**Novelty and difficulty of the questions presented**.

13.     This litigation is both legally, factually, and logistically novel and difficult.  As a preliminary matter ERISA is a complex statute and this case presents exceedingly complex issues that relate to the intersection of fiduciary liability, securities law, and complex damage modeling.  Thus, simply from the single case perspective this case would meet the novel and difficult prong of the lodestar methodology.  However, the liability and damages of the specific case is one facet of a multi-faceted defense advanced by a sophisticated defendant that has aimed to use multiple procedural tools to influence the outcome of this litigation.  Respondent DST, when initially confronted with this case as a class-action sought to, and prevailed in, compelling the individual arbitration of potentially thousands of claims.  This resulted in an exponential increase in both the difficulty and novelty of each case.  Claimant's counsel was forced to prepare to litigate hundreds of individual claims.  This adds to the complexity at every stage of the litigation, from staffing all the way to trying these cases.

14. It appears DST's success in compelling individual arbitrations was a classic example of being careful what you wish for. It appears that DST now seeks to extricate itself from the arbitration albatross. DST seeks to impose a mandatory, non-opt out class action upon the arbitration claimants. To do so, DST has reversed the position it took in compelling arbitration and is now advocating class relief. This about-face and the nuanced ERISA related issues it raises are on the forefront of modern legal issues. There are only a handful of courts in the country that have wrestled with the precise issues that DST is using as a means of avoiding the contractual obligation to arbitrate claims, although in Missouri courts have refused to permit parties seeking arbitration to later waive unilaterally that contractual obligation. Thus, as far as novel legal questions are concerned, this case is on the leading edge of litigating arguably unresolved ERISA issues. This case unquestionably raises a web of complex and novel legal issues.

## The skill requisite to perform legal services properly.

15. The lawyers prosecuting this case, on both sides, are among the best in the country. This is complex, high-stakes litigation. There are few firms capable of properly providing the requisite legal services to more than 500 individual claimants. However, Counsel for the claimant's results demonstrate that they have the requisite skills to properly provide the legal services necessary to combat a multi-billion-dollar corporation that appears to seek a trial on every single case filed.

## The Customary Fee

16. It is difficult to use the term "customary" to describe anything associated with this case. As detailed above, some of the best attorneys in the nation are facing off in litigation that, at the individual case level is both complex and yet has been reduced to a manageable one-week hearing, and at a broader level raises issues related to the intersection of arbitration, class action,

and ERISA that have been addressed by only a handful of courts in the country. Accordingly, it is difficult to describe any fee warranted on this litigation as customary or usual. Rather, I can safely say that the litigation services provided by Claimant's counsel are on par with attorney's fees awards in the most sophisticated and novel litigation as is seen throughout the country.

17. The hourly rates requested by Claimant's counsel in this case are consistent with the rates awarded in ERISA matters pending in the Eighth Circuit. *See Spano v. Boeing Co*., No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016); *see also Tussey v. ABB, Inc.,* No. 06-04305-CV-C-NKL, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012), vacated and remanded, 746 F.3d 327 (8th Cir. 2014) (citing *Eshelman v. Client Services, Inc., et al*., No: 0822–cv–00763 (22d Cir.Mo. Dec. 7, 2009)). They also compare favorably with the hourly rates Respondent's counsel charge.

18. The hourly rates proposed by Claimant's counsel are reasonable, considering counsel's experience and effort as well as the customary fees charged in complex litigation. Moreover, each of these firms is committing extraordinary resources to the prosecution of these cases both in connection with the expenditures necessary to litigate the cases, the staffing necessary to adequately work these cases and the willingness to forego other work.

**Whether the fee is fixed or contingent**

19. While Claimant's counsel has entered into a contingent fee agreement with their clients, that agreement specifically recognizes the right to seek and apply for fees under ERISA. Accordingly, the clear intent of this agreement is to provide a mechanism for the determination of the fee in the event of settlement. It is not, as Respondent would suggest, somehow a cap on what constitutes a reasonable fee.

20. Regardless, Eighth Circuit law is clear that a fee agreement is not intended to serve

as a cap when considering the reasonable fee to be awarded pursuant to the Lodestar methodology. *Quigley v. Winter*, 598 F.3d 938, 956 (8th Cir. 2010).

<u>**Time limitations imposed by client or the circumstances**</u>

21.    Claimants counsel have been working on this litigation in some form since 2016. Moreover, during the past several months Claimant's counsel have been trying hundreds of arbitrations week after week.  In each of these cases, Claimant's counsel has sought to achieve the benefits of arbitration by diligently seeking rapid trial settings requiring the preparation of a complex ERISA case on a relatively tight timetable.

<u>**The amount involved and the results obtained.**</u>

22.    The DST PSP lost over $300 million dollars in its employees' retirement savings. Claimant's counsel has undertaken efforts to restore as much of that loss to their clients as possible and has done so with exceptional rates of success.  Claimants have prevailed in 103 of 120 cases wherein awards or settlements have been entered.  In Claimant's particular case, a recovery of $30,733.00 was achieved.  This incredible success has taken incredible effort.  Claimant has fought and continues to fight every procedural hurdle and obstacle that can be placed before it.  Each of these obstacles was, apparently intended to derail or altogether stop the arbitration proceedings. Claimant's counsel is entitled to a fee reflecting the value of all work performed.  Claimant's counsel has been successful in recovering large percentages of loss for its clients and this alone should merit recovery of a full fee.  However, Claimant's counsel has also been challenged at every point, needlessly increasing the time and expenses that has been required to litigate this case.

23.    Respondent should not be encouraged in its scorched earth litigation tactics through a reduction in Claimant's counsel's fee award.   Rather, when a party has elected to maximize the cost associated with litigation, especially in a case wherein liability is clear, then that party should

be forced to pay the associated additional time and expense its actions cost Claimant. To conclude otherwise is, in my opinion, simply rewarding that behavior which most jurists seek to prohibit or at least limit.

## The experience, reputation and ability of the attorneys.

24. The attorneys representing the Claimant in this matter are among the best I have observed. I have seen attorneys from across the country appear before me as both a trial and appellate judge. I have, in fact, litigated with or against two of the firms. I can confidently state that counsel for Claimant is as talented, experienced, hard-working and zealous as any lawyers I have seen. Additionally, I am aware that each firm has an impeccable reputation for both the highest degree of ethical behavior as well as for success in litigating difficult cases. I anticipate counsel will provide you a list of their accomplishments and experiences, I can attest that these lawyers are highly regarded, highly talented and have achieved incredible success in these cases, consistent with their reputations for outstanding work.

## The undesirability of the case

25. Whether Claimants filed one arbitration or one thousand, they were going to have to perform certain work no matter what. Specifically, to properly litigate this case, Claimants were going to have to review hundreds of thousands of pages of documents, undertake depositions of key decision makers, and prepare a trial strategy and damage model consistent with the facts of the case. None of that time is reflected in the "Claimant Specific Time." Nevertheless, that is among the factors that make this case highly undesirable. Moreover, the arbitration agreement and class action waiver itself, can be viewed as significantly undesirable for most counsel. Each of these cases is being litigated one at a time. These factors reflect the "undesirability" of this case. Further, DST is intentionally making this case as "undesirable" as possible by seeking to,

for lack of a better term, "undo" what Claimant's counsel has accomplished by changing its position and now welcoming a class action that could severely restrict the Claimant's recovery.

### The nature and length of the professional relationship with the client

26. I am advised that Claimant's counsel have represented Mr. Giro since July, 2018.

### Awards in similar cases

27. There are ample decisions reflecting awards in similar cases. The following are a few awards demonstrating that Claimant's fee request is reasonable.

     a. Percy Payne v. DST Systems Inc., fee award of $410,285.00. Arbitrator Vering is known to affiant, has a stellar reputation and provided a 28-page order evaluating every aspect of the fee award. His reasoning is persuasive.

     b. Joshua Rhodes v. DST Systems Inc., fee award $269,428.47

     c. Scott Yungeberg v. DST Systems, Inc., fee award $228,878.35

     d. Leanne Trimble v. DST Systems, Inc., fee award $270,787.03

     e. Greg Bedell v. DST Systems Inc., fee award $231,151.25

     f. Darren Kinney v. DST Systems Inc., fee award $546,130

FURTHER AFFIANT SAYETH NOT.

_____

Hon. Ronald R. Holliger, (Ret.)

Subscribed and sworn to me this 10th day of May, 2021

Notary Public

My Commission Expires:

_6/7/22_____

PATRICIA A. PARKS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires June 7, 2022
Commission # 14897255

# HON. RONALD R. HOLLIGER

Attorney at Law

Address:    704 S. E. Blue Bird

Blue Springs, Mo. 64014

Phone:    816-547-5640 E-Mail

ronholliger@gmail.com

**Education**:

B.S.   University of Missouri Kansas City, 1969

J.D.   University of Missouri at Kansas City 1973

**Professional Licensures:**

Supreme Court of Missouri

Supreme Court of United States

United States Tax Court

U.S. Court of Appeals- 8th Circuit

U.S. Court of Appeals- 10th Circuit

United States District Court for Western District of Mo.

**Professional Associations:**

Missouri Bar Association

Kansas City Bar Association

American Bar Association

American Inns of Court

Association of Conflict Resolution

**Employment:**

Law Clerk, Missouri Court of Appeals 1973-74

Private Practice of Law   1974-1995

Judge, Circuit Court of Jackson County 1995-2000

Judge, Missouri Court of Appeals Western District 2000-   2009

General Counsel, Missouri Attorney General 2009-2014

Special Counsel, Missouri Attorney General January 2014-2016

**Teaching Experience:**

Adjunct Professor William Jewell College

Adjunct Professor Metropolitan Junior College

Adjunct Professor University of Missouri School of Law

Also have taught dozens of topics at various CLE's and at Missouri Trial Court Colleges and New Judge Orientation

**Professional Associations and Positions:**

Chair, Supreme Court Commission on Alternative Dispute Resolution in Domestic Cases, 1999-2007

Chair, Missouri Trial Judge Education Committee, 2000-2009

President, Ross T. Roberts Chapter American Inns of Court 2004-2008, Master 1996-2004

President, Elwood Thomas Inn of Court 2011, Master 2009-2012

Member, Joint Supreme Court and Mo. Bar Implementation Committee on Pro Se Litigation 2004

Member, Coordinating Commission on Judicial Branch Education 2000-2009

Member Supreme Court Judicial Education Committee 1996-2009

Editorial Board, Missouri Trial Judge's Bench Book

Vice President Missouri Circuit Judges Association 1999-2000

Numerous 16th Judicial Circuit Committees including Chair of Ad Hoc Committee on Docket Reform

Member, numerous KCMBA and Mo. Bar committees

Planning and Presentation of pilot project by National Center for State Courts for opinion writing in high profile cases

**Judicial Experience:**

Circuit Judge, over 100 jury and court tried cases and over 400 juvenile court cases

Appellate Judge, sat on approximately 1100 cases and authored approximately 451 opinions

**Appellate Practice:**

I served as the principal briefing attorney and argued approximately 25 cases before various appellate courts, including the Missouri Supreme Court, while in private practice.

After becoming General Counsel for the Missouri Attorney General I argued 4 –5 cases in Western and Eastern Districts and over 6 in the Missouri Supreme Court

# COMMITTEES

Chair, Supreme Court Commission on Alternative Dispute Resolution in Domestic Relations Cases 1999-2006

Chair, Missouri Judicial Education Committee 1996-2008

Member, Joint Supreme Court and Missouri Bar Implementation Committee on Pros Se Litigation 2004

Member, Coordinating Commission on Judicial Branch Education Committee 2000-2007

Chair of Trial Judge Education Committee, 2000-2008 responsible for 0ver 80 hours annually of Judge Training

KCMBA Committees

      Chair, Juvenile law

      Family Law

      Circuit Court Committee

      Appellate Law Committee

16th Circuit Committees

      Executive

      Family Court

      Budget

      Technology

      Facilities

Rules Committee

Electronic Filing Committee

Chair, Ad Hoc Committee on Docket Reform

Missouri Bar Committees, Numerous including member of original Alternative Dispute Resolution Committee which drafted the initial Rule 17 in 1988.

## Inns of Court

Ross T. Roberts Inn, Kansas City Master 1996 to 2004, President 2004-2008

Elwood Thomas Inn, Jefferson City-Columbia Inn 2008- 2014   President 2008-2010

## TEACHING

Missouri Association of Trial Attorneys, Panel member on Update of the Law 1997 to present

MATA

Keeping Your Clients' Verdict 1996

Spotting Comparative Negligence Issues 1992

Arbitration and Mediation 1991

Special Problems in Jury Instructions Products Liability & Malpractice 1990

Missouri Judicial Education

Judicial Independence and Judicial Accountability:  What's the Difference 2004

Premise Liability

Juror Note Taking

Medical Privileges Waiver and Ethical Issues

    Civil Instructions

    Pretrial Matters and Voir Dire

    New Judge Orientation 1997-2008 Judicial Fact Finding,
Evidence

    Judicial Philosophy

    Missouri Organization of Defense Lawyers Trial Academy 2003S

Attorney General of Missouri 2008-2014

    Oversaw all Training Programs for Assistant Attorney Generals consisting of approximately 40 hours of annual training and weeklong trial academy.

## PUBLICATIONS

Comparative Fault, Strict Liability and Crashworthiness Cases, 217 Journal of the Missouri Bar June 1995

Editor, Missouri Pretrial Civil Litigation LexisNexis Practice Guide 2019-present

# EXHIBIT 9

## AMERICAN ARBITRATION ASSOCIATION
### Employment Arbitration Tribunal

| | | |
|---|---|---|
| PERCY PAYNE, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| vs. | ) | AAA No. 01-18-0003-0418 |
| | ) | |
| DST SYSTEMS, INC., | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## FINAL AWARD AND ORDER REGARDING APPLICATION FOR ATTORNEY'S FEES AND COSTS

### Introduction

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the personnel manual or employment agreement entered into by the above-named parties and having been duly sworn and having duly heard the proofs and allegations of the parties, and Claimant being represented by The Klamann Law Firm, Kapke & Willerth, LLC, Humphrey, Farrington & McClain PC, Kent, Beatty & Gordon, LLP and White Graham Buckley & Carr, LLC, and Respondent being represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, Stinson LLP, and Shook, Hardy & Bacon LLP, hereby AWARD, as follows:

The parties have settled their dispute except for the sole pending issue of Claimant's August 28, 2020 Application for Attorney's Fees and Costs which seeks $502,967.85 in fees plus $10,018 in costs.[1] Claimant Percy Payne (herein "Claimant" or "Payne" or "Mr. Payne") seeks $416,245 for 566.35 hours spent specifically on the Percy Payne claim plus $76,704.60 which according to Claimant's Counsel represents a fair percentage of Group Time that benefited

---

[1] Claimant's counsel advises that this $10,018.25 in costs (less a $500 credit) is being sought in three different arbitrations and that in the event these costs are awarded in more than one Fee Application that a deduction will be applied to offset costs to avoid a double recovery.

1647107v1

1

Mr. Payne and the claimants in 495 other arbitrations asserting the same claims. This $76,704.60 represents 1% (valued at $76,704) of Total Group Time (11,233.51 hours of Total Group Time having an alleged value of $7,670,460) for work on all 495 arbitrations that benefits all arbitrations rather than a specific arbitration. Claimant's counsel argues that the fee request is reasonable under the loadstar method and that Claimant's counsel is not limited to a 40% contingency fee.

Respondent DST Systems, Inc. (herein "Respondent" or "DST") has opposed Claimant's fee request and has suggested that Claimant's attorneys' fees should be limited to, at most, $589.56, representing 40% of the claimed recovery [$1,473.91] plus costs of $10,018.25. DST takes the position that Claimant's fee agreement provides for a 40% recovery and points out that Claimant's attorneys have sought and obtained a 40% recovery in other arbitrations and that Claimant's counsel accepted a 40% fee in this case on the settlement amount paid by Ruane, Cunniff & Goldfarb, Inc. (herein "Ruane"). In the alternative, DST argues that if the attorneys' fee is calculated based on the loadstar method that the fees allowed should be greatly reduced because some time records were not contemporaneously prepared, the hours allegedly spent were inflated by inclusion of time spent on other separate litigation and arbitrations, time spent in cases where DST was not a party and cases in which a federal judge disqualified Claimant's counsel. DST also claims that the fees being sought are grossly disproportionate to the amount of the recovery, that the claimed hourly rates are too high, and that the number of hours claimed should be reduced because of alleged vague time entries, failure to bill by one-tenths of an hour, alleged unnecessary duplication of efforts and because certain tasks could have been performed by less senior attorneys at lower rates or by paralegals. These and other arguments will be addressed below.

2

Both parties agreed at the hearing on attorneys' fees to a reasoned opinion and agreed that there was no need for additional briefing prior to an award on the attorneys' fees and costs issue.

**A.      The Arbitrator is an expert on attorney's fees and familiar with the issues and counsel in this case, and he has wide discretion in awarding attorneys' fees.**

The Eighth Circuit affords courts wide discretion to determine whatever amount of attorney's fees is appropriate. Unless it is clear the court abused this discretion, any amount of attorney's fees may be awarded. "The amount of an award of attorneys' fees rests within the sound discretion of the court and we will not disturb it absent clear abuse of that discretion." *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009) (citing *Walton Gen. Contractors, Inc./Malco Steel, Inc. v. Chicago Forming, Inc.,* 111 F.3d 1376, 1385 (8th Cir.1997)).

The court presiding over the case is afforded this broad discretion because it "knows all the case's issues" and "is an expert on the question of attorney fees." *In re Alcolac, Inc. Litigation,* 945 S.W.2d 459, 461 (Mo. App. W.D. 1997) (citing *Roberts v. M c Nary,* 636 S.W.2d 332, 338 (Mo. banc 1982) (overturned on other grounds)), *see also Berry v. Volkswagen Group of America, Inc.* 397 S.W.3d 425, 430 (Mo. App. W.D. 2013) ("The trial court is deemed an expert at fashioning an award of attorney's fees and may do so at its discretion."). The Arbitrator knows the case, is familiar with the attorneys and the work performed.  In addition, the Arbitrator has over 40 years of experience as a practicing attorney in Kansas City, Missouri, has litigated, mediated and decided attorneys' fees issues in the past, and is familiar with attorneys' rates in Kansas City and Missouri.  Under applicable law, the Arbitrator has great discretion in determining what amount of attorney's fees that is reasonable.

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 112 of 195

**B.     Claimant's Counsel is not limited to a contingency fee award of 40% of the recovery.**

DST argues that Claimant's attorneys' fees should be limited to 40% of the recovery. While the attorneys' fee agreement between Claimant and his counsel does provide that counsel "will be entitled to a fee of 40% of the gross compensation you are awarded by a jury, arbitration panel or agree to accept in settlement," it goes on to say that "[b]ecause the statute we are suing under allows for the recovery of attorneys' fees we will be requesting that our fees be included in any final judgment or settlement." The Arbitrator concludes that the intent of the fee agreement was to allow Claimant's counsel to choose between a 40% contingency and the loadstar method, which is consistent with applicable law.

As DST admitted in its Opposition to Claimant's Counsel's Application for Attorney's Fees and Costs (herein "DST Opposition") at p. 8:

> Courts within the Eighth Circuit use two main approaches to determine an appropriate fee: (1) the percentage of the benefit approach or (2) the lodestar method. *Keil* v. *Lopez*, 862 F.3d 685, 701 (8th Cir. 2017); *see also Johnston* v. *Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996). **The Eighth Circuit has found "[i]t is within the discretion of the district court to choose which method to apply."** *Johnston,* 83 F.3d at 246. (Emphasis supplied).

The Arbitrator finds as a matter of fact and conclusion of law that Claimant may seek recovery of attorneys' fees under the loadstar method, and Claimant's counsel are not limited to a recovery of 40% of the settlement amount.

**C.     Mr. Payne is a prevailing party.**

ERISA allows courts in their discretion to "allow a reasonable attorney's fees and costs of action to either party." 29 U.S.C.A. § 1132. The Supreme Court explains this does not require the Claimant to prevail, only that he shows "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245, 130 S. Ct. 2149, 2152, 176 L. Ed. 2d 998 (2010) (*quoting*

4

*Ruckelshaus v. Sierra Club,* 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)). In order to meet this requirement, a litigant must show more than a "trivial" success or a "procedural victory." *Id.*

Because a settlement is not just a procedural victory, a party that obtains a settlement is a "prevailing party." "The phrase 'prevailing party' should not be limited to a victory only after entry of a final judgment following a full trial on the merits. A party may be deemed prevailing if he or she obtains a favorable settlement of the case..." *U. S. for Heydt v. Citizens State Bank*, 668 F.2d 444, 447 (8th Cir. 1982), *See also Wray v. Clarke*, 151 F.3d 807, 809 (8th Cir.1998) ("The term 'prevailing party' includes a civil rights complainant that prevails through settlement in lieu of litigation.").

> **D.     The Eighth Circuit holds a prevailing claimant in an ERISA claim should be denied attorney's fees in only the rarest of circumstances.**

DST has not disputed that Mr. Payne recovered 100% of his damages; thus, he has prevailed in full. He is therefore eligible for attorney fees absent the rarest of circumstances, which do not exist here. "[A]lthough there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees." *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1041 (8th Cir. 2006). The reason a prevailing plaintiff almost always receives fees is that ERISA is liberally construed to protect employees' retirement savings by securing their ability to litigate their claims. ERISA is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans. A district court considering a motion for attorney's fees under ERISA should therefore apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts. *Id.*, (quoting *Welsh v. Burlington N., Inc., Employee Benefits Plan*, 54 F.3d 1331, 1342 (8th Cir.1995)).

1647107v1

There are five factors a court should consider when determining if the case before it is the rare ERISA case that does not warrant an award of fees:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984). Not all of these factors need to weigh in favor of the prevailing plaintiff to require an award of attorney's fees. For instance, in *Starr*, the Eighth Circuit held it was an abuse of discretion to deny attorney's fees even though the first and fourth factors were not met. *Starr*, 461 F.3d at 1041. While the defendant did not act in bad faith and the plaintiff brought the case individually (as opposed to a class action), he was still entitled to attorney's fees because the defendant had the ability to pay attorney's fees, attorney's fees would serve as a deterrence, and the defendants lost on the merits (though survived summary judgment). *Id.* In denying fees, the court abused its discretion by undermining ERISA's purpose of empowering employees to recover losses to their retirement accounts: "Finally, given the remedial nature of ERISA legislation, and the need for ERISA litigants to have effective access to the courts to vindicate their rights, we hold that the district court abused its discretion in denying Starr's request for attorney fees." *Id.*

Here, like *Starr*, Mr. Payne's claim is not the rare case when the prevailing party can be denied attorney's fees. As in *Starr*, DST has the ability to pay. Attorney's fees will also deter DST from failing to monitor their employees' (including Mr. Payne's) retirement accounts in the future. The defendant in *Starr,* like DST in this case, survived summary judgment. Here, DST chose not

6

to defend on the merits, but decided to pay Mr. Payne 100% of his losses to settle his claim shortly before a hearing in the case after vigorously contesting his claim for over two years.

Mr. Payne did not prove that DST actions were highly culpable or that it acted in bad faith. However, he did produce evidence of some culpability by DST. For example, one of the members of the advisory committee gave a deposition wherein he continued to repeatedly insist he was never a fiduciary.

Mr. Payne also meets the fourth factor. Not only does his counsel represent 495 other plan participants, but it is clear DST had no interest in class-wide settlement until arbitration hearings were set to begin. Without Claimant's Counsel's efforts in filing and pursuing these arbitrations to a hearing, DST would likely still be taking the position that Plan-wide relief is impossible. Because Mr. Payne's arbitration was one of the earliest one, the work done pursuing his claims benefited all arbitration claimants represented by Claimants' counsel and may have benefited the other 9,500 Plan participants by encouraging DST to try to reach a class settlement. *Starr* is on-point. Moreover, Payne sought to resolve a significant legal question regarding ERISA relating to the liability of DST for failing to monitor Ruane, its investment adviser.

As to the fifth factor, the Arbitrator finds that by settling for the amount claimed by Payne, the relative merits of the parties' positions favors an award of Claimant's attorneys' fees.

The Arbitrator finds as a matter of fact and law that this is not one of the rare cases where Claimant's request for fees should be denied. Indeed, DST does not contend that no fees should be allowed; rather, it contends that a 40% contingency or in the alternative a lower loadstar fee should be allowed.

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 116 of 195

**E.     The Eighth Circuit approves of using the "lodestar" method to determine the amount of attorney's fees in ERISA actions which begins with a reasonable rate multiplied by a reasonable number of hours.**

The Eighth Circuit approves using the "lodestar" method to determine reasonable attorney's fees in ERISA cases. *See Brown v. Aventis Pharm., Inc.,* 341 F.3d 822, 829 (8th Cir. 2003), *see also Local 513, Int'l Union Operating Engineers v. Larry Ortmann Contracting, Inc.,* No. 4:08-CV-1177 CAS, 2009 WL 151698, at *2 (E.D. Mo. Jan. 22, 2009) ("The Eighth Circuit has affirmed this Court's use of the lodestar approach to determining an attorney's fee award in an ERISA withdrawal liability case.") The lodestar is determined by the number of hours reasonably expended times a reasonable hourly rate for those hours. *Fish v. St. Cloud State Univ.,* 295 F.3d 849, 851 (8th Cir. 2002).

**i.     The twelve factors to consider when determining a reasonable loadstar**

There are twelve "legitimate factors" which courts in the Eighth Circuit should consider "in some if not most cases" when determining whether a proposed lodestar amount is reasonable. *Greater Kansas City Laborers Pension Fund v. Thummel,* 738 F.2d 926, 931 (8th Cir. 1984) (citing *Seymour v. Hull & Moreland Eng'g,* 605 F.2d 1105, 1117 (9th Cir. 1979)). These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Seymour,* 605 F.2d at 1117.

The Arbitrator has undertaken an analysis of these factors to determine if the requested fee is reasonable.

8

1. **The time and labor required and whether time spent defending Ruane, Cunniff & Goldfarb, LLC v. Payne, Case No. 19-civ-11297 (S.D.N.Y. 2019), Canfield, Mendon, and other cases is recoverable in this arbitration.**

The Arbitrator believes that the time and labor this case required was tremendous. It was one of the first of over 490 arbitrations. Due to the enormous amount of resources and time required to pursue 495 arbitrations, four law firms worked together to represent Mr. Payne. Each law firm dedicated at least two lawyers to these matters, many of whom have been working almost exclusively on these cases. Attached to Claimant's fee application as Exhibits 1-4 are affidavits from lead counsel for each one of the four law firms. As the affidavits show, many thousands of hours were spent advancing these arbitrations. Some of these hours were spent on tasks that benefited all cases – reviewing the tens of thousands of documents DST produced, preparing for depositions of DST's witnesses and experts, retaining and consulting with experts to understand the breaches of duty and damages – while other hours were spent specifically on Mr. Payne's case. These hours specific to Mr. Payne include work such as communicating directly with him, conference calls with the Arbitrator, preparing the scheduling order, responding to discovery, producing the expert reports specific to him, individualizing his motion for summary judgment and reply, preparing and producing him for his deposition, and preparing for his hearing which included pre-hearing briefs, preparing and filing exhibit and witness lists, and meeting with the trial team to discuss and plan for the hearing.

Mr. Payne's case presented some unique demands on counsel's time that were not present in some of the other arbitrations as explained below. For example, this arbitration was the first case Claimant's Counsel served and enforced discovery in. Hence, there were significant hours dedicated to pursuing discovery from DST and Ruane in this case, and the claims against both defendants were intertwined.

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 118 of 195

## Ruane v. Payne

Mr. Payne was sued in the Southern District of New York in an action seeking declaratory relief and an injunction to prevent Mr. Payne and other plan participants from proceeding with this and other arbitrations. *Ruane, Cunniff & Goldfarb, LLC v. Payne*, Case No. 19-civ-11297 (S.D.N.Y. 2019). Significantly, DST, which was a defendant in that case, joined with Ruane and sought to enjoin this arbitration and to prevent it from going forward and also sought to prevent 400 other individual arbitrations from going forward.

Hence, Claimant's Counsel had to defend the *Ruane v. Payne* lawsuit in the course of their representation of Mr. Payne in order to adequately prosecute this Arbitration. Claimant's counsel researched and prepared a motion to dismiss, as well as an opposition to the preliminary injunction motion. DST, for their part, filed a response in support of the preliminary injunction. The time required of Claimant's Counsel to defend the *Ruane v. Payne* lawsuit was significant and is reflected in the hours spent pursuing Mr. Payne's claim.

Claimant takes the position that all hours spent defending the *Ruane v. Payne* action are recoverable in this arbitration and has produced evidence that 189.55 hours (having an alleged value of $138,505.00) were spent defending this action. DST takes the position that none of the hours spent defending the *Ruane v. Payne* action are recoverable in this Arbitration. Both parties cite to *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999 (8th Cir. 2004). *Parke* addressed the question of "whether the phrase 'any action' [in 29 USC. Section 1132(g)(1)] refers only to formal judicial actions, or whether we should interpret it more broadly to encompass administrative proceedings that take place beforehand." *Parke* held that ERISA does not allow recovery of attorney's fees incurred "during pre-litigation administrative proceedings." Id. at 1011. However, *Parke* distinguished the pre-litigation administrative proceedings presented in *Parke*

10

from the situation where a subsequent administrative proceeding is closely related to resolution of a judicial action/ERISA proceeding or where the administrative proceeding is necessary for enforcement of a judicial decree. *Id.* at 1011.

The Arbitrator also notes that in *Grand Elec., LLC v. Int'l Bhd. of Elec. Workers Local 265*, 2011 WL 6740408, at *9 (D. Neb. Dec. 22, 2011), a case cited by DST, the court allowed Defendant Funds to recover for attorneys' fees incurred in defending the plaintiff's declaratory judgment action where the declaratory judgment action would have precluded the defendants from asserting a right to recover contributions under ERISA.

Thus, this Arbitrator finds that Claimant should recover against DST for time spent defending the declaratory/injunctive action in *Ruane, Cunniff & Goldfarb, LLC v. Payne, supra*. The Arbitrator will discuss below the number of hours that will be awarded for that work.

### Canfield and Mendon

DST also challenges Claimant's request for attorneys' fees for time under the Group Time categories for time spent unsuccessfully opposing their disqualification in the Canfield and Mendon cases filed in the Southern District of New York. The Arbitrator finds that this time is not closely related to this Arbitration and declines to award in this Arbitration attorneys' fees for that time and has taken into consideration the amount of that time in determining the amount of Group time that is being included in the attorneys' fee award entered herein.

### Ruane v. DuCharme

DST also seeks to disallow attorneys' fees claimed in connection with defense of the action filed in the United States District Court for the Western District of Missouri in *Ruane v. DuCharme*. Time spent by Claimant's counsel on this matter was included as Group Time. The Arbitrator has disallowed Group Time he identified as having been spent on *Ruane v. DuCharme*.

## Ferguson

DST also seeks to disallow Group Time devoted to opposing the proposed mandatory class action settlement in the *Ferguson* mandatory class action lawsuit which according to the record would have resulted in a settlement of 10% of the losses claimed while Payne was able to collect 100% of claimed losses in this Arbitration. The Arbitrator finds that this time is properly included in Group Time because it is closely related to this Arbitration. Had a mandatory class been approved it would have precluded Mr. Payne from recovering 90% of his damages.

## Total Hours Claimed

Claimant's counsels seek 11,233.51 hours on work they claim benefited Mr. Payne's claim. Of this time, 10,667.16 hours were allegedly spent on work that benefited all claimants as a group ("Group Hours"). Claimant asserts that because these Group Hours benefited Mr. Payne, many of them would have been required even if he were the only arbitration claimant represented by Claimant's Counsel. On top of the Group Hours, 566.35 hours are sought on matters specific to Mr. Payne's claim. The time and labor spent was substantial and justifies a substantial lodestar award. The number of hours approved for payment will be discussed below.

### 2. The novelty and difficulty of the questions presented.

"ERISA is a complex field that involves difficult and novel legal theories and often leads to lengthy litigation." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781 SRN/JSM, 2015 WL 4246879, at *1 (D. Minn. July 13, 2015). One of the complexities specific to this case is that DST attempted to invoke ERISA's "safe harbor" defense. DST claimed it delegated its fiduciary duties to Ruane, and therefore could not be held liable for the losses in Mr. Payne's account. For instance, on page 21 of its Opposition to Claimant's Motion for an Order Granting Summary Disposition, DST argued:

12

ERISA Section 405(d)(1) provides the DST Parties with a safe harbor from liability for any "acts or omissions" of an investment manager appointed under ERISA Section 3(38), and provides that the DST Parties have no "obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager." 29 U.S.C. § 1105(d)(1).

Claimant argued that DST was always a fiduciary and therefore always had a continuing duty to monitor. However, because of DST's "safe harbor" defense, Mr. Payne could not be confident that he could simply rely on the joint and several liability found in 29 U.S.C. § 1105(a) and so he endeavored to also prove his case on the grounds that "[t]he duty to monitor also includes a duty to take action upon discovery that appointed fiduciaries are not performing properly." *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010) (quotation omitted).

By pouring through the tens of thousands of documents produced, taking depositions, and retaining experts, Claimant's Counsel was able to mount a compelling case against DST for failing to act despite knowing Ruane was not performing properly. Ultimately, DST chose to pay Mr. Payne all of his losses rather than proceeding to a hearing on the merits. But still, DST's "safe harbor" defense made an already complex area of law even more complex.

### 3. The skill requisite to perform the legal services properly.

As mentioned above, ERISA is a complex field involving difficult issues and lengthy litigation. *Krueger*, at *1, *see also In re AOL Time Warner ERISA Litig.*, No. 02 CIV. 8853 SWK, 2006 WL 2789862, at *8 (S.D.N.Y. Sept. 27, 2006) ("The substantive risks faced in this litigation are compounded by the fact that ERISA claims are rarely decided on their merits at trial, thus ERISA litigation boasts few successful precedents").

Add to all of this complexity the need to manage hundreds of arbitrations while DST took varying and inconsistent positions to prevent Claimant and other Plan participants from ever seeing a hearing and it becomes clear the skill Claimant's counsel needed to overcome these hurdles and

secure Mr. Payne 100% of his losses was exceptionally high. In the beginning, DST enforced the arbitration agreements and compelled their employees to resolve these claims via individual arbitrations. When Claimant's Counsel filed a class action in January 2017, DST moved to compel arbitrations, arguing that "because all of Mr. DuCharme's claims are subject to arbitration, and pursuant to Federal Rule of Civil Procedure 12(b)(6) this Court should dismiss the Amended Complaint with prejudice." *See DuCharme v. DST Systems Inc.,* Case No. 17-cv-00022-BCW, ECF No. 27. DST argued its class action waiver was binding and enforceable and "Mr. DuCharme or any other party to the Arbitration Agreement" was free to "arbitrat[e] a breach of fiduciary duty claim in connection with purported losses to their individual accounts." *DuCharme,* ECF No. 47. The court agreed and held the class action waiver prevented Mr. DuCharme from acting in a representative capacity on behalf of a class or collective action. *DuCharme,* ECF No. 57. As for his individual claims, the Court held "to the extent DuCharme alleges a § 502(a)(2) [claim] as an individual," his claims are arbitrable. *Id.*

And so, Claimant's Counsel began filing individual arbitrations – hundreds of them. Mr. Payne's was scheduled to be one of the first ones to have a hearing. Hence, not only did Claimant's Counsel need to prepare Mr. Payne's case for hearing by seeking written discovery, reviewing documents, taking depositions, and hiring expert witnesses, but they needed to do all of this while also scheduling and pursuing hundreds of other arbitrations. There can be no doubt successfully navigating so many arbitrations demands extremely skilled counsel.

The demands on Claimant's Counsel grew when, just as the arbitrations were set to be heard, DST reversed its prior position and sought to escape the arbitration agreements. It argued in the Southern District of New York that a mandatory class action was the only way to resolve these disputes. DST also moved to stay these arbitrations, first in court and when that failed in

each arbitration individually as the hearing date approached. Claimant's Counsel were forced to prepare for hundreds of arbitrations, oppose a mandatory class action, and oppose motions to stay. In addition, DST unsuccessfully argued in this arbitration that Claimant's counsel should be disqualified in this arbitration.

And yet, Claimant's Counsel prevailed for Mr. Payne. They secured for him a settlement for 100% of the losses to his retirement account. The Arbitrator finds that Claimant's counsel displayed a very high level of skill in handling the claims of Mr. Payne while pursuing over 490 other arbitrations and fending off other litigation designed to prevent Mr. Payne and other plan participants from recovering anything in arbitration proceedings. The legal skill, dedication and hard work displayed by Claimant's counsel in this arbitration is some of the best lawyering this Arbitrator has seen in over 40 years of practice in the Kansas City area.

**4. The preclusion of employment by the attorney due to acceptance of the case.**

Several of Mr. Payne's attorneys have worked on little else but these DST arbitrations over the past few years. For example, the Klamann Law Firm consists of one employee and two attorneys, John M. Klamann and Andrew Schermerhorn. Combined, these two attorneys have spent over 3,600 hours on matters that either benefited the arbitration group as a whole, or specifically Mr. Payne. They have been working almost non-stop on these cases, to the exclusion of all or most other matters, for the past ten months. Likewise, Kapke and Willerth has only four attorneys yet has spent over 2,000 hours on these arbitrations. Mr. Kapke's firm has had to pass on other matters so it could dedicate the time needed to these claims. William Carr has spent over 1,000 hours and has had to assign multiple tasks in other cases to other attorneys in his office. Since the beginning of this litigation, his firm (which has only six attorneys) has needed to carefully plan its caseload to ensure it could dedicate sufficient time and resources to these

arbitrations. Finally, Ms. Pierce has spent 2,498.95 hours that have either directly or indirectly benefited Mr. Payne's claim. She, too, has had little time to spend on any other matter. Claimant's Counsel has passed-up employment opportunities in order to pursue Mr. Payne's and his co-workers' claims for the past two years. They should be compensated for the time they have spent at the expense of pursuing other matters.

But, of course, it is not just an attorney's time that determines whether or not that attorney can take on a case. Cases cost money to litigate. Altogether, these experts have charged approximately One Million Dollars for work done in these arbitrations. The costs of pursuing Mr. Payne's and others' arbitrations also prevented Claimant's Counsel from taking on other matters.

DST is not disputing the claim for costs made by Claimant's counsel in this case.

**5. The customary fee.**

The Arbitrator finds that Claimant's citation to the fees in class action ERISA cases where the law firms handling those matters received large attorneys' fees awards based on a percentage of the recovery have little relevance to this case where the recovery was small and counsel is seeking recovery under the loadstar approach.

The Arbitrator finds that the requested hourly rates are on the upper end of the range of what the Arbitrator finds reasonable for other attorneys in ERISA and other complex litigation matters in the Kansas City area or in Missouri for that matter. The parties have not cited very many relevant cases on applicable rates, and the Arbitrator is not aware of any cases that are truly comparable to the instant arbitration which involved vigorous contested litigation over a claim of approximately $1,500.00 in the context of over 490 similar individual arbitrations and various court actions that were connected with and related to this arbitration. Indeed, in many respects

this arbitration is unique with little authority to rely upon to determine comparable market rates for such a unique case.

The Arbitrator notes that Claimant cited a 2016 case in the Southern District of Illinois where the Court held hourly rates for St. Louis attorneys in an ERISA case ranging from $998 - $460/hr were reasonable:

> [T]his Court finds that the reasonable hourly rate for Class Counsel's services at this time are as follows: for attorneys with at least 25 years of experience, $998 per hour; for attorneys with 15–24 years of experience, $850 per hour; for attorneys with 5–14 years of experience, $612 per hour; for attorneys with 2–4 years of experience, $460 per hour; for Paralegals and Law Clerks, $309 per hour; for Legal Assistants, $190 per hour.

*Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016). Similar hourly rates were recognized in 2009 as reasonable by the Circuit Court for the 22nd Circuit of Missouri. "[F]or attorneys with 25 years or more experience, $800 per hour; for attorneys with 15–24 years of experience, $625 per hour; 5–15 years of experience, $450 per hour; 2–4 years of experience, $325 per hour; and for professional support staff, $125 per hour." *Tussey v. ABB, Inc.*, No. 06-04305-CV-C-NKL, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012), vacated and remanded, 746 F.3d 327 (8th Cir. 2014) (citing *Eshelman v. Client Services, Inc., et al.*, No: 0822–cv–00763 (22d Cir.Mo. Dec. 7, 2009)).

In *Tussey*, the United States Federal Court for the Western District of Missouri approved a blended rate of $514.60 per hour for 25,160.8 hours and noted that a partner rate of $800 per hour was on the upper end of that charged by national law firms. *Tussey* 2012 WL 5386033, at *3. The Eighth Circuit reversed on other grounds, but held the court did not err when it held such a rate is reasonable: "Although the hourly rate the district court applied for attorney work is generous and the resulting fee award substantial, we are unable to say the district court abused its discretion in

determining the rate to use in calculating the award." *Tussey v. ABB, Inc.*, 746 F.3d 327, 340–41 (8th Cir. 2014).

Another way to compare Claimant's Counsel's hourly rates to the customary fee is to look at what defense counsel is charging. "Additionally, comparison of Plaintiffs' requested fees to the fees Defendants paid their attorneys may also be relevant to determining reasonableness." *Tussey*, 2012 WL 5386033 at *4 (citing *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1220 (8th Cir.1981)).

DST cites to *Burks v. Siemens Energy & Automation, Inc.*, 215 F.3d 880, 884 (8th Cir. 2000) which held that it was not an abuse of discretion for the trial court to decline to compare Plaintiff's attorneys' billing rates to Defendant's attorneys' billing rate and suggested in dictum that it would not be advisable to do so stating that such an apples to oranges comparison was not required. However, that case does not hold that it is an abuse of discretion to consider the billing rates of opposing counsel.

DST also cites to *McKeage v. Bass Pro Outdoor World, L.L.C.*, 2018 WL 10648681, at *3 (W.D. Mo. Nov. 8, 2018) (noting that "[t]he Eighth Circuit has rejected the argument that comparison of an opposing side's billing records and rates is useful in calculating attorneys' fees" and acknowledging the "differences between class-action litigation on the plaintiff and defense side"). In *McKeage*, the court noted that plaintiffs' produced an affidavit stating that "a common hourly rate for class-action litigation in Missouri is $600-$800" and that plaintiffs had produced evidence of cases where class counsel was awarded fees at rates similar to the $650 to $700 per hour sought by plaintiffs' attorneys.

In *McKeage*, the plaintiffs' firms did not have documentation of time spent by para-professionals (paralegals and law clerks) such that the court could not determine what time was

spent by attorneys and what time was spent by paraprofessionals. Also, plaintiffs failed to provide complete support for the hours worked by attorneys in that there was a lack of descriptions accompanying hours worked by attorneys. These factors and the fact that the plaintiffs' counsel officed in Springfield were considered along with other factors in the court's decision to reduce the blended hourly rate in that case.

Nevertheless, Judge Fenner did not reduce the number of hours plaintiffs claimed were worked in light of the court's knowledge of the amount of work required to prosecute the case. Judge Fenner's citation to *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (plurality opinion) ("[T]he defendant cannot litigate tenaciously then be heard to complain about the time necessarily spent by the plaintiff in response.") (quotation omitted) is very applicable to this case where the Arbitrator takes note of the fact that DST has very vigorously defended this arbitration at every turn and has engaged in what this Arbitrator considers to be hard-ball litigation tactics. For example, DST opposed allowing Claimants to take a corporate designee deposition in this arbitration. Moreover, DST required Claimant's counsel to destroy documents that DST had produced in the *DuCharme* litigation and then re-produced the same documents with different bates numbers in this arbitration creating extra work for Claimant's counsel. While DST has every right to assert all possible substantive and procedural defenses in this litigation and in discovery, it should not be heard to complain that Payne's counsel spent many hours prosecuting the case when it was so vigorously defended every step of the way by DST. See *City of Riverside v. Rivera*, *supra*, 477 U.S. 561, 580 n.11 (1986).

The Arbitrator finds the rates of DST's New York counsel are of very limited relevance but acknowledges that some courts have looked at the amounts of fees incurred and rates charged by opposing counsel officing in another geographical area. However, the Arbitrator has considered

the rates of DST's counsel in Kansas City and all 12 of the factors referenced in *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 931 (8th Cir. 1984) (*citing Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1117 (9th Cir. 1979)); and in *McKeage v. Bass Pro Outdoor World, L.L.C.*, 2018 WL 10648681, at *3 (W.D. Mo. Nov. 8, 2018) (citations omitted). The Arbitrator has also viewed the briefs, supporting documents, Exhibits and listened to the oral arguments at the hearing on attorneys' fees held in this case on October 23, 2020 for approximately 2.5 hours. The specific rates and hours the Arbitrator finds reasonable are set forth below in this Final Award.

### 6. Whether the fee is fixed or contingent.

Claimant's Counsel has an agreement with their client which allows them to seek attorney's fees from DST if they prevailed by judgment or settlement. In cases where damages prove to be much smaller than the cost of pursuing the case, like this one, the amount of attorney's fees awarded should be determined via lodestar rather than a contingency percent. To hold otherwise would undermine ERISA's purpose of empowering employees to protect their retirement income from losses caused by fiduciaries. No reasonable attorney would ever undertake to represent an ERISA plaintiff if the amount of damages were only about $1,500.00, as in this case, or any modest amount, if attorneys' fees were limited to a percentage of the recovery. If this case had proceeded to a hearing and had DST prevailed on the merits, Claimant's counsel would have received nothing for their hundreds of hours of efforts and substantial expenses expended on behalf of Mr. Payne. This factor supports a higher hourly rate.

### 7. Time limitations imposed by the client or the circumstances.

Here, in order to protect Mr. Payne's right to a timely resolution of his claim, Claimant's counsel was tasked with quickly preparing for a hearing on a matter as complex and difficult as

ERISA law while simultaneously preparing for numerous other hearings. Despite these limitations, Claimant's counsel timely prevailed and secured a settlement for 100% of Mr. Payne's losses.

## 8. The amount involved and the results obtained.

The Supreme Court holds that when determining the proper amount of attorney's fees, along with the reasonable rate and reasonable hours spent the "extent of a plaintiff's success is a crucial factor." *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S. Ct. 1933, 1943, 76 L. Ed. 2d 40 (1983). The extent of claimant's success was absolute – he received 100% of his losses even though the amount recovered was small ($1,473.91).

As for the amount involved, courts in the Eighth Circuit and Missouri award attorney's fees in amounts many times greater than what the plaintiff recovers. In 2013 the Western District upheld the trial court's decision to award attorney's fees in an amount equal to 49 times (not percent) the amount of class recovery. *Berry v. Volkswagen Group of America, Inc.*, 397 S.W.3d 425 (Mo. App. W.D. 2013). *See also Schultz v. Sw. Credit Sys., LP*, No. 16-CV-2033-LRR, 2018 WL 3398139, at *2 (N.D. Iowa July 12, 2018) ("In this case, Schultz was awarded attorney fees in an amount 66.8 times greater than the damages he was awarded."). In *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999 (8th Cir. 2004), the Eighth Circuit approved an award of approximately $78,600 in an ERISA case even though the judgment was only for $687.68 in interest (approximately 114 times the amount of the judgment for interest).

Here, Claimant's counsel seeks approximately 341 times the amount of the settlement in attorneys' fees and costs/expenses. The Arbitrator acknowledges that this is a higher multiple than in the other cases cited by the parties. However, given the unique facts and circumstances of this case and the vigorous defense by DST, the Arbitrator does not find the requested multiple unreasonable as a matter of law.

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 130 of 195

Courts are free to award attorney's fees in amounts many times higher than the client's recovery because the Eighth Circuit rejects "a per se rule applied by some courts that the attorney's fees award should be limited" to the amount of damages recovered. *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1274–75 (8th Cir. 1980). There, the Eighth Circuit explained the ratio between the fees requested and amount recovered should be examined so the court can be satisfied the prevailing party did not unnecessarily run up their legal bill on a relatively small case with the intent of sticking the other side with their fees: "A party is not entitled needlessly to accumulate exorbitant legal fees with the expectation that the losing party will be called upon to pick up the entire tab. This court will exercise vigilance and pare down needless and unconscionably high legal fees. An award of attorney's fees is compensatory, not punitive" *Id.* 1275 (citing *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 871 (8th Cir. 1977).

Here, the Arbitrator finds that Claimant's Counsel is not guilty of running up unnecessary fees in pursuing Mr. Payne's claim. Quite the opposite, DST chose the litigation strategy of putting off the arbitration hearings for as long as possible by any means necessary. Only after the Arbitrator denied DST's final emergency motion to stay and it became clear the hearing would proceed the next week did DST first attempt to settle Mr. Payne's claim. The Arbitrator finds that Claimant's Counsel did not spend needless time negotiating, and quickly agreed on a settlement. Rather than needlessly accumulating attorney's fees, Claimant's Counsel has simply spent time on the work required to pursue this case, much of which was necessitated as direct result of DST's litigation strategy. This is not a case where DST made an early offer of judgment or attempted to pay Mr. Payne for his alleged damages early in the litigation of this matter.

### 9. The experience, reputation, and ability of the attorneys.

Humphrey, Farrington & McClain, P.C. is nationally recognized for its success in trying cases and since 1984 has over $1 Billion in verdicts across the country. Mr. McClain was the lead trial attorney on these cases. He is licensed both in the United States and Canada. In 2005, Missouri Lawyers Weekly honored him as the Attorney of the Year. It has since recognized him multiple times for having the Top Plaintiff's Verdict of the year. He has pioneered several areas of litigation including against asbestos suppliers, the tobacco industry, and artificial butter flavoring manufacturers and suppliers in the microwave popcorn industry. He recently won a $60 million verdict in New York for a husband and wife business ownership team in a breach of contract case against HMS Holdings Corp., where he served as lead trial attorney on a team of attorneys, many of which are Claimant's Counsel in this matter. Mr. McClain stated during the hearing on this matter that he often handles matters on a contingency basis and collects more than $10,000.00 per hour for his time. He also stated at the hearing that he has prevailed in litigation against Rob Adams of Shook Hardy and is entitled to a rate at least equal to that of Mr. Adams. This Arbitrator is familiar with the reputation of Mr. McClain who is regarded as one of the best plaintiff's attorneys in this region. Similarly, Mr. Adams is widely regarded as one of the best defense lawyers in this region. Indeed, both attorneys have national reputations.

The Klamann Law Firm is a boutique firm which takes on a variety of complex cases. It has been instrumental in the recovery of more than one-half billion dollars for Plaintiffs in a wide variety of complex litigation settings, including most recently a group of unprecedented recoveries for NFL players suffering from CTE. Mr. Klamann and Mr. Schermerhorn were both members of the team of attorneys that won the $60,000,000 verdict in New York, mentioned above. In his 42 years of practice, Mr. Klamann has been the responsible attorney for liability prosecution in an

action which was settled for $83 million for approximately 500,000 victims in a "vanishing premium" insurance class action; he has been lead counsel in a joinder of 147 plaintiffs in 23 states in a federal action involving securities fraud; and he has been lead counsel for a bankruptcy committee representing more than 23,000 asbestos victims; he has authored three (3) Am Jur Trial articles on how to prepare and try complex civil cases. Mr. Klamann was the "Attorney of the Year" in U.S. News in 2014 in the field of employment litigation.

Kapke & Willerth LLC maintains a broad practice including the representation of multiple municipalities, corporations, large homeowner's associations and individuals. George E. ("Ted) Kapke Jr. is the past President of the Eastern Jackson County Bar Association. He has served as lead trial counsel on seven jury trials that have been tried to verdict. These cases have ranged from employment discrimination matters to inverse condemnation claims including cases tried in the United States District Court of Kansas, Clay County and Jackson County, Missouri. He has tried dozens of bench trials and served as second chair counsel on numerous jury trials. In addition to his trial experience, he has served as first chair for three arbitrations tried to final decision and argued before the Missouri Court of Appeal for the Western District of Missouri on several occasions.

The law firm of White, Graham, Buckley & Carr has been in existence for over three decades and has successfully obtained tens of millions of dollars of verdicts for their clients, including several successful results in multi-plaintiff and Class Action representation. Recently the firm and its attorneys were selected in 18 categories for Best Lawyers by US News and World Reports and five categories for Best Law Firms. Mr. Carr, a managing partner, has been a trial attorney for nearly thirty (30) years and has been the lead trial counsel in over fifty (50) jury trials in multiple states, including Missouri, Kansas, Nebraska, and New York. He has obtained several

24

verdicts well in excess of a million dollars, including being part of the team (made up of many of the same attorneys in this group) that secured a $60 million jury verdict in a commercial case in the Commercial Division of the Manhattan County Court in New York. He has also served as co-counsel in a number of multi-Plaintiff or Class Action claims, including several settled and approved by the Court recently in the Western District of Missouri.

**10. The "undesirability" of the case.**

The Arbitrator finds that this arbitration was a very undesirable case to take. Mr. Payne's total damages were just over $1,500.00[2]. Moreover, ERISA cases are difficult, time-consuming cases that can end in failure. Claimant's Counsel should not be punished for taking an undesirable case by receiving less than a reasonable hourly rate or less than the hours they reasonably spent on the case. *See West v. Aetna Life Ins. Co.*, 188 F. Supp. 2d 1096, 1100 (N.D. Iowa 2002) ("The court will not create a 'disincentive' to counsel to take on a challenging case or to obtain the specialized knowledge of an unfamiliar area of the law that may be required in a particular case, such as this one under ERISA, by reducing the attorneys' fees, after the fact, on the ground that counsel spent too much time becoming adequately prepared to prosecute the case.")

Another idea of the "undesirability" of this case comes from a comparison of the risks with the costs. Mr. Payne needed to hire counsel able to navigate the complex and difficult world of ERISA law. He also needed counsel capable (and willing) of investing significant resources into the case. His claim required at least three experts – one to discuss standard of care, one to discuss reasonable alternative investments, and one to calculate his damages. Without such counsel or experts, Mr. Payne could not prevail. The costs are high and so were the risks.

---

[2] DST's settlement is less than this because it is getting credit for the amount already paid by Ruane.

1647107v1

25

**11. The nature and length of the professional relationship with the client.**

Claimant's counsel has represented Mr. Payne for over two years. When DST filed its motion to disqualify Claimant's counsel, he signed a conflict waiver affirming he is happy with the representation provided by his counsel.

**12. Awards in similar cases.**

As far back as 2009, a Missouri state court held ERISA attorney's hourly rates of $800 - $325/hr to be reasonable. *Tussey v. ABB, Inc.*, No. 06-04305-CV-C-NKL, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012), *vacated and remanded*, 746 F.3d 327 (8th Cir. 2014) (citing *Eshelman v. Client Services, Inc., et al.*, No: 0822–cv–00763 (22d Cir.Mo. Dec. 7, 2009). The Judge in the Tussey case approved a blended rate of $514.60 for attorneys in that case decided in 2012. In 2016 in *Spano, supra*, a federal court held reasonable rates for St. Louis Missouri attorneys in an ERISA case ranged from $998 - $460/hr. The rates requested by Claimant's counsel are far below the rates DST's counsel, Paul Weiss, charged in this case ($1,560 - $775/hr.) and roughly in line with the rates charged by Shook Hardy of $890 to $625 per hour.

The Arbitrator does not believe it is reasonable to compare Claimant's fees request to contingent fee awards in class action cases with recoveries in the millions of dollars.

**F.    Claimant's Counsel's requested rates and the Arbitrator's decisions regarding what rates are reasonable in this case.**

The Arbitrator has carefully considered all the evidence and arguments of counsel and the authorities cited by the parties, his observations regarding the quality of the written briefs and oral arguments of counsel, the fact that there may have been some very minimal unnecessary duplication of efforts, the fact that some of Claimant's counsel's time entries were not as specific as they could have been and the 12 factors listed above and makes the following findings regarding the appropriate rates for Claimant's counsel in this case as follows:

26

The Arbitrator approves and finds the rate of $900 per hour reasonable under the unique facts in this arbitration for the following attorneys: Kenneth McClain, John Klamann, and William Carr.

The Arbitrator approves and finds the rate of $600 per hour reasonable under the unique facts in this arbitration for the following attorneys: Jonathan Soper, Andy Schermerhorn, Bryan White, George E. (Ted) Kapke, George Kapke, Sr., and Mike Fleming.

The Arbitrator approves and finds the rate of $500 per hour reasonable under the unique facts in this arbitration for J'Nan Kimak.

The Arbitrator approves and finds the rate of $400 per hour reasonable under the unique facts in this arbitration for Chelsea M. Pierce.

The Arbitrator approves and finds the rate of $150 per hour reasonable under the facts in this arbitration for Paralegal Shelli Hager.

**G.      Arbitrator's findings regarding reasonableness of Claimant's Counsel's requested hours.**

### Payne Hours and Group Hours

The Arbitrator recognizes that there are judgment calls to be made regarding what time should be considered Payne Time and what time should be considered Group Time. The Arbitrator, having reviewed the unredacted Group Time and Payne Time finds that a certain amount of Group Time which is time spent that benefits all arbitration plaintiffs, including Mr. Payne, should be awarded to fairly compensate Claimant's counsel for their efforts in this arbitration on behalf of Mr. Payne. Claimant's counsel suggests 1% of the Group Time. DST suggests nothing or at most 0.2% of the Group Time given that there were 495 arbitrations. In light of the fact that there has been little activity in many of the arbitrations and that Group Time incurred to date tends to benefit the arbitration plaintiffs whose hearings were scheduled early as

1647107v1

27

compared to other arbitration plaintiffs whose cases have been delayed, the Arbitrator finds that it is reasonable to allow 0.6% of the Group Time to be assessed against DST, which is halfway between 1% and 0.02%. Moreover, as explained below, the Arbitrator is further discounting some of the Group Time and a small amount of the Payne Time.

The Arbitrator notes that DST and its counsel did not keep time by individual arbitration claimant, and that DST estimated that its counsel at Paul Weis and Shook Hardy spent 127.2 hours at a total cost of $121,830 on this matter. The Arbitrator notes that DST did not supply any information regarding the hours spent defending this matter by DST's prior counsel Skadden Arps and Stinson, LLP who served as counsel in this matter until they were replaced by Paul Weis and Shook Hardy. Also, DST did not provide any information regarding time spent on this matter by in-house attorneys and in-house paralegals, if any.

The total number of hours estimated by DST to have been spent on defending the Payne arbitration appears low to this Arbitrator and does not include the hours spent by DST attorneys other than at Paul Weis and Shook Hardy. Nevertheless, the number of hours estimated by DST counsel and the work product that this Arbitrator has observed coming from DST shows a very sophisticated and vigorous defense of this matter which required a large number of Payne Time and Group Time hours to be spent by Claimant's counsel.

Claimant seeks to recover a loadstar based on 566.35 hours of Payne time and 1% of 10,667.16 hours of Group Time. DST challenges certain Payne time and certain Group Time on various grounds. The Arbitrator has considered these challenges and makes the following rulings and findings regarding what are reasonable hours that should be paid by DST as reasonable attorneys' fees.

28

## Ruane v. Payne Time

Claimant has allocated all his counsels' time defending *Ruane v. Payne* to Payne Time and has advised that he is seeking pay for 189.55 hours of work in defending this action where DST joined in seeking to enjoin this Arbitration. The Arbitrator finds that, although this time also benefited other arbitration plaintiffs, this time would have been incurred even if there had been no other arbitration plaintiffs, and Claimant's counsel will be prohibited from seeking recovery for these hours in any other arbitrations. The Arbitrator also finds the time entries specific enough and finds the number of hours expended defending this related litigation to be reasonable and will award Claimant fees at the reduced hourly rates mentioned above for these 189.55 hours less the reductions for time spent in negotiating and finalizing the Ruane settlement as explained below.

## Canfield and Mendon

The Arbitrator is deducting 8.3 hours of Mr. Ted Kapke's Group Time for work on the Canfield and Mendon disqualification lawsuits. The Arbitrator is deducting 114 hours of Andy Schermerhorn's Group Time for work on the Canfield and Mendon disqualification lawsuits. The Arbitrator is deducting 2.2 hours of Jonathan Soper's time for work on the Canfield and Mendon disqualification lawsuits. The Arbitrator cannot tell exactly how much time was spent by other Claimant's counsel on the Canfield and Mendon disqualification lawsuits but finds that the percentage deductions made below from Group Time will more than take into account any time spent by other attorneys for Claimant on the Canfield and Mendon disqualification lawsuits.

## Ruane v. DuCharme

DST objects to Claimant's counsel's entries in the *Ruane v. DuCharme* action filed by Ruane in the United States District Court for the Western District of Missouri. DST was not a party in that action and the fees Claimant's counsel incurred in that action are not recoverable from

DST. Therefore, the Arbitrator is disallowing 1 hour of Mr. McClain's Group Time, 1.5 hours of Mr. Ted Kapke's Group Time and 45.5 hours of Mr. Schermerhorn's Group Time work on *Ruane v. DuCharme*.

### Ruane v. Payne Settlement Time

As explained above, the Arbitrator finds that time spent by Claimant's Counsel defending the *Ruane v. Payne* lawsuit in which DST was a party and joined with Ruane in attempting to enjoin this Arbitration is generally recoverable against DST. However, time spent negotiating a settlement with Ruane is not recoverable. Therefore, the Arbitrator is disallowing 16 hours of Mr. McClain's Group Time and 18.1 hours of Mr. Schermerhorn's Group Time and 27.5 hours of Mr. Ted Kapke's Group Time and .75 hours of Mr. Ted Kapke's Payne time as hours spent on the settlement with Ruane.

### DST Claim that Fees Should be Reduced Because of Quarter Hour Billings

While there is some authority that an attorney's fee should be reduced for failing to bill in one-tenths of an hour, there is a split of authority on this issue. See e.g., *Nesse as Trustees of Minnesota Laborers Health & Welfare Fund v. Green Nature-C*, 2020 WL 2848193 at *3 (U.S. D. Minn.). The Arbitrator declines to reduce Claimant's counsel's hours because of quarter hour billings by some of Claimant's counsel.

### DST Claims of Over-Lawyering

DST claims that employing senior lawyers at four firms to work on this matter was over-lawyering and resulted in some unnecessary duplication of efforts and complains of the use of senior lawyers for tasks that could have been performed by more junior lawyers at lower rates. However, having considered all the evidence and the arguments of counsel, the Arbitrator is persuaded that given the prospect of having to run four or five simultaneous hearings that it was

reasonable to have numerous conferences and attorney to attorney communications and multiple attorneys at various hearings. Also, given the complexity of the case, the Arbitrator does not think it was reasonable to require Claimant's counsel to hire associates for those tasks to staff the cases with more junior lawyers. Given the vigorous opposition to Mr. Payne's claims by two of New York's premier law firms (when DST could have used its excellent local counsel in Kansas City at much lower rates—e.g., 2-year associates at Paul Weis are charging more per hour than 20 plus year partners at Shook Hardy), the Arbitrator does not find over-lawyering or use of senior lawyers by Claimant that warrants a reduction in the number of hours expended by the Claimant's attorneys.

### Argument that Claimant's Time Entries Include Vague or Inadequate Descriptions

DST's argument that some of the time entries of Claimant's counsel are vague has some merit. Mr. McClain explained that some of the time records were reconstructed and some were contemporaneous. Mr. McClain also explained the nature of the work performed with regard to some of the vague time entries including those of Mr. Klamann including his extensive review, organization and analysis of over 100,000 documents. Mr. McClain also explained the long hours spent by Ms. Pierce reviewing all the Arbitrators orders and keeping track of all deadlines and hearings. While many of the Group Time entries are general in nature, that can be explained in part by considering the fact that making very detailed Group Time entries for time spent benefiting almost 500 separate arbitrations could take excessive amounts of time.

That having been said, the generality and repetitiveness of some of the Group Time entries by some of Claimant's lawyers for Group Time does pose a challenge in determining the reasonableness of the hours of Group Time worked. The Arbitrator notes that the time entries of some of the Claimant's lawyers, particularly those in Mr. Kapke's law firm are more detailed than

1647107v1

the time entries of some of the other lawyers. Although the Affidavits of counsel and the arguments of Mr. McClain persuade the Arbitrator that the number of hours claimed as Group Time were in fact worked on Group Time, the Arbitrator believes that a 10% deduction in the Group Time spent by the following attorneys is warranted because of the vagueness and generality of their time entries: Kenneth McClain, John Klamann, Bill Carr, Andy Schermerhorn, Bryan White and Chelsea Pierce.

As to Payne Specific Time, the Arbitrator finds that the time entries of all of Claimant's counsel together with the Affidavits submitted, the oral arguments of counsel and the Arbitrator's review of their work products are sufficient to carry Claimant's burden of proving that these hours were reasonably expended and should be assessed against DST and no further reductions will be made in hours worked on this account, particularly where the Arbitrator has already considered this factor in making some slight reductions in hourly rates from the rates that would have been awarded had all of the time entries been more specific.

<u>**Conclusions and Award as to Payne Time**</u>

The Arbitrator finds that the following attorneys' fee awards as reasonable as to Payne Specific Time:

Kenneth McClain: 20.5 hours at $900 per hour = $18,450.

John Klamann: 22.5 hours at $900 per hour = $20,250

Bill Carr: 54.75 hours at $900 per hour = $49,275

Ted Kapke: 138.50 hours at $600 per hour = $83,100

Andy Schermerhorn: 210.75 at $600 per hour = $126,450

Mike Fleming: 3.5 hours at $600 per hour = $2,100

Jonathan Soper: 49.4 hours at $600 per hour = $29,640

32

J'Nan Kimak: 29 hours at $500 per hour = $14,500

Chelsea Pierce: 34.45 hours at $400 per hour = $13,780

Shelli Hager:  2.25 hours at $150 per hour = $337.50

The Total Payne Specific time awarded is $357,882.00.

## **Conclusions and Award as to Group Time**

Kenneth McClain: 797.9 hours – 17 hours = 780.9 - 10% = 548.8 hours X .6% = 3.29 hours at $900 per hour = $2,961.

John Klamann: 1,603 hours - 10% = 1,442.7 X .6% = 8.7 hours at $900 per hour = $6,778.

Bill Carr: 963.7 hours – 10% = 867.3 X .6% = 5.2 hours at $900 per hour = $4,680.

George Kapke: 3.25 hours X .6% = .02 hours at $600 per hour = $12

Ted Kapke: 1,609.5 – 37.3 = 1572.2 X .6% = 9.43 hours at $600 per hour = $5,658

Andy Schermerhorn: 1,772.16 hours – 177.6 = 1,594.56 – 10% = 1,435.14 X .6% = 8.61 hours at $600 per hour = $5,167.

Mike Fleming: 362.05 hours X .6% = 2.17 hours at $600 per hour = $1,303.

Bryan White: 308.9 – 10% = 278 hours X .6% = 1.7 hours at $600 per hour = $1,020

Jonathan Soper: 478.7 hours – 22 = 456.7 hours X .6% = 2.74 hours at $600 per hour = $1,644.

J'Nan Kimak: 287 hours X .6% = 1.72 hours at $500 per hour = $860.

Chelsea Pierce: 2,464.5 – 10% = 2,218 hours X .6% = 13.3 hours at $400 per hour = $5,320

The Total Group Time awarded is $35,403.

### Attorneys' Fees Incurred in Connection with Producing and Redacting Attorneys' Fees Records

Claimant's counsels have requested an additional award of $18,200 for 28 hours spent preparing fee applications materials at the request of this Arbitrator. The Arbitrator finds that this is a reasonable number of hours for this work, particularly since it does not reflect additional time spent responding to the Arbitrator's request for additional information regarding attorneys' fees and does not reflect time spent by Claimant's counsel preparing for and attending and being available to respond to questions at the attorneys' fees hearing. However, the Arbitrator finds that this time should be awarded at the rates specified above for a total of $17,000.00.

### Costs and Expenses

DST is not disputing the claim of $10,018.15 in costs incurred on behalf of several arbitration claimants and will enter an Award for those Costs and Expenses with the understanding that Claimant's counsel will only be able to recover once for these costs and expenses.

### Total Award

In conclusion, the Arbitrator finds that a reasonable attorneys' fee award in this case is $410,285.00 in attorneys' fees and $10,018.15 in expenses and costs for a grand total Award in favor of Claimant Percy Payne and against DST Systems, Inc. of $420,303.15 in Attorney's Fees and Costs.

The administrative fees and expenses of the American Arbitration Association (AAA) totaling $3,045.00 and the compensation and expenses of the Arbitrator totaling $55,221.00 shall be borne by Respondent.

The above sums are to be paid on or before forty (40) days from the date of this Final Award.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All other pending claims of Claimant against Respondent are denied.

John A. Vering, Arbitrator

Date:    November 18, 2020

# EXHIBIT 10

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| ALICIA ANDREWS, | ) |
| | ) |
| | ) |
| CLAIMAINT, | ) |
| | ) |
| | ) |
| V. | )      **Case Number: 01-18-0004-3591** |
| | ) |
| | ) |
| DST SYSTEMS, INC., et. al., | ) |
| | ) |
| RESPONDENTS. | ) |

## ORDER ON CLAIMANT'S APPLICATION FOR ATTORNEY'S FEES AND COSTS

This matter comes before the Arbitrator on Claimant's Application for Attorney's Fees and Costs. The Arbitrator has reviewed the briefs of the parties and finds as follows:

### I.      INTRODUCTION

Claimant Alicia Andrews was a participant in Respondent's Profit Sharing Plan, ("PSP"). On November 21, 2018, the parties submitted Claimant's demand for arbitration to the AAA. Claimant moved for summary judgment and on July 30, 2020, this Arbitrator denied the Motion. This matter was scheduled for hearing in September, 2020. Respondent moved for an immediate stay of the proceedings, and on August 24, 2020, this Arbitrator denied that Motion. On the eve of hearing, the parties settled for $21,653.79, which represents Claimant's losses in the PSP, allegedly due to the Valeant investment.

### II.      ANALYSIS

Claimant seeks $143,505.24 in attorney's fees and $2,892.58 in statutory costs. In support of her request, Claimant contends that her counsel expended a great time of time, energy and resources in the case. Claimant argues that courts nearly universally award prevailing plaintiffs

1

in ERISA cases their attorney's fees and costs. She urges the Arbitrator to adopt the lodestar approach and award her a pro rata share of attorney's fees incurred on behalf of her and similarly situated claimants whom Claimant's counsel represented, ("Group Time"), or $76,704.00; her individual attorney's fees that she has incurred, or $49,935.00; reasonable expenses of $16,865.64, and statutory costs that she has incurred which she claims are recoverable under 28 U.S.C. §§ 1821 and 1920.

Respondent argues that Claimant should not be entitled to any attorney's fees as she has inadequately supported her request with proper records. Respondent argues in the alternative that should this Arbitrator consider awarding fees, it should do so based upon the contingent fee contract entered into between Claimant and her counsel. Alternatively, Respondent urges the Arbitrator that if it undertakes an analysis under the lodestar method, Claimant's counsels' hourly rates are excessive, that counsels' time records lack the requisite detail to substantiate a fee award, or are otherwise excessive, and regardless, the entire amount sought is not proportionate to the settlement amount.

Section 502(g)(1) of ERISA, 29 U.S.C. Sec. 1132(g)(1) provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Although there is no presumption in favor of attorneys fees under ERISA's fee-shifting statute, a prevailing plaintiff rarely fails to receive attorney fees paid by defendant in addition to the award of damages. Starr v. Metro Systems, 461 F.3d 1036, 1041 (8th Cir. 2006). Fees under § 502(g)(1) are usually calculated under the "lodestar" method, multiplying the number of hours reasonably expended on a case by a reasonable hourly rate for the attorneys working those hours. Emmenegger v. Bull Moose Tube Co., 33 F. Supp. 2d 1127, 1137 (E.D. Mo. 1998); *see also* Tussey v. ABB, Inc., 850 F.3d 951, 961-962 (8th Cir. 2017).

The Eighth Circuit has outlined a five factor test to guide district courts (or in this case, the undersigned Arbitrator), in determining whether to award attorneys' fees in actions brought under ERISA § 502(g)(1):

(1) The degree of the opposing parties' culpability or bad faith;

(2) The ability of the opposing parties to satisfy an award of attorneys' fees;

(3) Whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances;

(4) Whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) The relative merits of the parties' positions.

Lawrence v. Westerhaus, 749 F.2d 494, 495 (8th Cir. 1984). The Court need not review each factor "exhaustively and explicitly." Griffin v. Jim Jamison, Inc., 188 F.3d 996, 997 (8th Cir. 1999). These factors are considered general guidelines. Martin v. Arkansas Blue Cross & Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002).

Claimant undertakes an exhaustive analysis of the Lawrence factors, while Respondent does not address them at all. Claimant suggest that she has satisfied the first, second and fourth factors of Lawrence. While the Arbitrator agrees that there is evidence regarding Respondent's culpability as to the claims, there is not sufficient evidence before it to justify a finding of bad faith. Respondent does not contest the second element, the ability to pay, and the Arbitrator concludes that DST likely has the wherewithal to satisfy a fee award. The Arbitrator also finds that Claimant's request for fees sought to benefit other PSP participants. Accordingly, the Arbitrator finds that awarding Claimant fees is appropriate.

3

## A.    Methodology Regarding Calculation of the Attorneys' Fee

Respondent urges that the Arbitrator award Claimant her contingent fee as opposed to using the lodestar approach.  (Resp. Br. at 9).  Respondent fails to offer the Arbitrator any persuasive authority that it should use the contingent fee arrangement.  Accordingly, the Arbitrator will use the "lodestar method."

In using the lodestar method, the starting point "is the number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate.  Magruder Construction Co., Inc. v. Gali, 2020 WL 4535122 (E.D. Mo.).  The party seeking fees is responsible for evidence of hours worked and the rate claimed.  Wheeler v. Mo. Highway & Transp. Commission, 348 F.3d 744, 754 (8th Cir. 2003).  The Arbitrator will exclude from the initial fee calculation hours that were not "reasonably expended," i.e., that are "excessive, redundant or otherwise unnecessary."  Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

## B.    Reasonable Hourly Rate

In general, a reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of comparable skills, experience and reputation. Safelite Grp., Inc. v. Rothman, No. CV 15-1878 (SRN/KMM), 2017 WL 3495768, at *6 (D. Minn. Aug. 11, 2017), aff'd, 759 F. App'x 533 (8th Cir. 2019).  In determining a reasonable hourly rate, "district courts (or in this case, the Arbitrator) may rely on their own experience and knowledge of prevailing market rates." Id. (quoting Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005)). Other factors to consider are:

> (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the

4

case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

Thornton v. Mainline Commc'ns, LLC, No. 4:12-CV-00479 SNLJ, 2016 WL 687844, at *1 (E.D. Mo. Feb. 19, 2016).

### C. Hours reasonably expended

In addition to establishing a reasonable hourly rate, a prevailing party seeking attorneys' fees has the burden of proving that the fees and costs taxed were reasonably necessary to achieve the result obtained. *See* Wheeler v. Missouri Highway & Transp. Com'n, 348 F.3d 744, 754 (8th Cir. 2003) (*citing* Hensley, 461 U.S. at 433, 434). The Arbitrator may review billing records submitted in support of the fee request to determine whether the hours were reasonably incurred or if any of the hours were "excessive, redundant, or otherwise unnecessary." *See* Robinson v. Custom Tree & Lawn Service, Inc., No. 4:08-CV-992 CAS, 2010 WL 3399076, at *2 (E.D. Mo. Aug. 26, 2010).

Andrews seeks $143,505.24 in attorneys' fees. In support of its motion, Andrews submits the affidavits of attorneys Kenneth McClain, John Klamann, William Carr and George E. Kapke Jr. detailing the hours spent on the case as well as the hourly rates for each attorney. Claimant App. Exhibits 1-4. Claimant's counsel seek hourly rates for their lawyers ranging from $400-$950 per hour. Respondent objects to the fee request and contends that such an award would be disproportionate to the amount recovered, and that the request is otherwise unsupported.

### D. Amount Requested

#### [1] Hours Requested

Respondent argues that Claimant's request is unreasonable and that none of the cases cited by Claimant awarded a fee in excess of 33% of the client recovery. In the Eighth Circuit,

however, the Court has rejected a "per se" rule limiting an attorneys' fee award. International Traveler Arrangers, Inc. v. W. Airlines, Inc., 623 F.2d 1255, 1274-75 (8th Cir. 1980).

As part of its recovery for attorneys' fees, Claimant seeks recovery for a pro rata percentage of Group Hours. Specifically, Claimant seeks 1% of the total claimed lodestar of $7,670,460. Claimant's Application at 22. Respondent argues that Claimant's request for Group Hours should be disallowed as she failed to include its contemporaneous billing records and that the entries are not sufficiently descriptive of the work performed. In support of its position, Respondent cites to MacDissi v. Valmont Industries, Inc., 856 F.2d 1054, 1061 (8th Cir. 1988), for the proposition that Claimant's failure to present more detailed records are not sufficiently reliable to award fees. In MacDissi, the Court reasoned that:

> Finally, Valmont protests the District Court's award of $34,500 to MacDissi's attorneys, on the ground that MacDissi's attorneys submitted reconstructed, rather than contemporaneous, records of time expended on MacDissi's case. Valmont suggests no particular reason to believe that these reconstructed records overstate the time actually spent. Instead, Valmont seems to be urging us to adopt a *per se* rule that the failure to keep contemporaneous time records automatically precludes the recovery of attorneys' fees. We decline to do so. The question of whether reconstructed records accurately document the time attorneys have spent is best left to the discretion of the court most familiar with the litigation. The maintenance of such records is certainly desirable, and district courts may reduce or eliminate attorneys' fees awards where the absence of such records leaves the court without a reliable basis on which to award fees. See *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

MacDissi affirmed the district court's decision to award fees.

Here, while the Arbitrator agrees that the better practice would have been to submit contemporaneous time records to substantiate a fee award, it will not disallow the recovery for Claimant's failure to do so. Respondent argues that Claimant's request for 1% of the lodestar is excessive as counsel for the claimant performed similar work for nearly 500 "identical"

arbitrations. Resp. Br. at 12. Respondent suggests that Claimant be awarded .002%[1] of the Group Hours sought. Claimant argues that the Andrews case required more work as it was one of the first to proceed to arbitration. The Arbitrator concludes that a fair resolution is to award Claimant .50% of the Group Hours claimed, or one half of 10,667.16 hours, or 5333.58 hours.

Claimant also seeks recovery of 73.70 hours for time specifically incurred in her case. Respondent does not attack these hours specifically, and these hours will be awarded.

### [2] Hourly Rates

A central contention between the parties is what market should be used to assess a "reasonable" fee. Respondent would have the Arbitrator assess Claimant's fee based on the local market rate in Kansas City, Missouri, while Claimant argues that her fee should be assessed based upon the national rate for complex litigation. "A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated." Fish v. St. Cloud University, 295 F.3d at 851–52 (8th Cir. 2002). However, in a complex matter, the relevant market "may extend beyond the local geographic community" and include the national market or a market for a particular legal specialization. Casey v. City of Cabool, Mo., 12 F.3d 799, 805 (8th Cir.1993); Tussey v. ABB, Inc., 2012 WL 5386033 (W.D. Mo. 2012). The Eighth Circuit has recognized that where plaintiffs' attorneys are "leaders in the field" and have "extensive experience" in a specialized area, they tend to be "able to handle the case in a shorter length of time than a local lawyer, without comparable experience," and so a higher rate is appropriate. Planned Parenthood, Sioux Falls Clinic v. Miller, 70 F.3d 517, 519 (8th Cir.1995) (affirming the district court's approval of higher hourly rates based on the specialized skill of counsel).

---

[1] Respondent inadvertently stated .2% in its Brief.

It is well established that complex ERISA litigation involves a national standard and special expertise. See, e.g., <u>Torgeson v. Unum Life Ins. Co. of Am.</u>, 2007 WL 433540 at *6 (N.D.Iowa Feb.5, 2007); <u>Dobson v. Hartford Fin. Services Group, Inc.</u>, 2002 WL 31094894 at *3 (D. Conn. Aug.2, 2002); <u>Mogck v. Unum Life Ins. Co. of Am.</u>, 289 F.Supp.2d 1181, 1191 (S.D.Cal.2003). Claimants' attorneys are clearly experts in ERISA litigation. The litigation was complex in size and subject matter, and involved novel questions of law, and spanned two years. The Arbitrator thus finds that a reasonable rate in this case would be best assessed against national rates for complex specialized litigation.

In <u>Tussey</u>, the Eighth Circuit approved the district court's top attorney rate of $800 per hour (decided in 2012). As this matter is eight years later, the Arbitrator does not find that the hourly rates sought by Claimant's counsel are out of line with the necessary skill and expertise of national counsel to prosecute the claim.

### [3]    Out of Pocket Expenses

Claimant claims an additional $16,865.64 in various out of pocket expenses. These are not contested and will be awarded.

### [4]    Costs under § § 1821 and 1920.

Claimant seeks costs of $2,892.58. These are not contested and will be awarded.

## III.    CONCLUSION

For these reasons, the Arbitrator finds Andrews is entitled to attorney's fees in the amount of $88,287, costs/expenses in the amount of $16,865.64, and statutory costs of $2,892.58 for a total award of $108,045.22.

8

# EXHIBIT 11

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| In the Matter of Amy Keller, | ) | |
| | ) | No. 01-19-0001-2798 |
| Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DST Systems, Inc., | ) | |
| | ) | |
| Respondent. | ) | |

**RULING ON CLAIMANT'S MOTION FOR SUMMARY DISPOSITION**

**BACKGROUND**

The Claimant, Amy Keller, was employed by Respondent DST Systems, Inc. from December 14, 1992 to June 30, 2016. She began participating in the Company's retirement plan on January 1, 1993. The Respondents (collectively "DST") include DST Systems, Inc.; the Compensation Committee of the Board of Directors of DST; the Advisory Committee of the DST 401(k) Profit Sharing Plan (collectively "DST"); and Ruane, Cunniff & Goldfarb, Inc. ("Ruane"), the firm hired to select and manage the DST retirement plan investments. The arbitration is governed by the DST Arbitration Program and Agreement with Associate Opt Out Right ("Arbitration Agreement") and the American Arbitration Association Employment Arbitration Rules and Mediation Procedures ("AAA Rules").

The Claimant has reached a settlement with Ruane which is no longer involved in this proceeding. What remains are claims against DST alleging that it breached its fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. § 1104

1

et seq. ("ERISA") in its monitoring, management and oversight of the Profit Sharing Plan ("PSP") it created for its employees, causing a loss to the plan and its participants.

The Claimant has filed a motion for summary disposition seeking judgment in her favor as a matter of law. The parties have cited substantial case law in the extensive briefs filed in support of their positions. They have also submitted numerous exhibits along with expert reports covering the scope of ERISA duties.

## RELEVANT FACTS

DST Systems, Inc. is engaged in the business of providing information processing and servicing solutions to its asset management, brokerage, retirement and healthcare industry customers. The Company has a workforce numbering in the thousands and provides them with a retirement program that during the relevant period was comprised of two components. One component consisted of a 401(k) participant-directed plan funded by employee contributions and matching contributions from DST. Participants in the plan could choose investments from among a number of investment options.

The second component of the Company's retirement program for its employees consisted of a Profit Sharing Plan ("PSP") which was funded entirely by discretionary employer profit-sharing contributions. Participants in this plan had no role in choosing how the funds in the plan were invested. Instead DST selected Ruane as its investment manager and delegated to it the authority to make discretionary investment decisions for all PSP assets. Ruane has managed over 2,000 investment accounts with assets exceeding $26 billion including 67 ERISA accounts totaling $4 billion. According to the DST/Ruane Investment Management Agreement ("IMA") Ruane had "full authority and

2

sole discretion . . . to purchase, sell, convert and exchange for the [PSP] any types of securities which [Ruane] deem[ed] appropriate." The IMA identified Ruane as a fiduciary to the PSP and confirmed that ERISA governed its conduct.

DST was both the PSP Plan sponsor and administrator, and fulfilled its responsibilities to the plan through the Board of Directors Compensation Committee. Until February, 2016, the Compensation Committee was empowered to appoint or remove the Advisory Committee which was identified in the PSP Summary Plan Description as the plan's "Named Fiduciary."

According to § 9.1(b)(3) of the Retirement Plan the Advisory Committee was to "[e]stablish a written investment policy, including a participant directed investment policy under Section 404(c) of the Act." Although establishing a written investment policy is not itself an ERISA requirement, the statute at 29 U.S.C. § 1104(a)(1)(D) provides that fiduciaries must act "in accordance with the documents and instruments governing the Retirement Plan." However, while such a policy statement was prepared for the self-directed 401(k) retirement plan, none was developed for the PSP until 2015. This deficiency was noted, at pages 5-7, in a February 23, 2018 Department of Labor letter to the DST fiduciaries which commented that "as fiduciaries, you may have breached your fiduciary obligations to the Plan and violated several provisions of ERISA."

Ruane used a Focused Portfolio/Non-Diversification investment strategy in its management of the PSP plan. DST was aware of this strategy which involved long term investments in a limited number of securities without requiring diversification among businesses, types of securities, industry sectors or geographical locations. Ruane's

approach was reflected most dramatically in its investment in Valeant Pharmaceuticals, Inc. ("Valeant"). By November, 2010 Ruane had acquired over 1½ million shares of Valeant at an average price of $18.89 per share. This amounted to close to 10% of the PSP plan assets. Ruane made no further purchases of Valeant shares, but the Valeant investment appreciated in value and grew to 25% of the PSP by January, 2014; 43% by May, 2015; and 45% as of August, 2015. At that point the Valeant share price was $262 and the value of the Valeant position reached $412 million. At the same time Ruane managed the separate Sequoia Fund which was also heavily invested in shares of Valeant.

However, by 2015 information was surfacing from investment managers at other firms and published reports that there were problems at Valeant relating to its financial accounting practices.   Morgan Stanley described Valeant as a "house of cards." By March, 2015, a Ruane analyst reported that the physician community and others in the marketplace had a negative perception of Valeant due to its lack of investment in research and development.

House and Senate investigations into a company Valeant had recently acquired were underway by May, 2015. The acquired company had engaged in questionable pricing increases followed by Valeant raising the prices even further after the acquisition. In October, 2015 a report titled "Valeant: Could this be the Pharmaceutical Enron?" was released by Citron Research. It questioned Valeant's relationship with the specialty pharmacy Phildor. During this period Fortune published a negative article relating to Valeant in which it outlined a "timeline of the big Pharma scandal."  In November 2015, the New York Times reported that two of the independent directors of

4

the Sequoia Fund resigned in protest after Ruane announced that the Sequoia Fund had purchased additional shares of Valeant.

Ultimately the PSP concentration in Valeant stock led DST to impose a cap of 25% for any single investment in the plan. Separately, DST had previously advised participants in the self-directed 401(k) plan not to invest more than 20% of their contributions in any one industry. Meanwhile Valeant's stock was on a roller coaster ride, having risen dramatically but then falling precipitously from its $262 high to a $26.30 per share price. The loss to the PSP was approximately $365 million, although when finally sold in June, 2016 the Valeant investment had produced an overall $16 million profit for a 56% return on the investment over the six years that the PSP held the stock.

In early 2014 the DST Advisory Committee did not consider whether the concentration of the plan in stock of Valeant required rebalancing to achieve diversification. By May 2014 Valeant shares comprised 27.2% of the PSP's total assets. This situation did not change until after June 4, 2014 when Advisory Committee member Jerry Lavin met with Robert Goldfarb, Ruane's Chairman and CEO, to discuss Ruane's top investments in the PSP account.

Mr. Goldfarb was responsible for managing the PSP assets as well as the Sequoia Fund which was also heavily invested in Valeant. Nevertheless, despite the fact that the Valeant investment had grown to more than 27% of the PSP, the Advisory Committee concluded at its August 2014 meeting that the "Ruane Funds' performance continued to be a solid prudent investment for those plan assets invested therein." At its November 21, 2014 meeting the Advisory Committee discussed the concentration of

5

PSP investments, including Valeant which then amounted to 28.6% of the plan's assets, but again took no action.

By May 29, 2015 when Mr. Lavin became aware that the Valeant investment had grown to over 43% of the PSP plan,[1] he sent an email to the other Advisory Committee members exclaiming "Whoa" and stating that "we need to get our legal expert's advice and think about our definition of prudent." Approximately nine months had elapsed during which the Valeant concentration in the PSP had grown dramatically and no steps were being taken to rebalance the fund.

At its June 9, 2015 meeting the Advisory Committee was provided with a memorandum summarizing Mr. Lavin's meeting with Mr. Goldfarb in which he sought additional information from Mr. Goldfarb on whether Ruane would be reducing Valeant holdings in the PSP over time. Also at that meeting the ERISA counsel to the Advisory Committee explained the Committee's fiduciary duties under the law.

The minutes of the June 9 meeting reflect counsel's observation "that there is no specific standard for determining if plan assets are held in appropriately diversified investments [noting that] in an ERISA conference report, Congress explained the ERISA duty of diversification cannot be stated as a fixed percentage or reduced to a specific asset allocation formula; instead, a fiduciary's compliance with the duty to diversify is determined by an analysis of all the facts and the totality of the

---

[1] According to the chart included in the *O'Brien* and *Quast* ruling, Valeant constituted 25% of the PSP plan by January, 2014. It was 27% by June, 2014; 29% by November, 2014; 43% by May, 2015; and 45% by August, 2015. The percentage then began to decline as a result of Ruane's limited sale of Valeant stock and the sharp decline in the price of Valeant shares, until June, 2016 when the last Valeant stock in the PSP was sold.

circumstances surrounding the plan's investments on an ad hoc basis."

Counsel also "informed the Committee that Section 404(a)(1)(C) of ERISA imposes on plan fiduciaries a duty to diversify '*the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.*'" (emphasis in the original) He also told members of the committee that the Committee "has an obligation with respect to the investments in DST 401(k) plan as a whole." This meant that the concentration in Valeant stock was not to be judged on the basis of the PSP alone, but rather on the basis of the PSP and self-directed portion of the 401(k) plan together. Counsel did not recommend that the Committee take any action.

Following a meeting between Lavin and Goldfarb on June 16, 2015, Ruane prepared a paper for DST reflecting Goldfarb's bullish view of Valeant's prospects. He expressed positive views of Valeant's CEO, and reflected his expectation that Valeant's earnings would grow by more than 20% per year.

Then on July 28, 2015, the DST Compensation Committee met and discussed the issue of PSP diversification and risk mitigation strategies. Within days this was followed by a direction from the DST CEO to the Advisory Committee that it "rebalance out of the 50% position" in Valeant and that he be provided with a "plan and timeline." This was followed at the August 13, 2015 meeting of the Advisory Committee with an observation that it was "prudent to request that Mr. Lavin reach out to Mr. Goldfarb and request that he begin putting in place certain concentration caps in the Ruane Managed Account." At this point there was no change in the "sole discretion [accorded to Ruane] as to how to manage and invest the Ruane Managed

Account." However, the Committee "suggested that Mr. Lavin discuss with Mr. Goldfarb putting in place a 10-15% on the initial investment and a 20-25% on the maximum concentration that an investment could have before diversification should begin to occur." Mr. Goldfarb urged that the higher limits be adopted.

In further actions DST amended Schedule A of the Investment Management Agreement to provide that "[i]f the value of any single security held in the Portfolio exceeds twenty-five (25%) of the market value of the Portfolio, [Ruane] must take appropriate and prudent actions to diversify such investment such that the Portfolio's investment in the single security is reduced to no more than twenty-five percent (25%) of the market value of the Portfolio." This requirement was conveyed to Mr. Goldfarb by letter dated August 28, 2015.

While the Advisory Committee conveyed to Ruane the instruction that called for diversifying out of the PSP's heavy concentration in Valeant, it simultaneously vested Ruane with complete discretion in how this should be accomplished. It allowed Ruane to establish, "on a timeframe that you believe will be practicable and prudent … [using your] best judgment," a plan for the divestiture of sufficient Valeant shares to meet the 25% cap. The Amendment to Schedule A similarly gave Ruane "the discretion and time to determine the most prudent manner in which to decrease" the concentration of any investment exceeding the 25% cap. This was true despite the fact that Ruane had a non-diversification investment strategy and faced an arguable conflict of interest since it was also heavily invested in Valeant stock in its Sequoia Fund. The sale of a substantial block of Valeant stock by the PSP could wind up depressing the value of the Valeant stock in the Sequoia Fund.

In fact, despite all of the negative information emerging about Valeant and the sharp decline in its stock price, Mr. Goldfarb still resisted selling Valeant stock on the grounds that he believed it was undervalued.[2] It took a directive from the Advisory Committee to get him to change course, but even so Ruane only sold 19,200 shares of its PSP Valeant holdings between August 28 and September 17, 2015, a small portion of what it needed to sell to meet the cap requirement that had been set.

As a result of the limited sale of Valeant stock and the sharp decline in its price, by October 30, 2015 Valeant stock comprised less than 25% of the DST PSP portfolio. However, Mr. Goldfarb continued to believe in Valeant stock, explaining his view that it was undervalued but would take time to rebound. That turned out not to be the case as Valeant's share price decreased significantly. Ultimately, between April and June, 2016, all of the remaining PSP Valeant stock holdings were sold at reduced prices resulting in a reduction of the total value of the PSP. The DST relationship with Ruane was terminated on July 31, 2016.

The ruling in the *Kannard* arbitration includes a discussion of relevant portions of the minutes of the Advisory Committee from December 2010 to April 2016. That discussion appears immediately below.

> December 2010: The Advisory Committee reviewed and discussed the assets held in the PSP, which included a review of Ruane's investment holdings. At this time, the Valeant shares represented less than 10% of the assets in the PSP.

---

[2] Mr. Goldfarb had informed the Department of Labor that "[t]he strategy for both the fund and for all of our clients was the same and its was to invest in a concentrated portfolio of equities with a very long time horizon." This applied to Ruane's ERISA and non-ERISA clients.

May 2011, October 2011, and April 2012, the Advisory Committee "reviewed and discussed the non-employee directed assets held in the [PSP] as of March 31, 2011," which included a review of Ruane's investment holdings.

September 2013: Jerry Lavin and Ken Hager, members of the Advisory Committee, met with Goldfarb to review the performance of the PSP. They noted that Valeant shares comprised 23.2 % of the PSP as of August 23, 2013. Goldfarb expressed confidence in Valeant.

December 2013: Valeant comprised approximately 24.3% of the PSP assets.

May 2014: The Advisory Committee requested that BMO, its pension consultant, include additional information related to the PSP's investments in the quarterly investment reviews ("QIRs"). Valeant shares comprised 27.2% of the PSP's total assets.

June 2014: Lavin met with Goldfarb to discuss the PSP's top investments and performance. Valeant comprised 27% of the PSP. In a memo to the other Advisory Committee members recapping the meeting, dated June 19, 2014, Lavin acknowledged the goal of the PSP: "the purpose of the PSP was to achieve long term capital growth with a very careful management of risk."

August 2014: The Advisory Committee "agreed that the Ruane Funds' performance continued to be solid and a prudent investment."

November 2014**:** The Advisory Committee discussed the PSP's concentration. The Valeant shares represented 28.6% of the PSP assets.

May, 2015:   In an email to the DST's CFO and Treasurer, dated May 29, 2015, Lavin noted the lack of diversification in the PSP, exclaiming "Whoa" with regard to the high concentration, and stating, "we need to get our legal expert's advice and think about our definition of prudent."   Valeant shares represented 43% of the PSP assets.

June 2015:  Lavin met with Goldfarb and shared the Committee's concern about Valeant's concentration. In response, Goldfarb expressed that he was still very bullish on Valeant.   At the Advisory Committee meeting that month, legal counsel explained to the Committee the fiduciary duties required under ERISA with respect to the Committee's obligations to review the performance of Ruane and some of the PSP's larger concentrations. He pointed out that ERISA imposes on plan fiduciaries a duty to diversify "the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Legal counsel told them that Ruane had "the primary duty to ensure that the

Ruane Managed Account complies with ERISA's diversification requirements." Legal counsel also confirmed that the Advisory Committee was responsible for monitoring Ruane to ensure that it complies with ERISA's diversification requirements.

July 2015: The Compensation Committee asked the Advisory Committee whether it had considered new investment managers for the PSP, and advised the Advisory Committee of its desire "that consideration be given to diversification approaches." Additionally, in an email to the Advisory Committee, DST CEO, Stephen Hooley, directed the Advisory Committed to provide a plan and a timeline for rebalancing out of the Valeant position. Valeant shares comprised 45% of the PSP assets.

August 2015: The Advisory Committee held an ad hoc meeting to discuss the Valeant position, ahead of its regularly scheduled meeting later in the month. The Advisory Committee directed Lavin to discuss with Goldfarb concentration limits of 10-15 percent on initial investments and 20-25 percent for existing investments. When Informed of these concentration limits, Goldfarb opposed any limitations on Ruane's investment strategy, stating ... that he should contact DST's former CEO who was invested in the PSP and that such restrictions would "reduce the future performance of the plan possibly by a significant order of magnitude." When Lavin instructed Goldfarb that he was to implement the limits, Goldfarb requested the limits be set at the higher end of the range discussed by the Advisory Committee and asked for flexibility in implementing the limits. Lavin acceded to his wishes. In an August 28, 2015 letter to Goldfarb, the Advisory Committee memorialized its direction to Ruane and the agreed upon concentration limits. The Advisory Committee never established a timeline for rebalancing out of Valeant.

August - September 2015: As of August 28, 2015, the date on which the Advisory Committee issued its letter to Goldfarb directing Ruane to diversify the PSP assets, the investment manager needed to sell approximately 43% of the PSP's Valeant holdings (i.e., 671,000 shares) to meet the concentration cap's stated objective. Ruane began to sell the PSP's shares of Valeant on August 28, 2015, and it continued to do so until September 17, 2015. However, Ruane sold only 19,200 shares, or approximately 1%, of the PSP's Valeant holdings during this period, and it sold no more of the PSP's Valeant holdings thereafter until April 2016.

October 2015: The Advisory Committee updated CEO Hooley and the Compensation Committee on the actions the Advisory Committee had taken relating to the Valeant position, asset diversification approaches, and consideration of retaining additional investment advisors.

November 2015: The Advisory Committee sent Goldfarb a revised Schedule A to the Investment Management Agreement, effective August 26, 2015, that contained position limits of 15% for initial investments and 25% for existing investments. On November 6, 2015, the Committee discussed the recent developments regarding Valeant and the concentration in the PSP. The Committee decided that Lavin should reach out to Ruane to understand its "analysis of the Valeant situation and whether and how it could impact Ruane's investment strategy" in the PSP. On November 10, 2015, Lavin reported back that Goldfarb "will not change his approach or investment style" and that "[t]he resignation of the Sequoia directors will not have any impact of the Profit Sharing account management. On November 20, 2015, the Advisory Committee "concluded that Lavin had received appropriate and satisfactory answers from Goldfarb concerning Ruane's…Valeant investment." By this point, the price of Valeant shares had dropped from $238 in May 2015 to $89.96.

December 2015: The Advisory Committee decided to begin weekly monitoring of the Valeant investment and Ruane's management of the PSP assets. Legal counsel informed the Advisory Committee that he "[did] not believe or recommend that the Committee needs to take any immediate action at this time other than to continue to monitor Ruane's actions." The Advisory Committee agreed that it would begin weekly monitoring of the Valeant investment and Ruane's management process.

December 2015 - April 2016: The Advisory Committee monitored the PSP weekly and received emails each week that included the market value and percentage share of the PSP's assets for each of the PSP's holdings.

## SUMMARY JUDGMENT PRINCIPLES

The Arbitration Agreement in this proceeding establishes the authority of the arbitrator[3] with respect to motions seeking a summary disposition of claims. It provides that the "Arbitrator shall have the exclusive authority to resolve all disputes relating to the facts or the law, including the authority to grant summary disposition of claims prior to hearing and to grant all relief that a court of competent jurisdiction could grant based

---

[3] In this case a panel of three arbitrators was selected.

12

on the claims asserted." AAA Rule 27 also permits the granting of a dispositive motion if "likely to succeed and dispose of or narrow the issues in the case."

Rule 56(a) of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) the Court explained that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." party." The Court added that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted" *Ibid.*

In ruling on a motion for summary judgment, the decision maker must view the evidence in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). In doing so all reasonable inferences must be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *U.S. v. Bame*, 721 F.3d 1025, 1028 (8th Cir. 2013).

## ERISA PRINCIPLES

ERISA was enacted in 1974 following numerous Company pension scandals that left beneficiaries unprotected after their retirement. The legislation imposed a series of requirements that were designed to ensure that private-sector pension promises would be fulfilled. Underfunding of pension plans and onerous vesting requirements were among the high-profile targets of ERISA's reforms, but the imposition of fiduciary duties upon those responsible for administering and managing covered pension plans was an

13

equally important contribution.

The goal behind the enactment of ERISA was to provide protection for the assets of retirement plans so that they would be available for plan participants. *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir.2011); 29 U.S.C. § 1001 (statement of congressional purpose). The imposition of fiduciary responsibilities on those with discretionary authority in the administration and management of covered pension plans[4] furthers that objective by holding them accountable for breaches of their fiduciary duties.

29 U.S.C. § 1109(a) provides in part that "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." Courts have recognized that ERISA's goals call for liberal construction of the Act in order to effectuate its purpose. *Welsh v. Burlington Northern, Inc., Employee Benefits Plan*, 54 F.3d 1331, 1342 (8th Cir.1995). *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO,* 901 F.2d 404, 417 (5th Cir. 1990) ("ERISA is… to be construed liberally to safeguard the interests of fund participants and beneficiaries, and to preserve the integrity of fund assets.").

Establishing a fiduciary breach under ERISA first requires the claimant to present a prima facie case that the fiduciary breached his duty and as a result caused a loss to the plan. Once these burdens have been met, the persuasion burden shifts to the fiduciary to prove that the loss was not caused by the breach. *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (1994). *See Martin v. Feilin,* 965 F.2d 660, 617 (8th Cir.

---

[4] 29 U.S.C. § 1002(21)(A) defines fiduciaries to include anyone who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control regarding management or disposition of its assets...."

14

1992)("[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty.")

§ 1104(a)(1)(B) of the Act imposes a duty of prudence on plan fiduciaries to ensure that each "particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain...." 29 C.F.R. § 2550.404a–1(b)(1)(i). In making these judgments fiduciaries must act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

In analyzing whether a fiduciary has breached the duty of prudence, an objective standard is applied. *Roth,* 16 F.3d at 917–18. As a consequence a fiduciary may not claim good faith belief as a defense if the underlying conduct would not have been engaged in by "a prudent man acting in a like capacity and familiar with such matters…" *Donovan v. Bierwirth*, 538 F. Supp. 463, 470 (E.D.N.Y. 1981)(citing ERISA section 404(a)(1)(B)). Similarly, a fiduciary's subjective good faith belief in his own prudence will not insulate him from liability. *Reich v. King*, 867 F. Supp. 341, 343 (D. Md. 1994); *U.S. v. Mason Tenders*, 909 F. Supp. 882, 888 (S.D.N.Y. 1995).

Fiduciaries may seek legal advice in the performance of their duties, and such advice along with advice from investment professionals may be offered as evidence of

15

prudence. *Hunter v. Caliber Sys. Inc.*, 220 F.3d 702, 703 (6th Cir. 2000). However, "fiduciary obligations under ERISA cannot be avoided by asserting misplaced reliance on counsel." *Mason Tenders*, 909 F. Supp. at 888 (S.D.N.Y. 1995). *See also Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir.1983) ("reliance on counsel's advice, without more, cannot be a complete defense to an imprudence charge"); *In re Cardinal Health, Inc., ERISA Litig.,* 424 F. Supp. 2d 1002, 1022 (S.D. Ohio 2006); *Clark v. Feder Semo & Bard, P.C.,* 739 F.3d 28, 32 (D.C.Cir. 2014)(a fiduciary may rely on "the advice of counsel when reasonably justified under the circumstances. The propriety of that reliance must be judged based on the circumstances at the time of the challenged decision." (footnotes omitted);[5] *Roth* 16 F.3d at 918-19 ("that the trustees consulted an attorney is relevant, but not dispositive").

The decision of the Supreme Court in *Fifth Third Bancorp* v. *Dudenhoeffer*, 573 U.S. 409 (2014) does not insulate DST from liability. There the employer maintained a defined contribution retirement plan which allowed the participants to choose among 20 separate investment options, including an employee stock ownership plan ("ESOP") whose funds were invested primarily in the employer's stock. The Court stated that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the

---

[5] In *Clark*, 739 F.3d at 33, the court explained that the legal advice relied upon was premised on a factual mistake, and the court concluded there was no reason for the fiduciaries to know or suspect the underlying error. In the court's view the "recommendation appeared to be based on a reasonable investigation, was accompanied by supporting documentation, and was consistent with the understanding that Semo and Bard had about the way the plan's groups were structured." *Ibid.*

stock are implausible as a general rule, at least in the absence of special circumstances." *Id. at* 426.

However, unlike the instant case, the plaintiffs in *Dudenhoeffer* were free to select other investments and were not limited to the ESOP option. *Usenko v. MEMC LLC*, 926 F.3d 468 (8th Cir. 2019) is similar in that respect. Moreover, neither case involved questions of the diversification of investments or the duty to monitor, and the allegation in the instant case is that the market valuation of Valeant was ignored rather than relied upon. Moreover, *Dudenhoeffer* stated that special circumstances could produce a different result.

ERISA plan fiduciaries have an obligation to act prudently in the selection of investment managers and in monitoring their performance. This is explained by the Department of Labor in 29 C.F.R. § 2509.75–8 as follows:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

In meeting this duty "[a] fiduciary's [monitoring] process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. '[A] pure heart and an empty head are not enough." *Scalia v. WPN Corp.,* 417 F.Supp.3d 658, 669 (W.D. Pa. 2019) (citations omitted).

The court in *In re Bausch & Lomb Inc. ERISA Litig., No. 06–CV–6297*, 2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) observed at *10 that the duty to monitor means

Case 4:21-cv-09184-NKL   Document 6-9   Filed 11/17/21   Page 171 of 195

more than simply developing a monitoring procedure. Instead it encompasses the duty to take appropriate action when necessary:

> "[T]he duty to monitor carries with it ... the duty to take action upon discovery that the appointed fiduciaries are not performing properly." *See Liss v. Smith,* 991 F.Supp. 278, 311 (S.D.N.Y.1998); *see also In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.,* 312 F.Supp.2d 1165, 1176 (D.Minn.2004) ("Implicit in the fiduciary duties attaching to persons empowered to appoint and remove plan fiduciaries is the duty to monitor appointees"); *Leigh v. Engle,* 727 F.2d 113, 134–35 (7th Cir.1984) (implicit in the power to appoint and remove fiduciaries is the duty to monitor).

Along the same lines the court in *Perez v. WPN Corp.,* 2017 WL 2461452 at *13 (W.D.Pa. June 7, 2017) observed that

> the duty to monitor requires that fiduciaries adopt a regular monitoring procedure under the applicable facts and circumstances that is capable of alerting the fiduciary of irregularities; that the fiduciary adhere to the monitoring procedure; and that the fiduciary take corrective action when required. Moreover, if an appointing fiduciary is relieved from liability simply by implementing monitoring procedures with regular reporting, even when monitoring reveals a need for corrective action but the appointing fiduciary does not act, the duty to monitor is reduced to a mere procedural implementation.

*See also Whitfield v. Cohen*, 682 F. Supp. 188, 196 (S.D.N.Y. 1988) (The fiduciary "had a duty to monitor [the investment manager's] performance with reasonable diligence and to withdraw the investment if it became clear or should have been clear that the investment was no longer proper for the Plan."); *Leigh v. Engle*, 727 F.2d 113, 136 (7th Cir. 1984) (the duty of a fiduciary includes the obligation to "remedy any violations which might have already occurred."); *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010).

DST and Ruane, appointed by DST to manage the PSP investments, were both fiduciaries of the PSP plan. Nevertheless, DST may be responsible for fiduciary breaches by Ruane pursuant to § 1105(a) of the Act which provides that a fiduciary shall

18

be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same Retirement Plan in the following circumstances:

> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with [ERISA's fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

This is a reflection of the fact that "the courts have held that [ERISA] § 405(d)(1) does not grant co-fiduciaries immunity for their own actions or negligence." *In re GCO, LLC*, 324 B.R. 459, 464 (Bankr. S.D.N.Y. 2005).

ERISA incorporates a safe harbor provision which protects parties from co-fiduciary liability for the acts or omissions of an investment manager appointed under Section 3(38) of the act. *Bedall v. State Street Bank & Tr. Co.*, 137 F.3d 12, 23 (1st Cir. 1998). Ruane was such an investment manager. However, the provision does not provide a safe harbor to DST's fiduciary duty to monitor the actions of Ruane. As stated in *Perez* at *13, "if an appointing fiduciary is relieved from liability simply by implementing monitoring procedures with regular reporting, even when monitoring reveals a need for corrective action but the appointing fiduciary does not act, the duty to monitor is reduced to a mere procedural implementation."

The duty to monitor investments is a continuing one. This was recognized by the court in *Tibble v. Edison International*, 135 S. Ct. 1823, 1828 (2015) when it noted that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and

remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." The court therefore concluded that "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 1829. "A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Armstrong v. LaSalle Bank Nat'l Assoc.,*446 F.3d 728, 734 (7th Cir.2006). As noted in *In re Bausch & Lomb Inc. ERISA Litig., No. 06–CV–6297*, 2008 WL 5234281, *10 (W.D.N.Y. Dec. 12, 2008)

> Under ERISA, fiduciaries who have appointed other fiduciaries have a *continuing duty* to monitor the actions of the appointed fiduciaries. *See Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1465 (4th Cir.1996) ("The power ... to appoint, retain and remove plan fiduciaries ... carries with it a duty 'to monitor appropriately' those subject to removal"). (emphasis added)

Fiduciaries also owe a duty of loyalty in performing their functions. As stated in ERISA, fiduciaries must act "for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. §1104(a)(1)(A) They "must display...complete loyalty" to the Plan, "and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). *See also Ogden v. Michigan Bell Telephone Co., 571 F. Supp. 520, 522* (E.D. Mich.1983). And, while ERISA may contemplate some situations where a fund trustee may have dual loyalties, "when acting on behalf of the fund, his primary loyalty to the fund is the only loyalty which may affect his judgment." *Donovan v, Bierwith,* 538 F. Supp. 463, 468 (E.D.N.Y. 1981).

ERISA imposes the further requirement on fiduciaries to discharge their duties "in accordance with the documents and instruments governing the Retirement Plan

insofar as such documents and instruments are consistent with [other provisions of ERISA]." 29 U.S.C. §1104(a)(1)(D). *Huff v. United Mine Workers of America, Health and Retirement funds, et al.,* 797 F. Supp. 521, 525 (S.D. W.Va. 1992). In effect this constitutes a "[duty] of compliance." *Egelhoff v. Egelhoff*, 532 US 141, 151 (2001). *Huff v. United Mine Workers of America, Health and Retirement Funds, et al.,* 797 F. Supp. 521, 525 (S.D. W.Va. 1992).

ERISA fiduciaries must also comply with the duty of diversification. The statute provides in § 1104(a)(1)(C) that a trustee must discharge his duties by "diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Diversification "imposes a separate duty on plan fiduciaries to spread the risk of loss to the plan." *Marshall v. Glass/Metal Ass'n & Glaziers & Glassworkers Pension Plan*, 507 F. Supp. 378, 383 (D. Haw. 1980)("*Glaziers*").

If a prima facie case of non-diversification is made (in the case of *Glaziers* a commitment of 23% of the fund's assets to a single loan) "[t]he burden is not merely to prove that the investment is prudent, but that there is no risk of large loss resulting from the non-diversification." *Id.* at 384. As observed in *Reich v. King,* 861 F. Supp. 379, 384 fn. 3 (D. Md. 1994); "a fiduciary's prudence in each investment decision … has nothing to do with whether his decision not to diversify was 'clearly prudent'[.]" Ultimately, if a fund's investments are overconcentrated, "it is the rare case where diversification 'is clearly not prudent.'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 669 (S.D. Tex. 2003).

Further support for the independent duty of diversification is provided in *Hugler*

*v. Brynes*, 247 F. Supp. 3d 223, 235 (N.Y.N.D. 2017) where the court cited *Glaziers'* observation that "[t]he burden is not merely to prove that the investment is prudent (i.e., that the duty of prudence was met), but that there is no risk of large loss resulting from the non-diversification." *Glaziers*, 507 F. Supp. at 384. *See also In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 652 (S.D.N.Y. 2012). If "the evidence demonstrates that non-diversification accentuated, rather than minimized, the risk of large losses" the fiduciary cannot meet the burden of proving prudence in the allocation of investments. *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 636 (W.D. Wis. 1979) (finding that the defendant trustees had not met the burden where the evidence demonstrated that the non-diversification accentuated, rather than minimized, the risk of large losses).

Fiduciaries must satisfy the duty of prudence in the selection of investments, but they must also act prudently in deciding how fund assets are allocated among investments. *See Reich v. King*, 861 F. Supp. 379, 384 n.3 (D. Md. 1994). Holding a concentration of shares in a single stock risks creating a diversification problem. "Because the value of any single stock or bond is tied to the fortunes of one company, holding a single kind of stock or bond is very risky." *Summers v. State St. Bank & Tr. Co.*, 453 F.3d 404, 409 (7th Cir. 2006) (quoting N. Gregory Mankiw, Principles of Economics 546 (1998)). "That is why ERISA fiduciaries have a duty of diversification as part of their overall duty of prudence." *Ibid. See also In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 438 (3d Cir. 1996) (quoting H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974).) ("A fiduciary usually should not invest the whole or an unreasonably large proportion of the trust property in a single security.")

ERISA does not set a precise numerical figure for determining whether the diversification requirement of a covered fund has been satisfied. Instead, the factors to consider include "(1) the purpose of the plan, (2) the amount of plan assets, (3) financial and industrial conditions, (4) the type of investment, (5) the distribution as to industries, and (7) the dates of maturity." *Gray v. Briggs*, 45 F.Supp.2d 316, 327 (S.D.N.Y. 1999). Ultimately it is a totality of the evidence determination based on the particular facts and circumstances of each case.

Although DST provided employees with two retirement program options, a 401(k) self-directed plan and the PSP, the fiduciary duty of diversification applies to each program separately. In this proceeding the duty to diversify must therefore be analyzed from the perspective of the PSP alone. Investments made in the self-directed 401(k) program are not considered in determining whether DST met its diversification requirement. This approach is reflected in 29 C.F.R. § 2550.404a–1(b)(1)(i) which provides that a fiduciary's duty focuses on "that portion of the Retirement Plan's investment portfolio with respect to which the fiduciary has investment duties."

Court decisions support this conclusion. *See In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 650-51 (S.D.N.Y.), quoting *In re Unisys Sav. Retirement Plan Litig.*, 74 F.3d 420, 438-40 (3rd Cir. 1996) ("[a] fiduciary's performance of the duty to diversify 'may be measured by the diversity it has achieved in a particular investment vehicle and, where the management of a Retirement Plan's investments is distributed among several managers, in the segment of the Retirement Plan for which it has responsibility"). Ruane's responsibility was limited to the PSP plan and DST's responsibility to monitor Ruane was similarly limited.

Cases identified by the Claimant and the Respondent illustrate differing rulings on the diversification question in light of the circumstances of each case. Courts, for example, have found diversification lacking in a variety of circumstances where 25% or more of plan assets were invested in a single security *or* in a single type of security. *See e.g., Whitfield v. Tomasso*, 682 F. Supp. 1287, 1301 (E.D.N.Y.1988) (welfare benefit plan invested more than 25% in a foreign insurance company); *Toledo Blade Newspaper Unions Blad Pension Plan v. Investment Performance Services., LLC*, 565 F. Supp. 2d 879 (N.D. Ohio 2008) (30% of pension plan funds invested in a concentrated growth portfolio); *California Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036 (9th Cir. 2001) (30% of pension plan funds invested in "inverse floaters"); *Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F. Supp. 986, 990–91 (E.D.N.Y.1978) (36% of plan assets in a single loan); *In re Miller*, 133 B.R. 405 (Bankr. S.D. Ohio 1991) (42% of pension plan funds invested in a single company).

Contrary rulings are exemplified by *See, e.g.*, *Metzler* v. *Graham*, 112 F.3d 207, 209–12 (5th Cir. 1997) (purchase of property represented 63% of the plan assets established non-diversification on its face, district court finding that it was clearly prudent not to diversify under the circumstances upheld); *Jones* v. *O'Higgins*, No. 87-CV-1002, 1989 WL 103035, at *6–8 (N.D.N.Y. Sept. 5, 1989) (while investing over 90% of the plan's assets in three stocks made out a prima facie case of failure to diversify, evidence established that this allocation was clearly prudent under the fiduciary's contrarian theory of investing – strategy was within industry standards and approved by plaintiff).

Finally, losses are measured by the difference between how the PSP performed and how it would have performed had it been invested in "other funds being invested during the same period in proper transactions." *Donovan*, 754 F.2d at 1056. *See also Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 268 (S.D.N.Y. 2015) (finding that a pension plan "would have earned substantially higher returns had Defendants not breached their fiduciary duties to the Plans"); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 604 (8th Cir. 1995) (A prima facie loss may be demonstrated "by comparing the [Plan's] actual profit to potential profit that could have been realized in the absence of breach.").

Thus, it makes no difference whether the PSP ultimately profited from the Valeant investment. Losses can be sustained *even if* there is an overall profit. Rather, if liability is established, the loss determination must compare what the PSP actually earned on the non-diversified Valeant investment with what it would have earned had the funds in question been available for other legitimate purposes. *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 656 (S.D.N.Y. 2012).

In this proceeding it is not appropriate to apply collateral estoppel/issue preclusion principles. Initially, it should be noted that the Arbitration Agreement provides that "[a]ll claims must be asserted, heard and resolved on a single Associate basis, unless otherwise agreed to by all parties."[6] Collateral estoppel, if applied to the

---

[6] In *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), the Supreme Court found no basis in the Federal Arbitration Act for refusing to enforce arbitration agreements waiving class action and collective action procedures. This arbitration may not technically be a waiver case, but the underlying Arbitration Agreement does call for all claims to be dealt with on an individual Associate basis unless all parties agree to the contrary.

instant case, would effectively mean that one decision for one Claimant would resolve all 400 or so cases involving the DST retirement plan. Regardless of policy arguments, the Panel does not believe that the Arbitration Agreement contemplates this result.

In most of the other cases involving the DST PSP retirement plan the arbitrators have declined to grant summary disposition. Ultimately this reflects a conclusion that the submitted facts do not establish by a preponderance of the evidence that the Claimant is entitled to judgment as a matter of law. Put another way, declining summary judgment means that the arbitrators believe that it is possible that a reasonable jury could find for the Respondents on the merits of the case. This is at least in part due to the complexity of the underlying issues along with the lack of clear legislative standards as to whether monitoring requirements as defined in this award were satisfied; what constitutes non-diversification; if it occurred, at what point in time did this happen; and when would non-diversification be "clearly prudent." Live testimony on how DST's actions or inactions did or did not comport with ERISA's requirements is necessary to resolve these issues.

The rulings in previous DST arbitrations have clearly been inconsistent with one another. Given this diversity of rulings, granting collateral estoppel/issue preclusion would be an inappropriate exercise of the Panel's discretion. Nevertheless, the Claimant argues that the arbitration rulings denying summary disposition are not final on the merits and thus do not count for purposes of determining inconsistency. This question was addressed generally in *Jack Faucett Associates Inc. v. American Tel. and Tel. Co.,* 744 F.2d 118, 130 (D.C. Cir. 1984) as follows:

Contrary to Jack Faucett's argument, *Parklane Hosiery* does not hold that only inconsistent *judgments* can preclude offensive estoppel. Admittedly, the Court stated that: "Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous *judgments* in favor of the defendant." <u>439 U.S. at 330, 99 S.Ct. at 651</u> (emphasis added). In applying this test, however, the Court stated that the "judgment in the SEC action was not inconsistent with any previous *decision*." *Id.* <u>at 332, 99 S.Ct. at 652</u> (emphasis added). Moreover, the draft of the Restatement (Second) of Judgments referenced by the Court used the term "inconsistent *determinations*." <u>Restatement (Second) of Judgments § 88(4) (Tent.Draft No. 2, Apr. 15, 1975)</u> (emphasis added). Because of this inconsistency in terminology and because of the absence of any explicit consideration of this issue, we cannot agree with appellees that the Supreme Court held that only inconsistent *judgments* could preclude offensive estoppel. The Court did not address this issue directly and we have no reason to limit the reasoning of the Court to an arbitrary distinction between judgments and other judicial determinations. The rationale for the inconsistency rule is equally pertinent wherever the inconsistency occurs.

This Panel finds that the totality of the circumstances, including the diversity of arbitral determinations on the Claimant's summary disposition motion, calls for the Claimant's request for the application of collateral estoppel/issue preclusion to be denied.

A final observation is in order concerning how this determination squares with the policy considerations behind the collateral estoppel/issue preclusion doctrines. First, these doctrines help to preserve scarce judicial resources. The resource problem does not apply to the arbitration process. Second, collateral estoppel/issue preclusion limits the ability of the stronger party to wear down the weaker one. However, given the likelihood of the award of attorney's fees and costs if the Claimant prevails, the stronger party in this case may be wearing itself down.

## **RULING**

The Claimant's motion for summary disposition is granted in part and denied in part. The Panel finds that there are genuine disputes concerning material facts as

27

applied to the controlling legal principles. These preclude a finding that the Claimant is entitled to judgment as a matter of law.

The Panel finds that the PSP portfolio was not properly diversified. Evidence will be received as to the point at which the PSP portfolio was in violation of the diversification requirement, whether non-diversification was "clearly prudent," and if not whether appropriate remedial action was taken by DST.

The parties shall also present evidence on the methodology and amount of damages suffered by the Claimant if liability is established.

Consideration will be given to the award of costs and attorneys' fees in separate submissions if liability is established.

The Panel finds that the following legal standards have been established as a matter of law and will be applied to the evidence received at the hearing:

1.      Diversification shall be judged within the PSP alone, excluding investments in DST's self-directed 401(k) retirement plan.

2.      A prima facie case of non-diversification has been established. The burden of proving that it was "clearly prudent" not to diversify falls on the Respondent. This is distinct from the general duty of prudence with respect to individual investment decisions.

3.      The duty to monitor is not limited to establishing monitoring procedures, but includes the duty to take affirmative action when appropriate.

4.      ERISA's fiduciary duty standard is objective and is not negated by a claim of good faith.

5.      While securing the advice of counsel is not a complete defense, it may be introduced as evidence and will be given appropriate weight.

6.       The *Dudenhoeffer* ruling of the Supreme Court does not preclude imposing liability on the Respondents.

7.     ERISA's safe harbor provisions do not protect DST from liability for failure to monitor Ruane's investment activities with respect to the statute's diversification requirement.

8.     The failure to establish an Investment Policy Statement as called for by the documents and instruments governing the Retirement Plan is a per se violation of the Respondents' fiduciary duties, but can result in liability only if the Claimant meets the burden of demonstrating resulting loss through non-speculative evidence.

9.     If liability is established, the fact that Valeant shares were ultimately sold for a profit over its original cost does not preclude a finding that the Claimant has sustained a loss. In such a case evidence may be introduced to determine how loss to the Claimant shall be calculated.

Finally, the parties are encouraged to submit a comprehensive statement of

uncontested facts prior to the hearing so that the evidence can be limited to the issues

genuinely in dispute.

December 1, 2020                     /s/ *Randall Mitchell*
                                      Randall Mitchell, Arbitrator

                                      /s/ *Mark Berger*
                                      Mark Berger, Arbitrator

                                      /s/ *Mark Schantz*
                                      Mark Schantz, Arbitrator

# EXHIBIT 12

602.690.0086

# Steven M. Guttell, PLC

---

## STEVE'S RESUME

Education

Juris Doctor, cum laude                    Suffolk University Law School, 1974, (Law Review, Editor)

Bachelor of Science (Accounting)          Northeastern University, 1969

Bar Memberships

- Arizona (1982)
- Various Federal Courts
- Massachusetts (Retired)
- New York (Resigned)

Panels, Professional Affiliations and Leadership

- American Arbitration Association – Mediator and Arbitrator panels.
- Financial Industry Regulatory Authority – Arbitrator panel (Chair qualified).
- U. S. Postal Service – REDRESS Mediator panel.
- State Bar of Arizona – **Fee** Arbitration Program (Chair 2014–present, Vice-Chair 2011-2014); Arizona Employment Law Handbook, Discrimination Chapter Editor and Article author (1990-2019); Alternative Dispute Resolution Section, Board Member.
- City of Scottsdale - Personal Board (2014-2020, Chair 2016-2020).
- Phoenix Employment Relations Board, Hearing Officer Panel
- Maricopa County Superior Court - Judge Pro Tem (1995-2011).
- Arizona Association for Conflict Resolution – President 2011-2012).
- Arizona Summit Law School - Adjunct Professor of Law (2012-2018, Employment Discrimination Law, Employment Law, Alternative Dispute Resolution, Professional Responsibility).
- Scottsdale Bar Association - former Board Member.
- "Arizona's Finest Lawyers" (2011).
- Ranking Arizona Award Winner, (ADR) Arizona Business Magazine (2008).
- U.S. Army, 1st Lt. BSM (1969-1971).

Presentations and Publications

- Speaker: Arizona State Bar Convention: **Fee** Arbitration and ADR Programs (2018 - prese
- Speaker: Maricopa County Justices Courts; Reasonable Attorneys **Fee**s in Justice Court.

- Speaker: Maricopa County Bar Association; Ethics for Probate Practitioners and Estate Planners (June 2018).
- Speaker, "Ethics and Professionalism: What Mediators Need to Know", Maricopa County Association of Family Mediators (January, 2015).
- Speaker, "ADR Options in the Employment Context and Preparing Yourself and Your Client for Mediation", State Bar ADR Section and the Coconino County Bar Association (November 2013).
- Speaker, "Best Practices for Putting on a Labor Arbitration", Arizona Labor and Employment Relations Association (November 2013).
- Speaker, "Arizona Wage and Hour Laws", National Business Institute (December 2011).
- Panel Member, "From the Mediators' Perspective: Effective Preparation and Advocacy During Mediation," State Bar Annual Employment Law Seminar, Sedona, AZ (October 2009).
- Panel Member, Roundtable: "14 Penn Plaza LLC v. Pyett", Arizona Labor and Employment Relations Association (September 2009).
- Speaker, "Current Issues in Employment ADR: Transformative Mediation," State Bar Convention - Labor Section (June 2009).
- Speaker, "Preparing Yourself and Your Client for Mediation," State Bar Alternative Dispute Section (May 2009).
- Speaker and Chair, "Transformative Mediation," State Bar Employment & Labor Law Section (May 2008).
- Co-chair, American Bar Association Employment Litigation Skills Training Program, Phoenix (January 2008).
- Speaker, "Creating Legally Defensible Documentation," National Business Institute Seminar (July 2006).
- Speaker, "Avoiding the Legal Landmines: Ensuring Your Investigation Complies With the Law and Protecting Against Fallout From the Investigation," Council on Education in Management Seminar (June 2006).
- Speaker, "Certificate in Human Resources Management," Council on Education in Management Seminar (April 2006).
- Speaker, "Public Section Employment Law Update," Council on Education in Management Seminar (March 2006).
- Speaker, "Update on Critical Legal Issues in Conducting Workplace Investigations to Minimize Your Liability Risks," Council on Education in Management Seminar (July 2005).
- Speaker, "New Employment Law Challenges in 2005," Council on Education In Management Seminar (March 2005).
- Speaker, "Making the Right Decisions Without Violating the Law," Council on Education In Management Seminar (March, 2005).
- Speaker, "Employment Practice Issues" and "Mental Health and Emotional Issues in the Workplace," Sterling Education Services, LLC Seminar (May 2003).

Case 4:21-cv-09184-NKL Document 6-9 Filed 11/17/21 Page 186 of 195

- Chapter Author, "Employment Torts, Employment Termination Rights and Remedies," Second Edition 2003 Supplement, ABA Section of Labor and Employment Law.

ADR Training

- American Arbitration Association, Clarity in Award Writing, 2016
- American Arbitration Association, Take the Initiative! Your Obligation to be a Proactive Arbitrator, 2015.
- Arizona Association for Conflict Resolution, Master Class in Mediation-Advanced Mediation Workshop, 2015.
- U.S. District Court, District of Arizona, Prisoner Mediation Training, 2014.
- U.S. Postal Service, Redress Mediation Training, 2007, supplemental 2009.
- Maricopa County Superior Court, Judge Pro Tem Mediator Training, 1998 and 2008.
- Professional Mediation Associates, Comprehensive Mediation Training, 2008.
- Financial Industry Regulatory Authority (formerly NASD) Arbitrator Training, 2007.
- State Bar of Arizona, ADR Section – Sectional Educational Program, Apology and the Resolution of Employment Disputes, 2007.
- State Bar of Arizona, ADR Section – Sectional Educational Program, Proper Documentation of a Mediation Settlement Agreement, 2007.
- American Arbitration Association, Dealing with Delay Tactics in Arbitration, 2010, 2006.
- American Arbitration Association, Chairing an Arbitration Panel: Managing Procedures, Process & Dynamics, 2005, 2010.
- American Arbitration Association, Arbitration Awards: Safeguarding, Deciding & Writing Awards, 2003.
- American Arbitration Association, Neutrals Conference, 2003.
- American Arbitration Association, Arbitrator Update, 2002.
- American Arbitration Association, Employment Arbitrator II Training, 2002.
- American Arbitration Association, Commercial Arbitrator Training, 1999.
- American Arbitration Association, Employment Arbitrator Training, 1997.

Prior Affiliations

- Shareholder, Walker & Peskind, PLLC, Scottsdale, AZ, 2009-2011.
- Member, Gust Rosenfeld P.L.C., Phoenix, AZ, 1982-2009.
- Staff Attorney, U.S. Department of Labor, Washington, D.C. and New York, NY, 1974-1981.

9393 N. 90th Street, #102-241, Scottsdale, AZ

sguttell@adrarizona.com

**COPYRIGHT © 2020 STEVEN M. GUTTELL, PLC - ALL RIGHTS RESERVED.**
**SGUTTELL@ADRARIZONA.COM**

POWERED BY GODADDY

# EXHIBIT 13

In the Matter of the Arbitration Between

Barbara O'Mara,                                    AAA No. 01-19-0004-4510

                 Claimant,

        v.

DST Systems, Inc., The Advisory Committee
of the DST Systems, Inc., 401(K) Profit Sharing
Plan, The Compensation Committee of the
Board of Directors of DST Systems, Inc.

            Respondent.

_____

## **FINAL AWARD**

### **Introduction**

    I, THE UNDERSIGNED ARBITRATOR, has been designated and sworn, has heard the evidence submitted by the parties, and has reviewed and considered the parties' pre- and post-hearing briefing on the substance of this matter and Claimant's Application for Attorney's Fees and Costs, and Respondents Opposition. Claimant is represented by Humphrey, Farrington & McClain PC ("Humphrey"), The Klamann Law Firm ("Klamann"), White Graham Buckley & Carr, LLC ("White"), and Kapke & Willerth, LLC ("Kapke"). Respondent is represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Shook, Hardy & Bacon LLP. Having

1

previously rendered an Interim Arbitration Award dated March 31, 2021, I hereby render the following Final Award:

Both parties were represented by excellent counsel throughout the hearing, argument and briefing process in both the underlying claim and the claim for attorneys' fees, costs and expenses. Counsels' arguments were precise cogent and assisted the arbitrator immensely.

The parties agreed that the Arbitrator issue a simple, interim award (rather than a reasoned award) setting forth only the prevailing party and any award of damages. Any award of attorneys' fees, costs and expenses would be left for later argument. On March 31, 2021, the interim award was issued in favor of Claimant in the amount of $37,256 as of January 15, 2021, which amount is offset by $5887.26 the amount of the settlement between Claimant and Ruane Cunniff & Goldberg ("Ruane").

This Final Award finalizes the interim award and addresses the issue of fees, costs and expenses. The Parties agreed that the determination on fees would also be in the form of a simple award, with explanation as appropriate.

## Discussion

### Overview

The issue before the Arbitrator is whether, under the requirements of ERISA DST Systems Inc. ("DST") failed to prudently and adequately monitor the company Profit Sharing Plan fund assets and the investment manager of those assets, Ruane, and if so, by its actions or inactions became liable for the diminution of the value of the fund. The nature of this case is somewhat unique in that there are now more than 580 individual claims regarding DST's actions or inactions all requiring separate arbitrations. At the time this matter was heard in January there

2

were 477 claims against DST. The total sum sought by all claimants is now as much as $80 million.

In awarding attorneys' fees, the Arbitrator is cognizant that this matter as one of many. It may well be that whether fees are reasonable cannot be determined until all matters are concluded and the total claim for fees is considered in relation to the total moneys recovered. Counsel are not aware, and neither is the Arbitrator, of any case law that provides direction in assessing fees where there is one act that results in multiple individual high and low value claims each subject to a mandatory arbitration and class-action waiver agreement.

Respondent argues that fees should be limited to 40% of Claimant's recovery. In the Eighth Circuit it "is within the discretion of the [arbitrator] to choose …" whether to apply a percentage of recovery or lodestar method." *Johnston v. Comerica Mortg. Corp*., 83 F. 3rd 241, 246 (8th Cir. 1996). The Arbitrator finds that in this case a contingent fee approach would not result in a reasonable fee and that the lodestar method is appropriate and will be applied. The Arbitrator is aware that Counsel has sought a contingent fee recovery in some, presumably high value, arbitrations.

Adjustments

There are downward adjustments for all law firms to recognize that there is duplication of work and some excessive and vague time entries. The downward adjustments are also intended to address Respondent's concern that some hourly rates are greater than those generally applicable in Missouri. The downward adjustments take into consideration all of Respondent's concerns and arguments as well as those specifically noted below.

The downward adjustments have been adjusted upward to take into consideration the undesirability of taking these cases. "Expenses entailed in mounting individual claims [in these

3

types of cases] will often far outweigh potential recoveries". *Epic Systems Corporation v. Lewis*, 584 US ___, __ (2018) (Ginsburg, J., dissenting). Further demonstrated here by the fact that claimants have been unsuccessful in some arbitrations. Simply stated many attorneys will not undertake these cases due to the high-risk factor. *Lamps Plus, Inc., v. Varela*, 587 US ___, _ (2019) (Ginsburg, J., dissenting) ("[w]hat rational lawyer" … would accept representation for a relatively small value claim. (citation omitted).

For the Humphrey firm there is a net downward adjustment in attorney's fees of 5%, to recognize the above considerations and that the firm rounds down (not up) its time. In addition, and specifically with regard to time spent preparing for and attending Claimant's arbitration hearing there is no reduction for Olsen (IT Professional) and Mitchell (Trial Paralegal).

For the Klamann firm there is a net downward adjustment of 10% to recognize the above considerations and that the firm's records are a mix of reconstructed and contemporaneous time.

For the White firm there is a net downward adjustment of 10% to recognize the above considerations and that the firm's records are a mix of reconstructed and contemporaneous time.

For the Kapke firm there is a net downward adjustment of 10%; to recognize the above considerations and that the firm maintained contemporaneous time records in quarter hour increments.

Calculations

**Total O'Mara Specific Time**

Total amount sought: $15,830.00.

Humphrey firm: Amount sought $6,077.50. Amount awarded $5,773.63.

Klamann firm: Amount sought $4,175.00. Amount awarded $3,757.50.

White firm: Amount sought $927.50. Amount awarded $834.75.

4

Kapke firm: Amount sought $4,650.00. Amount awarded $4,185.00.

Total sum awarded: $14,550.88.

**Total O'Mara Specific Time Spent During Hearing (All 6 Claimants)[1]**

Total amount sought: $109,980.00.

Humphrey firm: Amount sought $82,525.00. Amount awarded[2] $79,127.50.

White firm: Amount sought $27,455.00. Amount awarded $24,709.50.

Total sum awarded: $103,837.00.

**1% of Total Group Time ($7,670,460.00)[3]**

The award for Group Time requires additional explanation. Respondent objects to assessment of fees related to matters that did not specifically name Claimant or that were not directly related to Claimant. Success and participation in those matters were necessary to move the matter forward with the result that Claimant was able to recover in this arbitration. There is no adjustment to the Group Time fees other than the percentage reductions noted above. Inasmuch as Claimant's counsel stipulated that sums collected in any one arbitration will not be collected in any other there is no reason to reduce the one percent calculation.

Total amount sought: $76,704.60.

Humphrey firm: Amount sought $21,902.00. Amount awarded: $20,806.90.

Klamann firm: Amount sought $28,519.70. Amount awarded $25,667.73.

White firm: Amount sought $11,471.90. Amount awarded $10,324.71.

Kapke firm: Amount sought $14,811.00. Amount awarded $13,329.90.

---

[1] Claimant's counsel has stipulated that a credit will be given so that no double recovery will be collected.
[2] $67,950 for attorneys reduced by 5% = $64,552.50 plus non attorney time (IT and Paralegal) $14,575.00 equals $79,127.50.
[3] Claimant's counsel has stipulated that a credit will be given so that no double recovery will be collected.

5

Total sum awarded: $70,129.24.

Total of Attorneys' Fees Awarded: $188,517.12.

**Total Reasonable Out-Of-Pocket Expenses**

Total amount sought: $37,792.26.

The parties have stipulated to this amount.

Total sum awarded: $37,792.26.

**Total Costs Recoverable Under 28 U.S.C. §§ 1821 and 1920.**

Total amount sought: $36,343.18.

The parties have stipulated to this amount.

Total sum awarded: $36,343.18.

### Award

1. DST Systems, Inc. must pay to Barbara O'Mara the sum of $37,256 as of January 15, 2021, which amount to be offset by $5887.26 the amount of the settlement between Claimant and Ruane.

2. Prejudgment interest through the date of this award, the specific amount of which the parties shall agree to.

3. DST Systems, Inc. must pay to Humphrey, Farrington & McClain, acting as lead counsel and on behalf of all counsel representing Barbara O'Mara the sum of $188,517.12 in attorneys' fees.

4. DST Systems, Inc. must pay to Humphrey, Farrington & McClain, acting as lead counsel on behalf of all counsel representing Barbara O'Mara the sum of $37,792.26 which are the total reasonable out-of-pocket expenses.

6

5. DST Systems, Inc. must pay to Humphrey, Farrington & McClain, acting as lead counsel on behalf of all counsel representing Barbara O'Mara, the sum of $36,343.18 which are the total costs recoverable under 28 U.S.C. §§ 1821 and 1920.

6. All other fees, costs, compensation, reimbursement, and hearing requests are denied.

7. The administrative fees and expenses of the American Arbitration Association totaling $3,200.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $19,800.00 shall be borne as incurred.


This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.


Dated: April 29, 2021                              /s/Steven M. Guttell____
                                                   Steven M. Guttell
                                                   Arbitrator

7